11/15/01

FILED

## IN THE CIRCUIT COURT FOR HILLSBOROUGH COUNTY, FLORIDA
### CIVIL DIVISION

01 DEC -5 PM 1: 36

TAMPA, FLORIDA

8:01-CV-2313-T-24EAJ

|  |  |  |
|---|---|---|
| MELVEEN MALONE, and | ) | |
| ROBERT L. MALONE, | ) | |
|  | ) | |
| Plaintiffs, | ) | |
|  | ) | Case No. 01 CA 9984 |
| vs. | ) | |
|  | ) | Division **DIVISION A** |
| CITY OF TAMPA, | ) | |
|  | ) | |
| Defendant. | ) | |
| _____ | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Melveen Malone ("Mrs. Malone") and Robert L. Malone ("Rev. Malone") sue Defendant City of Tampa (the "City"), and state:

### Allegations Common to All Counts

1.  This is an action for damages which exceed $15,000.00, exclusive of interest, costs, and attorney's fees.

2.  Rev. and Mrs. Malone are African Americans.

3.  At all material times, Rev. Malone and Mrs. Malone have been husband and wife.

4.  At all material times, Rev. Malone and Mrs. Malone have been residents of Louisville, Kentucky, and citizens of the United States of America.

5.  The City is a municipal corporation of the State of Florida, and is located in Hillsborough County, Florida.

6.  At all material times, the City has operated the City of Tampa Police Department (the "TPD") as its agency and instrumentality.

7.  Dillard's, Inc. is a foreign corporation engaged in the retail merchandise business, and at all material times, operated a department store located at Westshore Plaza, Tampa, Hillsborough County, Florida ("Dillard's Westshore") and utilized "extra-duty" TPD officers to assist in handling security issues.

1

2

8.     At all material times, the TPD officers on extra-duty assignments at Dillard's Westshore wore full TPD police uniforms.

9.     In December 1998, the TPD received an incident report alleging that several black female employees at Dillard's Westshore had received an anonymous letter, which stated, "Niggers need to know their place. 1 was fine 6 is too many." A copy of the incident report is attached hereto as **"Exhibit A."** According to the incident report, the complaint was initially received and investigated by TPD Officers Robert Carey and Ronda Jones.

10.     Victoria Morris was one of the Dillard's Westshore African American female employees who received said anonymous letter, and was also employed as an agent with the Florida Department of Law Enforcement ("FDLE").

11.     In January 1999, FDLE Agent Morris contacted TPD Officer Robert Tungate about the anonymous letters. FDLE Agent Morris asked TPD Officer Tungate if he knew about the TPD officers who worked at Dillard's Westshore and suggested that TPD was participating in racially discriminatory practices at Dillard's Westshore.

12.     TPD Officer Tungate subsequently reported the matter to TPD Deputy Chief J. Siling, and this gave rise to a TPD Internal Affairs Bureau investigation, referred to as "IAB Case No. 99A-107."

13.     On or about March 16, 1999, members of the TPD Internal Affairs Bureau took a sworn statement from TPD Officer Tungate. Among other things, TPD Officer Tungate's testimony included the following:

DET. NEWMAN:     Have you ever worked extra-duty at Dillard's?

OFC. TUNGATE:     No.

DET. NEWMAN:     Why not?

OFC. TUNGATE:     Uhh, several years ago **I had heard that if you worked at Dillard's that the management would tell you to follow blacks around.**

2

DET. NEWMAN:    For no reason, just to follow them.

OFC. TUNGATE:    **Just because they were black.**

DET. NEWMAN:    But you never, you have no personal knowledge of that. That's just what other officers have told you.

OFC. TUNGATE:    That's just, yeah, that was just rumor and that's why I never chose to work that job.

DET. NEWMAN:    So, when Agent Morris said something to you you put two and two together that there could be a concern?

OFC. TUNGATE:    Yes.

(Emphasis added). A copy of the complete transcript of TPD Officer Tungate's sworn statement is attached hereto as **"Exhibit B."**

14.    On or about March 16, 1999, members of the TPD Internal Affairs Bureau took a sworn statement from TPD Officer M.B. Hopper. Among other things, TPD Officer Hopper's sworn testimony included the following:

DET. NEWMAN:    Have you ever worked in an extra-duty capacity at Dillard's in Westshore Plaza?

OFC. HOPPER:    Yes.

. . . . .

DET. NEWMAN:    ... While you were working there, extra-duty as a Tampa Police Officer, was there ever a directive given to you by a store supervisor or a store policy relayed to you by either a store employee or representative that dictated you watch any Afro-American customers in the store for possible illegal activity?

OFC. HOPPER:    There was never anything directly told to me, nor was I ever informed of any official policy, **but there was a policy, unofficially.**

DET. NEWMAN:    How do you know that?

OFC. HOPPER:    Because **every time** a black would hit the store they would call me. On some occasions they would call me for minorities and it would turn out to be off-duty police officers or something, you know.

. . . . .

DET. NEWMAN:      What did they say to you?   How did that work?
Describe the procedure.

OFC. HOPPER:      Basically, they would say--they would give you
limited information.  They would say to you, "We need you down in Juniors."
And, I said, "Well, who is it that you need me in Juniors for?  What does the
person look like?"  "Oh, it's a black male" you know, and that was after dragging
it out, "wearing blue jeans" or whatever it might be.  But, honestly, John, a lot of
times they wouldn't even give you that.  It was just through experience.  **Every
time you went down there is was a black.  Every time.  Every time.**

DET. NEWMAN:      Did you ever voice your concerns with [Dillard's
manager] or any other store people?

OFC. HOPPER:      I never said anything.  I talked to other officers.  I
remember me and Bobby Holder talked about it one time, saying it's bullshit that
**they call for every minority** that hits the damn door.  Uhh, I can remember
talking it over to, with Bob--

DET. NEWMAN:      Bob Carey?

OFC. HOPPER:      **Bob Carey and, uhh, his girlfriend, the female?**

DET. NEWMAN:      Ronda?

OFC. HOPPER:      Jones.  **Ronda Jones.**  And, uhh, uhh, they, **I guess
understood that there was a problem there,** uhh, although, and I like Bob and
Ronda and I don't think they did anything criminal or illegal or against department
policy, I really don't, but **they were very much pro Dillard's because that was
their main job.  You know.  They were--so, they seemed to defend that a little
bit better than, than a lot of other officers.  In fact, they were the only two
that--**

DET. NEWMAN:      Do you remember any other officers that you spoke
with about the concerns you had?

OFC. HOPPER:      Oh gosh.   You know I can't think of any.   I
remember Bobby Holder.  I remember that I talked to Ronda [Jones].  I think Bob
[Carey], about it.  I'm trying to think of some of the other officers that worked
there.  But, God, all you would have to do is go back and pull the list of officers
working off-duty.  **I mean, it would surprise me if you came in and somebody
said, "I never saw anything like that in my life."  I mean it really would.
That would be the, that would be the shocker,** because-
. . . . .

DET. NEWMAN:      OK.   But no one actually gave you a specific
directive, but it was pretty obvious to you, based on your experience, that this was
going on?

OFC. HOPPER:  **It was very obvious** and, I want to be **clear** on this, so that there's **no mistake**.  **It was very obvious** to me that they were, they were targeting out minorities, or any African-American that walked in there.  ...

. . . . .

OFC. HOPPER:       ... So, was I ever told of a specific policy?  No.  **Was I aware of one?  Absolutely.**  There's **no doubt in my mind** that they did, 'cause it's just, statistically, it was just, just too unbelievable.  It just doesn't happen that way.

(Emphasis added).  A copy of the complete transcript of TPD Officer Hopper's sworn statement

is attached hereto as **"Exhibit C."**

15.       On or about March 16, 1999, members of the TPD Internal Affairs Bureau took a

sworn statement from TPD Officer Mary Gilmore, who had also worked extra-duty at Dillard's

Westshore.    Among  other  things,  TPD  Officer  Gilmore's  sworn  testimony  included  the

following:

DET. NEWMAN:  Was there ever a directive given to you by a store supervisor or a store policy relayed to you be either a store employee or a representative, that dictated that you watch any African-American customer in the store for possible illegal activity?

OFC. GILMORE:       There was never actually a policy given **but they would always call when an African-American would walk into the store.**
. . . . .

DET. NEWMAN:       Did you ever discuss your concern with this store policy, and I'll use that word, policy?  Did you ever discuss that concern you had with any other TPD law enforcement officers?

OFC. GILMORE:       Yes.

DET. NEWMAN:       Who?

OFC. GILMORE:       Ofc. Hopper, Ofc. Jones, Ofc. Carey, Bob Carey.

DET. NEWMAN:       What was they response to your concerns?

OFC. GILMORE:       Uhh, **Ofc. Hopper agreed** with me the fact **that it's wrong, absolutely wrong.**  Umm, and eventually, **it's going to come back to bite the department because we're basically harassing these people while they're shopping.**  So, umm, **Ofc. Jones and Ofc. Carey,** on the other hand, **worked there very closely with the management and they, I don't want to say**

they believe in that theory but <u>**they didn't have as much grief about doing it**</u> as myself and Ofc. Hopper.

. . . . .

DET. NEWMAN:     Ofc. Gilmore, is there anything else you think I need to be aware of?

OFC. GILMORE:     Uhh, no, only, **I quit working there, basically, because I didn't want to be the one to get in trouble** for, you know, doing police activity when really we didn't have any basis to do it, other than them asking us, "Well, we're paying you as an off duty officer. We want you to do this in our store." **I didn't feel right about that so, I quit working there.**

(Emphasis added). A copy of the complete transcript of TPD Officer Gilmore's sworn statement is attached hereto as **"Exhibit D."**

16.     On or about March 16, 1999, members of the TPD Internal Affairs Bureau took a sworn statement from TPD Sergeant George Seiler, who had also worked extra-duty at Dillard's Westshore. Among other things, TPD Sergeant Seiler's sworn testimony confirmed that it was "obvious" to him that Dillard's Westshore engaged in a practice of directing law enforcement officers "to pay close attention to any Afro-Americans that enter the store." A copy of the complete transcript of TPD Sergeant Seiler's sworn statement is attached hereto as **"Exhibit E."**

17.     On or about March 16, 1999, members of the TPD Internal Affairs Bureau took a sworn statement from TPD Officer David Goodman, who had also worked extra-duty at Dillard's Westshore. Among other things, TPD Officer Goodman's sworn testimony confirmed that it was "obvious" to him that Dillard's Westshore engaged in a practice of directing law enforcement officers "keep an eye on suspicious people and those people are usually, disproportionately, Afro-Americans as compared to another group". A copy of the complete transcript of TPD Officer Goodman's sworn statement is attached hereto as **"Exhibit F."**

18.     On or about March 16, 1999, members of the TPD Internal Affairs Bureau took a sworn statement from TPD Officer Enrique Lastra, who had also worked extra-duty at Dillard's Westshore. Among other things, TPD Officer Lastra's sworn testimony was that about 4 out of 5

calls he received at Dillard's Westshore was to observe African-Americans. A copy of the complete transcript of TPD Officer Lastra's sworn statement is attached hereto as **"Exhibit G."**

19.     On or about March 17, 1999, members of the TPD Internal Affairs Bureau took a sworn statement from TPD Sergeant Bobby Holder, who had also worked extra-duty at Dillard's Westshore. Among other things, TPD Sergeant Holder's sworn testimony confirmed that Dillard's Westshore engaged in a practice of "targeting African-Americans" and as a result, he stopped working there. A copy of the complete transcript of TPD Sergeant Holder's sworn statement is attached hereto as **"Exhibit H."**

20.     On or about March 17, 1999, members of the TPD Internal Affairs Bureau took a sworn statement from TPD Officer David Torres, who had also worked extra-duty at Dillard's Westshore. Among other things, TPD Officer Torres's sworn testimony confirmed he noticed that Dillard's Westshore called him "in a disproportionate amount on Afro-Americans compared to other customers in the store" and that "Most of the time, they are ... Afro-American. Black females." A copy of the complete transcript of TPD Officer Torres' sworn statement is attached hereto as **"Exhibit I."**

21.     On or about March 17, 1999, members of the TPD Internal Affairs Bureau took a sworn statement from TPD Officer Ronda Jones, who had also worked extra-duty at Dillard's Westshore. Among other things, TPD Officer Jones described herself as the TPD officer that "run[s] the job" at Dillard's Westshore and said that she is "like the liason person." TPD Officer Jones also stated that when she first began working at Dillard's Westshore, other TPD officers may have told her something about discriminatory practices at Dillard's Westshore, such as "... they only called me on black people and it got old." However, TPD Officer Jones denied that Dillard's Westshore had a directive or policy dictating that law enforcement officers watch all African American customers for illegal activity. Rather, TPD Officer Jones stated that "There is maybe two employees that might call on just black people, mostly just black females." When

asked whether she had been called a disproportionate amount of times for African American customers, TPD Officer Jones said:

> No. **There is, probably, a majority of black females that I watch over everybody else,** but they don't call me more so. It's just the way they're acting and **the way they** [i.e., **African American females**] **will run their mouth and stuff** when they get to the department.

(Emphasis added). A copy of the complete transcript of TPD Officer Jones's sworn statement is attached hereto as **"Exhibit J."**

22.     On or about April 13, 1999, members of the TPD Internal Affairs Bureau took a sworn statement from TPD Master Patrol Officer Robert Carey, who had also worked extra-duty at Dillard's Westshore. Among other things, TPD Officer Carey testified that he began working there in 1992 and worked there pretty regularly "since the beginning of the job". Like TPD Officer Jones, TPD Officer Carey generally denied that there were any discriminatory practices at Dillard's Westshore. A copy of the transcript of TPD Officer Carey's sworn statement is attached hereto as **"Exhibit K."**

23.     On or about April 28, 1999, TPD's in-house attorney issued a memorandum to Assistant TPD Chief W.A. Sawyer and TPD Chief B.R. Holder concerning IAB Case No. 99A-107. A copy of that memorandum is attached hereto as **"Exhibit L."**

24.     Among other things, the April 28, 1999 memorandum concluded that "while the Dillards clerks may be engaging in questionable targeting practices, TPD officers are clearly **not** participating in any race based targeting." (Emphasis in original). As such, TPD's in-house attorney recommended that "This inquiry should be closed as **no violation.**" (Emphasis in original).

25.     In concluding that "TPD officers are clearly **not** participating in any race based targeting", TPD's in-house attorney disregarded evidence generated in IAB Case No. 99A-107, including the above-quoted sworn testimony of TPD Officers Hopper and Gilmore, revealing

that TPD Officers Jones and/or Carey understood there were discriminatory "racial profiling" practices at Dillard's Westshore and defended and participated in those practices.

26.     Pursuant to the April 28, 1999 memorandum, the City ratified and/or adopted such discriminatory racial profiling practices, and/or revealed a practice, policy, or custom to condone or acquiesce in such discriminatory racial profiling practices.

27      Following the conclusion of TPD Internal Affairs Bureau's investigation in IAB Case No. 99A-107, the TPD took no remedial or corrective action against Dillard's Westshore, TPD Officer Jones, or TPD Officer Carey, nor did TPD instruct, train, or supervise them in a manner to discourage or stop them from engaging in such discriminatory racial profiling practices against African American customers of Dillard's Westshore.

28      On or about September 7, 1999, Rev. and Mrs. Malone were visiting Tampa to participate in the activities of the National Baptist Convention being held there.

29.     On or about September 7, 1999, TPD Officers Jones and Carey were working an extra-duty assignment at Dillard's Westshore.

30.     At all material times, TPD Officers Jones and Carey were employed by the City and acting within the scope of their employment, in their official capacities as police officers, and as agents and instrumentalities of the City.

31.     Sometime between 5:00 p.m. and 5:30 p.m. on September 7, 1999, Mrs. Malone was shopping at Dillard's Westshore and was conducting herself in a lawful manner.

32.     At that time and place, a Dillard's Westshore employee, Ms. Lucia Ranieri, claimed that she saw Mrs. Malone place an unidentified item in her bag but could not see what the item was.

33.     At that time and place, Ms. Ranieri reported this to the Dillard's Westshore Assistant Store Manager, Jane Fannin, and Ms. Fannin called TPD Officer Jones to the area where Mrs. Malone was browsing.

34.     At that time and place, in Ms. Fannin's presence, Ms. Ranieri told TPD Officer Jones that she had seen Mrs. Malone put something in a bag, but she was not sure what it was.

35.     At that time and place, Ms. Fannin instructed TPD Officer Jones to watch Mrs. Malone.

36.     At that time and place, TPD Officer Jones proceeded to stop and detain Mrs. Malone without any unlawful activity by Mrs. Malone and after Mrs. Malone had made several purchases within Dillard's Westshore.

37.     At that time and place, TPD Officer Jones falsely accused Mrs. Malone of shoplifting, handcuffed her, placed her under arrest, seized her belongings, grabbed her, and walked her through the store to an upstairs room.

38.     TPD Officer Carey observed Mrs. Malone's detention and arrest.

39.     On or about September 20, 1999, members of the TPD Internal Affairs Bureau took a sworn statement from Officer Carey.  Officer Carey described what he saw as follows:

> OFC CAREY:   Yeah.  When I approached.  And she [Officer Jones] was already engaged in conversation with her [Mrs. Malone].  And, uhh, she requested her to go up to the, the office with you know, uhh with Ronda [TPD Officer Jones].  Ronda requested Mrs. Malone to, you know, accompany her up to the office.

> DET WATKINS:  Did she explain to her why?

> OFC CAREY:   When I was there she, she [TPD Officer Jones] eventually explained that somebody had witnessed her [Mrs. Malone] put something in her bag.  And when she [TPD Officer Jones] asked her to go to the office Mrs. Malone became nervous, what I would consider to be nervous, and excited, and she was kind of questioning why.  And, uhh, Mrs. Malone kind of, uhh, backed away from her and kind of stepped backwards a little bit and, at that point, uhh Ronda [TPD Officer Jones] reached out and took hold of her arm, took the packages that were in her hand, because she had two bags in her hand, two Dillard's bags and then she had, uhh, a purse that was on a strap over her shoulder and, uhh, she kind of took control of the bags and pulled the bags away from her and handed me the bags, and then she reached down and got her handcuffs and told her that was under arrest.  And she handcuffed her and then, uhh, began to escort her to the security office, which is upstairs.

A copy of the complete transcript of TPD Officer Carey's sworn statement is attached hereto as **"Exhibit M"**.

40.　At that time and place, TPD Officer Carey joined TPD Officer Jones, and they frisked Mrs. Malone, searched her personal belongings, and questioned her.

41.　Throughout the entire incident, Mrs. Malone steadfastly maintained that she had done nothing wrong, and her requests to call her husband by telephone were denied by TPD Officers Jones and Carey. In addition, TPD Officer Jones threatened Mrs. Jones with additional criminal charges if she failed to be quiet.

42.　Eventually, TPD Officers Jones and Carey confirmed that all merchandise in Mrs. Malone's possession matched her receipts.　However, even after they confirmed that Mrs. Malone had no stolen merchandise, TPD Officers Jones and Carey nonetheless continued to keep her handcuffed, and photographed her before removing the handcuffs.

43.　As requested by Dillard's Westshore personnel, TPD Officers Jones and Carey placed Mrs. Malone's photograph in a book of known shoplifters and trespassers owned and maintained by Dillard's Westshore.

44.　TPD Officers Jones and Carey subsequently "un-arrested" Mrs. Malone, released her, and directed her to immediately leave the store.　As requested by Dillard's Westshore personnel, before releasing Mrs. Malone, TPD Officers Jones and/or Carey issued a written TPD trespass warning to Mrs. Malone and told her that she was prohibited from entering any Dillard's stores in the future.　A copy of the trespass warning is attached hereto as **"Exhibit N"**.

45.　Even though it was a rainy day and Mrs. Malone had to walk a few blocks to get back to her hotel, TPD Officers Jones and Carey also seized from Mrs. Malone's possession a clear plastic dress bag that a Dillard's sales clerk had previously given her to use as a rain poncho, and they did not return it to her.

46.     As a result of the foregoing, Mrs. Malone has suffered bodily injury, pain, suffering, severe emotional distress, disability, mental anguish, loss of capacity for enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and/or aggravation of a pre-existing condition.   The losses are either permanent or continuing and Mrs. Malone will suffer the losses in the future.

47.     On October 16, 2000, the Malones' undersigned attorneys provided the City with a notice of claim in accordance with Section 768.28, Florida Statutes.  A copy of the notice is attached as **"Exhibit O".**

48.     All conditions precedent to maintaining this action have occurred, been performed, been satisfied, or been waived.

## COUNT I: INTENTIONAL VIOLATION OF 42 USC §1983

49.     This is an action by Mrs. Malone against the City for intentional violation of 42 USC §1983.

50.     Mrs. Malone restates each and every allegation contained in Paragraphs 1 through 48.

51.     At all material times, the City was aware that Dillard's Westshore and/or its personnel were engaging in discriminatory "racial profiling" practices, which included targeting, stalking, detaining, and/or otherwise harassing African American customers who entered the store.

52.     At all material times, the City was aware that its employees, TPD Officers Jones and Carey, had engaged in and otherwise participated in such discriminatory racial profiling practices while performing extra-duty assignments at Dillard's Westshore.

53.     In the course of participating in such discriminatory racial profiling practices, the City, Dillard's Westshore, and/or their respective employees combined, confederated, and/or

conspired with each other in a concerted action to perform unlawful acts and/or to perform lawful acts by unlawful means, including such discriminatory racial profiling practices.

54.    Such discriminatory racial profiling practices were overt acts performed in pursuance of a conspiracy between and among the City, Dillard's Westshore, and/or their respective employees.

55.    The above-described conduct of TPD Officer's Jones and/or Carey against Mrs. Malone was performed pursuant to said conspiracy.

56.    As part of said conspiracy, the City, Dillard's Westshore, and/or their respective employees combined, confederated, and/or conspired with each other to interfere with and violate Mrs. Malone's civil rights by stopping, detaining, handcuffing, arresting, frisking and searching her, without probable cause to do so.

57.    As part of the conspiracy, the City, Dillard's Westshore, and/or their respective employees combined, confederated, and/or conspired with each other to unlawfully deprive Mrs. Malone of rights, privileges, and immunities secured to her under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitutions, and under the Constitution of the State of Florida, and the laws thereof and of the United States, including but not limited to:

(a)    Mrs. Malone's right to privacy;

(b)    Mrs. Malone's right to be free from racial discrimination;

(c)    Mrs. Malone's right to be free from unreasonable searches and to be secure
        in her person;

(d)    Mrs. Malone's right to not be subjected to excessive force;

(e)    Mrs. Malone's right to be free from unlawful arrest and confinement;

(f)    Mrs. Malone's right of free speech; and

(g)    Mrs. Malone's right to due process of law.

58.     As a co-conspirator, the City is jointly and severally liable for any act by Dillard's Westshore and/or its employees performed pursuant to said conspiracy.

59.     At all material times, the City and its employees, TPD Officers Jones and Carey, acted under color of law, including the statutes, ordinances, charter, customs, usages, and laws of the City and of the State of Florida, and under color of their official positions and capabilities.

60.     As a direct and proximate consequence of the foregoing, Mrs. Malone has suffered damages.

61.     Pursuant to 42 USC §1988, if Mrs. Malone is the prevailing party in this action, she is entitled to recover her reasonable attorney's fees and costs from the City.

**WHEREFORE,** Mrs. Malone demands judgment against the City for damages, interest, attorney's fees and costs, and such other relief as the Court deems appropriate.

## COUNT II: VIOLATION OF 42 USC §1983
## WITH DELIBERATE INDIFFERENCE

62.     This is an action by Mrs. Malone against the City for violation of 42 USC §1983 with deliberate indifference.

63.     Mrs. Malone restates each and every allegation contained in Paragraphs 1 through 48.

64.     At all material times, the City acted with deliberate indifference to the fact that Dillard's Westshore and/or its personnel were engaging in discriminatory "racial profiling" practices, which included targeting, stalking, detaining, and/or otherwise harassing African American customers who entered the store.

65.     At all material times, the City acted with deliberate indifference to the fact that its employees, TPD Officers Jones and Carey, had engaged in and otherwise participated in such discriminatory racial profiling practices while performing extra-duty assignments at Dillard's Westshore.

66.     In the course of participating in such discriminatory racial profiling practices, the City, Dillard's Westshore, and/or their respective employees combined, confederated, and/or conspired with each other in a concerted action to perform unlawful acts and/or to perform lawful acts by unlawful means, including such discriminatory racial profiling practices.

67.     Such discriminatory racial profiling practices were overt acts performed in pursuance of a conspiracy between and among the City, Dillard's Westshore, and/or their respective employees.

68.     The above-described conduct of TPD Officer's Jones and/or Carey against Mrs. Malone was performed pursuant to said conspiracy.

69.     As part of said conspiracy, the City, Dillard's Westshore, and/or their respective employees combined, confederated, and/or conspired with each other with deliberate indifference to interfere with and violate Mrs. Malone's civil rights by stopping, detaining, handcuffing, arresting, frisking and searching her, without probable cause to do so.

70.     As part of the conspiracy, the City, Dillard's Westshore, and/or their respective employees combined, confederated, and/or conspired with each other with deliberate indifference to unlawfully deprive Mrs. Malone of rights, privileges, and immunities secured to her under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitutions, and under the Constitution of the State of Florida, and the laws thereof and of the United States, including but not limited to:

(a)     Mrs. Malone's right to privacy;

(b)     Mrs. Malone's right to be free from racial discrimination;

(c)     Mrs. Malone's right to be free from unreasonable searches and to be secure in her person;

(d)     Mrs. Malone's right to not be subjected to excessive force;

(e)     Mrs. Malone's right to be free from unlawful arrest and confinement;

15

(f)     Mrs. Malone's right of free speech; and

(g)     Mrs. Malone's right to due process of law.

71.     As a co-conspirator, the City is jointly and severally liable for any act by Dillard's Westshore and/or its employees performed pursuant to said conspiracy.

72.     At all material times, the City and its employees, TPD Officers Jones and Carey, acted under color of law, including the statutes, ordinances, charter, customs, usages, and laws of the City and of the State of Florida, and under color of their official positions and capabilities.

73.     As a direct and proximate consequence of the foregoing, Mrs. Malone has suffered damages.

74.     Pursuant to 42 USC §1988, if Mrs. Malone is the prevailing party in this action, she is entitled to recover her reasonable attorney's fees and costs from the City.

**WHEREFORE,** Mrs. Malone demands judgment against the City for damages, interest, attorney's fees and costs, and such other relief as the Court deems appropriate.

## COUNT III: NEGLIGENT VIOLATION OF 42 USC §1983

75.     This is an action by Mrs. Malone against the City for negligent violation of 42 USC §1983.

76.     Mrs. Malone restates each and every allegation contained in Paragraphs 1 through 48.

77.     At all material times, the City reasonably should have known that Dillard's Westshore and/or its personnel were engaging in discriminatory "racial profiling" practices, which included targeting, stalking, detaining, and/or otherwise harassing African American customers who entered the store.

78.     At all material times, the City reasonably should have known that its employees, TPD Officers Jones and Carey, had engaged in and otherwise participated in such discriminatory racial profiling practices while performing extra-duty assignments at Dillard's Westshore.

16

79.    In the course of participating in such discriminatory racial profiling practices, the City, Dillard's Westshore, and/or their respective employees combined, confederated, and/or conspired with each other in a concerted action to perform unlawful acts and/or to perform lawful acts by unlawful means, including such discriminatory racial profiling practices.

80.    Such discriminatory racial profiling practices were overt acts performed in pursuance of a conspiracy between and among the City, Dillard's Westshore, and/or their respective employees.

81.    The above-described conduct of TPD Officer's Jones and/or Carey against Mrs. Malone was performed pursuant to said conspiracy.

82.    As part of said conspiracy, the City, Dillard's Westshore, and/or their respective employees combined, confederated, and/or conspired with each other to negligently interfere with and violate Mrs. Malone's civil rights by stopping, detaining, handcuffing, arresting, frisking and searching her, without probable cause to do so.

83.    As part of the conspiracy, the City, Dillard's Westshore, and/or their respective employees combined, confederated, and/or conspired with each other to negligently and unlawfully deprive Mrs. Malone of rights, privileges, and immunities secured to her under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitutions, and under the Constitution of the State of Florida, and the laws thereof and of the United States, including but not limited to:

(a)    Mrs. Malone's right to privacy;

(b)    Mrs. Malone's right to be free from racial discrimination;

(c)    Mrs. Malone's right to be free from unreasonable searches and to be secure in her person;

(d)    Mrs. Malone's right to not be subjected to excessive force;

(e)    Mrs. Malone's right to be free from unlawful arrest and confinement;

(f)      Mrs. Malone's right of free speech; and

(g)      Mrs. Malone's right to due process of law.

84.      As a co-conspirator, the City is jointly and severally liable for any act by Dillard's Westshore and/or its employees performed pursuant to said conspiracy.

85.      At all material times, the City and its employees, TPD Officers Jones and Carey, acted under color of law, including the statutes, ordinances, charter, customs, usages, and laws of the City and of the State of Florida, and under color of their official positions and capabilities.

86.      As a direct and proximate consequence of the foregoing, Mrs. Malone has suffered damages.

87.      Pursuant to 42 USC §1988, if Mrs. Malone is the prevailing party in this action, she is entitled to recover her reasonable attorney's fees and costs from the City.

**WHEREFORE,** Mrs. Malone demands judgment against the City for damages, interest, attorney's fees and costs, and such other relief as the Court deems appropriate.

## COUNT IV: FALSE IMPRISONMENT

88.      This is an action by Mrs. Malone against the City for false imprisonment.

89.      Mrs. Malone restates each and every allegation contained in Paragraphs 1 through 48.

90.      By their above-described conduct, the City's employees intentionally caused Mrs. Malone to be completely restrained and detained against her will.

91.      The detention was without probable cause, and was unreasonable and unwarranted under the circumstances.

92.      As a direct and proximate consequence of the foregoing, Mrs. Malone has suffered damages.

**WHEREFORE,** Mrs. Malone demands judgment against the City for damages, interest, costs, and such other relief as the Court may deem appropriate.

## COUNT V: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

93.     This is an action by Mrs. Malone against the City for intentional infliction of emotional distress.

94.     Mrs. Malone restates each and every allegation contained in paragraphs 1 through 48.

95.     The above-described conduct of the City's employees was intentional and outrageous, and includes but is not limited to:

(a)     making Mrs. Malone the target of discriminatory racial profiling practices;

(b)     stopping, detaining, arresting, handcuffing, frisking and searching Mrs. Malone, without probable cause;

(c)     threatening Mrs. Malone with additional criminal charges if she failed to be quiet;

(d)     parading Mrs. Malone in handcuffs through the department store in plain view and thereby publicly subjecting her to extreme embarrassment and humiliation;

(e)     handcuffing Mrs. Malone with such excessive force and pressure that her wrists were bruised;

(f)     speaking to Mrs. Malone in an arrogant, disrespectful, condescending, and harassing manner;

(g)     refusing to allow Mrs. Malone to call her husband by telephone; and

(h)     after having confirmed that Mrs. Malone was innocent of any crimes,  continuing to detain her and keep her handcuffed, photographing her, placing her photograph in a book of known shoplifters and trespassers, banning her from all Dillard's stores, and seizing and not returning her rain protection despite inclement weather.

96.     The above-described conduct of the City's employees caused Mrs. Malone severe emotional distress.

97.     As a direct and proximate consequence, Mrs. Malone has suffered damages.

**WHEREFORE,** Mrs. Malone demands judgment against the City for damages, interest, costs, and such other relief as the Court may deem appropriate.

## COUNT VI:  BATTERY

98.     This is an action by Mrs. Malone against the City for battery.

99.     Mrs. Malone restates each and every allegation contained in Paragraphs 1 through 48.

100.    By the above-described conduct, the City's employees intentionally touched and otherwise contacted Mrs. Malone in a harmful and offensive manner by among other things, grabbing Mrs. Malone, handcuffing her, and frisking her, without probable cause.

101.    As a direct and proximate consequence of the foregoing, Mrs. Malone suffered damages.

**WHEREFORE,** Mrs. Malone demands judgment against the City for damages, interest, costs, and such other relief as the Court may deem appropriate.

## COUNT VII:  ASSAULT

102.    This is an action by Mrs. Malone against the City for assault.

103.    Mrs. Malone restates each and every allegation contained in Paragraphs 1 through 48.

104.    By the above-described conduct, the City's employees made an intentional, unlawful offer of corporal injury to Mrs. Malone by force, or force unlawfully directed toward Mrs. Malone's person.

105.    The above-described conduct of the City's employees placed Mrs. Malone in fear of imminent peril.

106.    The City's employees had the apparent present ability to effectuate the threatened or attempted action.

107. As a direct and proximate consequence of the foregoing, Mrs. Malone suffered damages.

**WHEREFORE,** Mrs. Malone demands judgment against the City for damages, interest, costs, and such other relief as the Court may deem appropriate.

## COUNT VIII: LOSS OF CONSORTIUM

108.   This is an action by Rev. Malone against the City for loss of consortium.

109.   Rev. Malone restates each and every allegation contained in Paragraphs 1 through 48.

110.   As a direct and proximate consequence of the foregoing, Rev. Malone has been deprived of his wife's society, services, care, comfort, companionship and consortium, as well as her assistance in and about their home. The losses are either permanent or are continuing in nature, and Rev. Malone will suffer the losses and impairment in the future.

**WHEREFORE,** Rev. Malone demands judgment against the City for damages, interest, costs, and such other relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of any and all issues triable of right by a jury.

**DATED** this 15th day of November , 2001.

Respectfully submitted,

de la PARTE & GILBERT, P.A.

David M. Caldevilla
Florida Bar No. 654248
P. O. Box 2350
Tampa, FL  33601-2350
Telephone:  (813) 229-2775
**Attorneys for Plaintiffs**

03/16/99  TUE 13:18 FAX 813  ?233          TPD RECORDS

## INCIDENT REPORT - TAMPA POLICE DEPARTMENT

Page 1 of 3

**Event**

| 1A | ☒ Offense/Incident | State Statute | Location | 10 | 01 |
|---|---|---|---|---|---|
| | INFORMATION | 999.9999 | 347 WESTSHORE PLAZA | | |
| 2A | ☐ Offense/Incident | State Statute | Location | | |

| Date Occurred | Time Occurred | Day of Week | Date Reported | Time Reported | Gnd |
|---|---|---|---|---|---|
| 12/06/98 | 1330-1430 | ☐ Mon ☐ Wed ☐ Fri ☒ Sun ☐ Tue ☐ Thu ☐ Sat ☐ Unk | 12/07/98 | 0945 | 149 |

**Victim**

| 3/4 Name: Last | First | Middle | Race | Sex | D.O.B. | Age | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| 001 Dillards Dept. Store #201 | | | | | | | 00 00 CC |
| Home Address | City | County | State | Zip | Home Phone | | | | |
| 347 WESTSHORE PLAZA | City Tampa | County Hills | State FL | Zip 33609 | | | | | |
| Business/School Address | | | | | Business Phone 286-7033 | Hrs. VARY | | | |

| 3/4 Name: Last | First | Middle | Race | Sex | D.O.B. | Age | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|---|
| 002 Nicholson, Jill | | | W | F | 09/02/64 | 34 | 00 00 01 01 |
| Home Address | City | County | State | Zip | Home Phone | | | | |
| 1110 BAY CLUB CIR. | City Tampa | County Hills | State FL | Zip 33607 | 639-1013 | | | | |
| Business/School Address | | | | | Business Phone 286-7033 | Hrs. VARY | | | |
| 347 WESTSHORE PLAZA | City Tampa | County Hills | | Zip 33609 | | | | | |

Codes  W/U=Weapon/Instrument Used  S=Stolen  R=Recovered  L=Lost  F=Found  K=Safekeeping  RJ=Recovered for Other Jurisdiction

Property Receipt No.

**Property**

| Code | Item | Description/Serial Number/Identification No., etc. | Value | Rec. Val. |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Vehicle**

Codes  SL=Stolen/Leased      Z=Seized      E=Evidence      SV=Suspect Vehicle      VA=Vehicle Attacked      Evidence No

| Code | Type | YR | Make | Model/Style | Color | Tag/State/Year | VIN No. | Value |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

| Further Description | Impound/Repo Check ☐ Yes ☐ No |
|---|---|

| 9 Rec. Value | Finance and Insurance Co. | P/U ☐ Yes ☐ No | With/Time |
|---|---|---|---|

**Arrests**

| Name: Last | First | Middle | Race | Sex | D.O.B. | Age | OBTS No |
|---|---|---|---|---|---|---|---|
| Home Address | City | County | State 10 | Influence Drugs/Alcohol ☐ Yes ☐ No ☐ Unk | | | |
| Charges | | | 11 State Statute | CTS | State Statute | CTS | |
| Name: Last | First | Middle | Race | Sex | D.O.B. | Age | OBTS No |
| Home Address | City | County | State 10 | Influence Drugs/Alcohol ☐ Yes ☐ No ☐ Unk | | | |
| Charges | | | 11 State Statute | CTS | State Statute | CTS | |

**Reconstruction**

A LETTER WAS FOUND IN FIVE EMPLOYEE'S PERSONAL MAILBOXES AT THE DILLARDS DEPT. STORE JUNIORS DEPT. THIS HAND WRITTEN LETTER CONTAINED RACIAL TERMS.  THE COMPLT. HAS BEEN CONDUCTING INTERVIEWS & PLANS ON DOING POLYGRAPH TESTING.  THE ONLY EMPLOYEE THAT RECEIVED THE LETTER ARE B/F'S.

| Domestic Violence Form Issued ☐ Yes ☒ No | Assault Victim Form Issued ☐ Yes ☒ No |
|---|---|

| Detective Notified | Supervisor Notified | Crime Scene Tech Assigned |
|---|---|---|

**Admin.**

| Reporting Officer 34079 | Div/Sqd. | Second Officer 28654 | Div/Sqd. | Related Reports |
|---|---|---|---|---|
| R.A. JONES #215 | FH/32 | R.B. CAREY #162 | D1/13 | |

| Returned To | Div | By: | ☐ Inactive/Admin ☐ Unfounded | ☐ Arrest ☐ Notice to Appear | ☐ Adult ☐ Juv. |
|---|---|---|---|---|---|
| ☐ Exceptionally Cleared | ☐ Adult To: | ☐ Juv. By: | ☐ Prosecution Declined ☐ Death of Offender | ☐ Extradition Declined ☐ Juv./No Custody | ☐ Victim Signed Complaint Withdrawal ☐ Arrested Prior Offense |

| Edited By | | FHDC Date 12/12/98 | Referred To | |
|---|---|---|---|---|
| Records Section Only: Copies | | Routed By | Data Entry | Pick Up |

TPD 305 (8/96)

**EXHIBIT A**
Page 1 of 5

03/16/99  TUE 13:19 FAX 81? ?3233      TPD RECORDS                    ☒003

| Codes | SP=Suspects | W=Witness | JA=Juvenile Arrest | JR=Runaway | M=Missing | Page 2 of 3 |

| Code | 3 | Name: Last | First | Middle | Race | Sex | DOB/Age | Height | Weight | Hair | Skin | Eyes | Build | Armed ☐ Yes ☐ No |
|------|---|-----------|-------|--------|------|-----|---------|--------|--------|------|------|------|-------|------|
| Home Address | | | | | | City | | County | State | Zip | | Phone | | |
| Business/School Address | | | | | | City | | County | State | Zip | | Phone | | |
| Occupation | | | | Work Hours | | Can ID P/U ☐ ☐ | With/Time ☐ ☐ | | Foul Play ☐ | | | Miss Prev ☐ | | |
| Additional Description/Juvenile Charges | | | | | | | | | | | | | 12 | |
| Code | 3 | Name: Last | First | Middle | Race | Sex | DOB/Age | Height | Weight | Hair | Skin | Eyes | Build | Armed ☐ Yes ☐ No |
| Home Address | | | | | | City | | County | State | Zip | | Phone | | |
| Business/School Address | | | | | | City | | County | State | Zip | | Phone | | |
| Occupation | | | | Work Hours | | Can ID P/U ☐ ☐ | With/Time ☐ ☐ | | Foul Play ☐ | | | Miss Prev ☐ | | |
| Additional Description/Juvenile Charges | | | | | | | | | | | | | 12 | |

**Restricted Persons** (vertical label)

**Evidence** (vertical label)

Item #    Description

| Dusted ☐ Yes ☐ No | Prints Attached ☐ Yes ☐ No | Photos ☐ Yes ☐ No | Evidence No | | How Marked | Prop Clerk | Date | Time |

If an officer is assaulted or killed, consult the CIS Code Sheet and enter the appropriate codes in the blocks. The incident must be fully explained in the Narrative Section.

Officer's Name:

| 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
|----|----|----|----|----|----|----|----|----|----|----|----|----|

Narrative:

## VICTIM INFORMATION CONTINUED:

V 01 03 GAINER, SHARON      B/F  02/06/54  44yoA  00 00 01 01
    1726 W. LaSalle St. Tampa, FL 33607  Hills  253-6039
    347 Westshore Plaza  Tampa, FL 33609  Hills  286-7033

V 01 03 MORRIS, VICTORIA    B/F  10/08/63  35yoA  00 00 01 01
    4211 N. Lois Ave  Tampa, FL 33604  Hills  238-6215
    347 Westshore Plaza  Tampa, FL 33609  Hills  286-7033

V 01 03 BESS, KATHIE       B/F  05/20/56  42yoA  00 00 01 01
    4601 W. Gray St. #3174  Tampa, FL 33609  Hills  282-1142
    347 Westshore Plaza  Tampa, FL 33609  Hills  286-7033

V 01 03 MEEKS, FRANCINE     B/F  02/15/53  45yoA  00 00 01 01
    P.O. Box 82441  Tampa, FL 33682    978-1578
    347 Westshore Plaza  Tampa, FL 33609    286-7033

V 01 03 HENNECK, MISHELLE  B/F  01/12/70  28yoA  00 00 01 01
    7413 S. Westshore Blvd.  Tampa, FL 33616    839-1119
    347 Westshore Plaza  Tampa, FL 33609    286-7033

03/16/99  TUE 13:19 FAX 81 3233          TPD RECORDS                    ☒004

## TAMPA POLICE DEPARTMENT CONTINUATION/LETTER

Page 3 of 3

Victim/Firm: *INFORMATION*
*DILLARDS DEPT STORE #201*

Location: *347 WESTSHORE PLAZA*
Address: *347 WESTSHORE PLAZA*
Date: *12/11/98*

*DETAILS: WHILE WORKING EXTRA DUTY AT DILLARDS DEPT. STORE THE complt. CONTACTED OFC. R.B. CAREY ABOUT A MATTER OF GREAT CONCERN TO HER & THE STORE. FIVE EMPLOYEE'S RECEIVED letters IN THEIR PERSONAL FILE FOLDERS, IN THE JUNIORS DEPT THE LETTER SAID " NIGGERS NEED TO KNOW THIER place I WAS FINE 6 is TOO MANY." THE NOTE APPEARS TO HAVE BEEN WRITTEN WITH SOMEONE'S LEFT HAND & NOT. All Black Employee's RECEIVED A NOTE IN THAT DEPT. OFC. R.B. CAREY CONTACTED I.D. TECH. Supv. Peoples, AND SHE ADVISED SHE WOULD BE ABLE TO FINGERPRINT THE letters.*

*    THE complt., Nicholson, SAID THAT SHE CONDUCTED SEVERAL INTERVIEWS & HAS A SPECIFIC SUSPECT IN MIND. SHE IS TRYING TO ADDRESS THIS IN A VERY SERIOUS WAY, BUT TRYING TO KEEP IT AS CONFIDENTIAL AS POSSIBLE. Nicholson SAID THAT POLYGRAPH TESTS will MOST LIKELY BE CONDUCTED & IS REQUESTING THE FINGERPRINTS WHEN AVAILABLE. SHE DOESN'T WANT ANY FURTHER INCIDENTS like THIS ONE OR WORSE TO OCCUR. SHE IS TRYING TO GET EVERYTHING DONE AS SOON AS POSSIBLE.*

*    All OF THE EMPLOYEES THAT RECEIVED letters ARE listed IN THE VICTIM INFORMATION CONTINUED SECTION.*

*    THE original letters WERE placed IN THE property Room AS FOUND property.*

Report No. *9B-94691*

Reporting Officer: *34679*  Div/Sqd: *FH/52*  *R.A. JONES #215*
Second Officer: *28637*  *R.B. CAREY #62*  Div/Sqd: *D43*
Edited By:
Date:

Records Section Only: Copies to
Routed By:  Data Entry:  Pick Up:

TPD 303 (8/96)

**EXHIBIT A**
Page 3 of 5

03/16/99   TUE 13:20 FAX 81  763233          TPD RECORDS                              Ⓐ006

## TAMPA POLICE DEPARTMENT
### PROPERTY RECORD

PAGE __1__ OF __1__

TYPE OF OFFENSE: _Information_                     TPD REPORT #: _98-94460_

LAB #: _____          COURT CASE #: _____

PROPERTY TYPE:   EVIDENCE ☐   FOUND ☒   RECOVERED ☐   DECEASED ☐   PERSONAL ☐
DATE SUBMITTED: _12/11/98_  BY: _OFC R.A. JONES_  DIV _FH/32_  PAYROLL: _34079_
OFC/DET: _____                          DIV: _____          PAYROLL: _____

### RELATED PERSONS

| | LAST | FIRST | M | DOB |
|---|---|---|---|---|
| SUSPECT: | | | | |
| OWNER: | | | | |
| VICTIM: | | | | |
| CLAIM: ☐Y ☐N  FINDER: | | | | |
| FINDERS ADDRESS: | | | ZIP: | |
| ADDITIONAL RELATED PERSONS: | | | | DOB: |

NOTE: FIREARMS ENTERED WITH OTHER PROPERTY ARE LISTED ON A FIREARMS SUPPLEMENT.

| PKG. # | ITEM | DESCRIPTION (Includes Serial #) | NARCOTICS | | PROPERTY SECTION | |
|---|---|---|---|---|---|---|
| | | | WEIGHT | VALUE | CONTROL # | BIN |
| 1 | 1-5 | NOTE/LETTER CONTAINING RACIAL COMMENTS | | | | 98-16 |

SEALED PACKAGE RECEIVED BY: _Wade_

EVIDENCE TECHNICIAN PAYROLL #: _32475_

DATA ENTRY BY PAYROLL #: _____

TPO 7 (10/95)

TPD REPORT #: _98-94460_

Package Entry Time: _1604_

EXHIBIT A
Page 5 of 5

# TAMPA POLICE DEPARTMENT
## Internal Affairs Bureau

COMPLAINANT: **CHIEF OF POLICE**              **I.A.B. CASE 99A-107**
INTERVIEWED: **TUNGATE, ROBERT OFC.**       **TRANSCRIBED: 03/17/99**

1    This interview is being placed on tape on March 16, 1999 and the time is 1315 hours.

2    Det. John Newman, along with Cpl. Gerald Honeywell, with the Tampa Police Department

3    Internal Affairs Bureau, is conducting an interview with Ofc. Robert Tungate, District II, SAC

4    squad.  This interview is part of an investigation concerning the extra-duty assignment at

5    Dillard's, located at 347 Westshore Plaza. · Ofc. Tungate you are being interviewed as a

6    witness and not as a subject officer.  Do you understand that?

7    **OFC.TUNGATE:**           Yes.

8    **DET.NEWMAN:**           You signed the departmental's form on untruthfulness, the State

9    Statute on perjury, you know the difference between right and wrong and that this is an

10   official proceeding.  Is that correct?

11   **OFC.TUNGATE:**           That's correct.

12   **DET.NEWMAN:**           Please raise your right hand for me (Oath administered)

13   **OFC.TUNGATE:**           Yes I do.

14   **DET.NEWMAN:**           I understand that you had some contact with an FDLE agent by

15   the name of Victoria Morris.  Is that correct?

16   **OFC.TUNGATE:**           Yes.

17   **DET.NEWMAN:**           How do you know Agent Morris?

18   **OFC.TUNGATE:**           Uhh, from working at FDLE on the task force.

19   **DET.NEWMAN:**           Presently, you are working on the task force.  Is that correct?

20   **OFC.TUNGATE:**           Yes.

1

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

**COMPLAINANT:** CHIEF OF POLICE                    **I.A.B. CASE 99A-107**
**INTERVIEWED:** TUNGATE, ROBERT OFC.          **TRANSCRIBED: 03/17/99**

---

1  **DET.NEWMAN:**          What concerns did Miss Morris confront you about early last

2  week?  Was it last week?

3  **OFC.TUNGATE:**         No.  It was actually she brought this to my attention, maybe,

4  January.

5  **DET.NEWMAN:**          Of this year, 1999?

6  **OFC.TUNGATE:**         Yes.

7  **DET.NEWMAN:**          A couple months ago.

8  **OFC.TUNGATE:**         Yeah.

9  **DET.NEWMAN:**          What did she bring to your attention?

10  **OFC.TUNGATE:**        She informed me that she had gotten a letter in her mailbox at

11  Dillard's, where she works on the side of FDLE, a letter that was a racial letter to all blacks

12  that work at Dillard's.

13  **DET.NEWMAN:**         Did she show you the letter?

14  **OFC.TUNGATE:**        No.  She just told me what was on it.

15  **DET.NEWMAN:**         She told you what happened.  Did she provide you with a TPD

16  incident report number?

17  **OFC.TUNGATE:**        No.

18  **DET.NEWMAN:**         What did she tell you about that letter?

19  **OFC.TUNGATE:**        She said that, uhh, she went to work.  I believe she works in, I

20  think she told me Juniors department, and that when she got to work there was a letter in

2

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:   CHIEF OF POLICE                I.A.B. CASE 99A-107
INTERVIEWED:   TUNGATE, ROBERT OFC.          TRANSCRIBED: 03/17/99

1  her little mailbox that said, something along the lines of, "You niggers need to leave. One

2  was fine but six are too many." Not signed.

3  **DET.NEWMAN:**          How did the conversation--so, it was an anonymous letter.

4  **OFC.TUNGATE:**         Anonymous letter.

5  **DET.NEWMAN:**          She confronted you about this letter?

6  **OFC.TUNGATE:**         Yes.

7  **DET.NEWMAN:**          Did she want you to take some action about it or what did she

8  say to you?

9  **OFC.TUNGATE:**         No. She just asked me if I knew about the officers that worked

10  there?

11  **DET.NEWMAN:**         How did you respond to her?

12  **OFC.TUNGATE:**        Uhh, I told her I knew people who worked there but I don't

13  know anything about the job.

14  **DET.NEWMAN:**         Did there come an opportunity where you had some concerns

15  about the extra-duty assignment at Dillard's?

16  **OFC.TUNGATE:**        Yeah. When I was talking to Victoria Morris she had informed

17  me that she was looking into criminal charges against Dillard's management or possibly a

18  private attorney seeking a class action lawsuit.

19  **DET.NEWMAN:**         Why did that concern you?

20  **OFC.TUNGATE:**        Uhh, the class action lawsuit, due to the fact of, uhh, the

3

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:  CHIEF OF POLICE                    I.A.B. CASE 99A-107
INTERVIEWED:  TUNGATE, ROBERT OFC.    TRANSCRIBED:  03/17/99

1    negative press that would be coming against the Tampa Police Department.

2    **DET.NEWMAN:**          Why would there be negative press against the police

3    department?

4    **OFC.TUNGATE:**          If it was made to look like that the Tampa Police Department is

5    taking part in any, uhh, racial, some type of racial--

6    **DET.NEWMAN:**          Practices?

7    **OFC.TUNGATE:**          Practices going on at Dillard's.

8    **DET.NEWMAN:**          Have you ever worked extra-duty at Dillard's?

9    **OFC.TUNGATE:**          No.

10   **DET.NEWMAN:**          Why not?

11   **OFC.TUNGATE:**          Uhh, several years ago I had heard that if you worked at Dillard's

12   that the management would tell you to follow blacks around.

13   **DET.NEWMAN:**          For no reason, just to follow them.

14   **OFC.TUNGATE:**          Just because they were black.

15   **DET.NEWMAN:**          But you never, you have no personal knowledge of that.  That's

16   just what other officers have told you.

17   **OFC.TUNGATE:**          That's just, yeah, that was just rumor and that's why I never

18   chose to work that job.

19   **DET.NEWMAN:**          So, when Agent Morris said something to you you put two and

20   two together that there could be a concern?

4

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:  CHIEF OF POLICE                    I.A.B. CASE 99A-107
INTERVIEWED:  TUNGATE, ROBERT OFC.    TRANSCRIBED: 03/17/99

---

1   **OFC. TUNGATE:**          Yes.

2   **DET. NEWMAN:**          What did you do with that information?

3   **OFC. TUNGATE:**          Uhh, after learning this information I knew that she was looking

4   into doing something, I informed Chief Siling.

5   **DET. NEWMAN:**          How did you get the report number?

6   **OFC. TUNGATE:**          Umm, I went to, actually, I was talking to George Seiler and he

7   informed me that he worked off-duty at Dillard's.

8   **DET. NEWMAN:**          Did he agree with you or has he ever had any experience with

9   any type of--

10  **OFC. TUNGATE:**          In fact, I'm not sure how we started talking about it.  I think he

11  was saying that he had off-duty that night and I asked him, "Oh, where are you working?"

12  He said he just started working again at Dillard's.  I said, "Oh, you work at Dillard's?"  He's

13  like, well, "Yeah.  I just started back because an incident happened there and I was asked to

14  be taken off the schedule."  And I already knew about what incident he was talking about

15  so I asked him, "What are you talking about?"  He says, well, "A letter showed up in some

16  mailboxes and it was kind of racial and I told them to take me off the schedule.  I don't want

17  to be a part of this."  I asked him if he knew about that.  He said that he thought that Ronda

18  Jones had written a report about it.  And we just sat down at the computer and looked up

19  the address and that's how I got the report.

20  **DET. NEWMAN:**          So a report was originated about the hate mail that Agent Morris

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| | | |
|---|---|---|
| COMPLAINANT: | CHIEF OF POLICE | I.A.B. CASE 99A-107 |
| INTERVIEWED: | TUNGATE, ROBERT OFC. | TRANSCRIBED: 03/17/99 |

---

1   received in her box?

2   **OFC. TUNGATE:**          Yes.

3   **DET. NEWMAN:**          Have you had an opportunity to look at that report?

4   **OFC. TUNGATE:**          I, uhh, pulled the report and read it. Yes.

5   **DET. NEWMAN:**          For the benefit of the reader, that report number is #98-94460.

6   Is that correct?

7   **OFC. TUNGATE:**          I believe that is.

8   **DET. NEWMAN:**          Who else that you are aware of works out there? Do you know?

9   In an extra-duty capacity.

10  **OFC. TUNGATE:**          The only one I knew was Ronda Jones, Bob Carey, and I just

11  learned that George Seiler works there. That's the only ones I know that work there.

12  **DET. NEWMAN:**          Det. Honeywell?

13  **DET. HONEYWELL:**       Nothing.

14  **DET. NEWMAN:**          Is there anything else you think I need to be made aware of?

15  **OFC. TUNGATE:**          No. Not at this time.

16  **DET. NEWMAN:**          Gerald?

17  **DET. HONEYWELL:**       What kind of questions did Agent Morris ask you, other than who

18  worked there?

19  **OFC. TUNGATE:**          Umm, I believe she was asking me questions like, uhh, "Have I

20  ever known Dillard's to be racial in any way?"

6

EXHIBIT B
Page 6 of 8

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:  CHIEF OF POLICE                          I.A.B. CASE 99A-107
INTERVIEWED:  TUNGATE, ROBERT OFC.          TRANSCRIBED: 03/17/99

---

1    **DET. NEWMAN:**          Did you tell her what you had heard about the other officers?

2    **OFC. TUNGATE:**          I had told her that I had heard a long time ago that if you are

3    working there off-duty that someone would come to you and say, hey, "There's two black

4    individuals, male and female, that came into the store" and have the officers follow them.

5    That's only--

6    **DET. NEWMAN:**          And you shared that information with her?

7    **OFC. TUNGATE:**          Yeah.

8    **DET. NEWMAN:**          What was her response?

9    **OFC. TUNGATE:**          She said, "This is employee related.  Do you know anything

10    about employees?"  And I said, no.

11    **DET. HONEYWELL:**          That's, pretty much, the only question she asked you?

12    **OFC. TUNGATE:**          That's, pretty much, about it.

13    **DET. HONEYWELL:**          OK.  I have no further questions.

14    **DET. NEWMAN:**          Is she aware that you went to your Internal Affairs Unit about

15    this?

16    **OFC. TUNGATE:**          I, I, I talked to her, maybe, last Thursday or Friday and I told her

17    that, due to the nature of the complaint, that was probably coming that I couldn't keep it

18    to myself.  And I told her I informed Chief Siling and Internal Affairs would probably be

19    looking into it.

20    **DET. NEWMAN:**          OK.  Please state your full name and your title for me.

7

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: **CHIEF OF POLICE**          **I.A.B. CASE 99A-107**
INTERVIEWED: **TUNGATE, ROBERT OFC.**      **TRANSCRIBED: 03/17/99**

---

1    **OFC.TUNGATE:**        Robert Tungate.  I'm an officer.

2    **DET.NEWMAN:**        We're going to terminate this interview and the time is 1320

3    hours.

4    This interview was recorded on Tape #99A-107, Tape #1, Side A.

5
6    J. R. NEWMAN, Detective
7    Internal Affairs Bureau

8    mag

8

EXHIBIT B
Page 8 of 8

# TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| | | |
|---|---|---|
| **COMPLAINANT:** | **CHIEF OF POLICE** | **I.A.B. CASE 99A-107** |
| **INTERVIEWED:** | **HOPPER, M. B. OFC.** | **TRANSCRIBED: 03/16/99** |

1   This interview is being placed on tape on March 16, 1999 and the time is 1115 hours.

2   Det. John Newman, along with G. H. Honeywell, with the Tampa Police Department Internal

3   Affairs Bureau, is conducting an interview with Master Patrol Officer Mark Hopper from the

4   Special Operations Group Traffic Squad.   This interview is part of the investigation

5   concerning the extra-duty job at Dillard's, located at 347 Westshore Plaza.   Mark Hopper

6   you are being interviewed as a witness and not as a subject.   Do you understand that?

7   **OFC.HOPPER:**          Yes I do.

8   **DET.NEWMAN:**          You signed the departmental directive on perjury and truthfulness

9   in departmental matters and you know this is an official proceeding and you know the

10   difference between right and wrong, is that correct?

11   **OFC.HOPPER:**          Yes I do.

12   **DET.NEWMAN:**          Raise your right hand for me (Oath administered)

13   **OFC.HOPPER:**          I do.

14   **DET.NEWMAN:**          Have you ever worked in an extra-duty capacity at Dillard's in

15   Westshore Plaza?

16   **OFC.HOPPER:**          Yes.

17   **DET.NEWMAN:**          When?

18   **OFC.HOPPER:**          Probably, all total, for over, I want to say about a year and a half.

19   **DET.NEWMAN:**          What were the dates?

20   **OFC.HOPPER:**          I'm going to go from '96-'97 1/2, maybe, give or take six

1

**EXHIBIT C**
**Page 1 of 10**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:   **CHIEF OF POLICE**                    I.A.B. CASE 99A-107
INTERVIEWED:   **HOPPER, M. B. OFC.**                 TRANSCRIBED: 03/16/99

---

1    months in there.

2    **DET. NEWMAN:**        Do you remember a specific manager that you reported to or a

3    store supervisor?

4    **OFC. HOPPER:**        Nancy, I think was her name.  Nancy.

5    **DET. NEWMAN:**        Nancy.  While you were working there, extra-duty as a Tampa

6    Police Officer, was there ever a directive given to you by a store supervisor or a store policy

7    relayed to you by either a store employee or representative that dictated you watch any

8    Afro-American customers in the store for possible illegal activity?

9    **OFC. HOPPER:**        There was never anything directly told to me, nor was I ever

10   informed of any official policy, but there was a policy, unofficially.

11   **DET. NEWMAN:**        How do you know that?

12   **OFC. HOPPER:**        Because every time a black would hit the store they would call

13   me.  On some occasions they would call me for minorities and it would turn out to be off-

14   duty police officers or something, you know.  They just--

15   **DET. NEWMAN:**        Where would they call you to?

16   **OFC. HOPPER:**        Any department they were in.  Uhh, a lot of times it would be

17   if they went over to Tommy Hilfiger, if they went upstairs in the Juniors department, uhh,

18   basically, you know, those were the two popular ones, especially Tommy Hilfiger.  But, uhh,

19   any department that they went into, basically, I mean, they were--it got to, John, it got so

20   bad that when they would call me for a minority or a black, I would take my sweet time

2

EXHIBIT C
Page 2 of 10

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:   CHIEF OF POLICE                    I.A.B. CASE 99A-107
INTERVIEWED:   HOPPER, M. B. OFC.               TRANSCRIBED: 03/16/99

1   going down there and when I finally got down there I would walk into the department and

2   walk back out. I wouldn't even follow the people. They've called me on people down there,

3   uhh, I can give you one specific incident. I can remember going down, you know, and I used

4   to work retail security so I have a general idea of what to look for.

5   **DET.NEWMAN:**          Uh, huh. (Affirmative)

6   **OFC.HOPPER:**          I mean, I'm not an idiot. That was one of the pros and cons of

7   why they liked me working there. The supervisor herself, Nancy, told me, "I like it because

8   you have ex-retail experience" before I was ever a policeman. I can remember walking

9   downstairs to, I think it was fine jewelry or the jewelry department down there, and there's

10  a black gentleman and a black female down there, you know, I could tell just by the five

11  minutes I stood there, they were not thieves and their dollar figure amount would exceed

12  mine by leaps and bounds, you know, I mean, they were just very well dressed. I mean, they

13  didn't talk with any slangs, you know. They were, you know, of what I could hear of them,

14  as close as I could get, they were just very nice, very well-to-do black folks. Just, just very

15  fortunate.

16  **DET.NEWMAN:**          How did you know to go there?

17  **OFC.HOPPER:**          They called me.

18  **DET.NEWMAN:**          What did they say to you? How did that work? Describe the

19  procedure.

20  **OFC.HOPPER:**          Basically, they would say--they would give you limited

3

EXHIBIT C
Page 3 of 10

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:  CHIEF OF POLICE                    I.A.B. CASE 99A-107
INTERVIEWED:  HOPPER, M. B. OFC.          TRANSCRIBED: 03/16/99

---

1    information.  They would just say to you, "We need you down in Juniors."  And, I said,

2    "Well, who is it that you need me in Juniors for?  What does the person look like?"  "Oh,

3    it's a black male" you know, and that was after dragging it out, "wearing blue jeans" or

4    whatever it might be.  But, honestly John, a lot of times they wouldn't even give you that.

5    It was just through experience.  Every time you went down there it was a black.  Every time.

6    Every time.

7    **DET.NEWMAN:**          Did you ever voice your concerns with Nancy or any other store

8    people?

9    **OFC.HOPPER:**          I never said anything.  I talked to other officers.  I remember me

10   and Bobby Holder talked about it one time, saying it's bullshit that they call for every

11   minority that hits the damn door.  Uhh, I can remember talking it over to, with Bob--

12   **DET.NEWMAN:**          Bob Carey?

13   **OFC.HOPPER:**          Bob Carey and, uhh, his girlfriend, the female?

14   **DET.NEWMAN:**          Ronda?

15   **OFC.HOPPER:**          Jones.  Ronda Jones.  And, uhh, uhh, they, I guess understood

16   that there was a problem there, uhh, although, and I like Bob and Ronda and I don't think

17   they did anything criminal or illegal or against department policy, I really don't, but they

18   were very much pro Dillard's because that was their main job.  You know.  They were--so,

19   they seemed to defend that a little bit better than, than a lot of other officers.  In fact, they

20   were the only two that--

4

EXHIBIT C
Page 4 of 10

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: **CHIEF OF POLICE**    I.A.B. CASE 99A-107
INTERVIEWED: **HOPPER, M. B. OFC.**   TRANSCRIBED: 03/16/99

1 **DET.NEWMAN:**   Do you remember any other officers that you spoke with about

2 the concerns you had?

3 **OFC.HOPPER:**   Oh gosh. You know I can't think of any. I remember Bobby

4 Holder. I remember I talked to Ronda. I think, Bob, about it. I'm trying to think of some

5 of the other officers that worked there. But, God, all you would have to do is go back and

6 pull the list of officers working off-duty. I mean, it would surprise me if you came in and

7 somebody said, "I never saw anything like that in my life." I mean, it really would. That

8 would be the, that would be the shocker, because--

9 **DET.NEWMAN:**   For lack of a better term I'll call it their store policy or what they

10 do out there, their mannerisms, was that based just on Afro-Americans or was it any minority

11 group? I mean, did they do the same thing for Spanish, the same thing for, you know, Afro-

12 Americans, they do the same things for Oriental or was it mostly Afro-Americans?

13 **OFC.HOPPER:**   Well, predominantly African Americans.

14 **DET.NEWMAN:**   OK. Did you ever, most of the time you didn't see any

15 suspicious behavior when you got called down there. Would you say that was the case or

16 was it sometimes something?

17 **OFC.HOPPER:**   I arrested, I think, maybe two shoplifters in a year and a half.

18 **DET.NEWMAN:**   OK.

19 **OFC.HOPPER:**   It was just ridiculous, John. I wouldn't even watch them

20 anymore because I knew they weren't going to do anything. They were just, they would walk

EXHIBIT C
Page 5 of 10

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| | | |
|---|---|---|
| **COMPLAINANT:** | **CHIEF OF POLICE** | **I.A.B. CASE 99A-107** |
| **INTERVIEWED:** | **HOPPER, M. B. OFC.** | **TRANSCRIBED: 03/16/99** |

---

1    in off the mail and, boom, there would be a phone call.

2    **DET.NEWMAN:**    Have you taken any, and this is a difficult question, have you

3    taken any police action while working at Dillard's based solely on someone's ethnicity or

4    outward appearance?

5    **OFC.HOPPER:**    Have I taken any reports?

6    **DET.NEWMAN:**    Any police action while working extra-duty at Dillard's against

7    any Afro-Americans based solely on their race or outward appearance?

8    **OFC.HOPPER:**    Me, myself?

9    **DET.NEWMAN:**    Yes when you were working off-duty there.  In other words, did

10    you agree with the policy--

11    **OFC.HOPPER:**    No.

12    **DET.NEWMAN:**    --and follow it?

13    **OFC.HOPPER:**    No.  No.

14    **DET.NEWMAN:**    OK.  Have you ever seen any Dillard's employees initiate any

15    action, whether it be surveillance or any type of investigation on any Afro-American based

16    solely on their race and/or appearance?  Did you see any of their people follow people

17    around just because they were black?

18    **OFC.HOPPER:**    Well, I seen people--I seen their employees standing in a

19    department watching them and then I would walk up and they would say, "There's" you

20    know, they would point "Right over there, right over there.  They're over there."  OK.

EXHIBIT C
Page 6 of 10

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| COMPLAINANT: | CHIEF OF POLICE | I.A.B. CASE 99A-107 |
|---|---|---|
| INTERVIEWED: | HOPPER, M. B. OFC. | TRANSCRIBED: 03/16/99 |

1    "What did they do?" "Well, they've been in the department too long." OK. Well, maybe

2    they're shopping, you know. They would watch some of their employees.

3    **DET.NEWMAN:**      Did you ever hear a code on the PA or anything? Was there--

4    **OFC.HOPPER:**      Yeah. There was a code but I, I'm trying to think of what it was.

5    I want to say "8", which was for security or the police officer to call and, uhh, but, uhh,

6    Mary worked it. Mary's worked over there before. She could tell you how bad it is over

7    there.

8    **DET.NEWMAN:**      Det. Honeywell?

9    **DET.HONEYWELL:**      When you worked there, you always worked for the same

10    manager?

11    **OFC.HOPPER:**      Nancy was, Nancy Vaughn, I believe was her name. Not Nancy

12    Vaughn. Nancy, I forget her last name.

13    **DET.NEWMAN:**      Hyde?

14    **OFC.HOPPER:**      Hyde. She was the manager that was there during my duration

15    or my time I was there.

16    **DET.HONEYWELL:**      So, pretty much she was always the one?

17    **OFC.HOPPER:**      She was always there.

18    **DET.NEWMAN:**      Did they have a security manager or was Nancy Hyde the store

19    manager or the security manager?

20    **OFC.HOPPER:**      She was the Assistant Store Manager.

EXHIBIT C
Page 7 of 10

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:   **CHIEF OF POLICE**                      I.A.B. CASE 99A-107
INTERVIEWED:   **HOPPER, M. B. OFC.**              TRANSCRIBED:  03/16/99

---

1  **DET.NEWMAN:**            OK. But no one actually gave you a specific directive, but it was

2  pretty obvious to you, based on your experience, that this was going on?

3  **OFC.HOPPER:**             It was very obvious and, I want to be clear on this, so that there's

4  no mistake.  It was very obvious to me that they were, they were targeting out minorities,

5  or any African-Americans that walked in there.  It was clearly, you know, several times, now,

6  I have arrested a couple of blacks out of there, but, majority of the time it was totally

7  unwarranted by them, in my opinion.  Their employees, although none of them ever said

8  anything to me, it was clear in my mind that they were all instructed to call about any

9  minorities that stayed in the department too long, whatever their case might be, or if they

10  walked through.  Or if they were pushing a baby buggy or had a bag in their hand, or

11  anything that any other normal person would do walking through a store, you know--

12  **DET.NEWMAN:**            Normal or white person?

13  **OFC.HOPPER:**             Normal or white person, you know, or anybody other than black,

14  let's put it that way.

15  **DET.NEWMAN:**            OK.

16  **OFC.HOPPER:**             Would not be called on.  So, was I ever told of a specific policy?

17  No.  Was I aware of one?  Absolutely.  There's no doubt in my mind that they did, 'cause

18  it's just, statistically, it was just, just too unbelievable.  It just doesn't happen that way.

19  **DET.NEWMAN:**            Why aren't you working there anymore?

20  **OFC.HOPPER:**             Because the job stopped and I just never went back to try to get

8

**EXHIBIT C**
**Page 8 of 10**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:  CHIEF OF POLICE                    I.A.B. CASE 99A-107
INTERVIEWED:  HOPPER, M. B. OFC.              TRANSCRIBED: 03/16/99

1    into a position to work there again.  I mean, I just quit working it, uhh, I think, and this is

2    just my opinion, I think they mistook your lack of catching shoplifters or your lack of, of,

3    what's the word I'm looking for?

4    **DET.NEWMAN:**          Productivity?

5    **OFC.HOPPER:**          Productivity as a sign of laziness and it wasn't.  It was, more less,

6    I'm not going to place myself, and that's why I quit doing it, to be very frank with you, I'm

7    not going to place myself, nor this agency, or the Chief of Police in a position where we're

8    involved in a racial matter between Dillard's, the City of Tampa or myself.  Because that's,

9    and I think when they realize that, OK, he's not--'cause literally John, I would walk into the

10   department, they would see me, and I would leave.  And, a lot of times, I wouldn't even go.

11   I mean, it's just, I'm not going.  I'm not going to get involved in that.  I'm not going to get

12   in the middle of that.  You know.  I would walk around the store.  I mean, call me bad, call

13   me lazy, but I'm not going to get in the middle of it.  So, I would just go someplace else.

14   **DET.NEWMAN:**          Gerald?

15   **DET.HONEYWELL:**      That's it.

16   **DET.NEWMAN:**          Master Patrol Officer Hopper you are advised not to discuss this

17   with anyone.  OK?

18   **OFC.HOPPER:**          Absolutely.

19   **DET.NEWMAN:**          Please state your full name and title for me.

20   **OFC.HOPPER:**          Mark B. Hopper, Police Officer, City of Tampa.

EXHIBIT C
Page 9 of 10

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:   CHIEF OF POLICE                I.A.B. CASE 99A-107
INTERVIEWED:   HOPPER, M. B. OFC.            TRANSCRIBED: 03/16/99

1    **DET.NEWMAN:**          We're going to terminate this interview and the time is 1125

2    hours.


3    This interview was recorded on Tape #99A-107, Tape #1, Side A.


4    _____
5    J. R. NEWMAN, Detective
6    Internal Affairs Bureau

7    mag

10

EXHIBIT C
Page 10 of 10

### TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:  **CHIEF OF POLICE**                    I.A.B. CASE 99A-107
INTERVIEWED:  **GILMORE, M. A. OFC.**          TRANSCRIBED: 03/17/99

---

1    This interview is being placed on tape on March 16, 1999 and the time is 1135 hours.

2    Det. John Newman, with the Tampa Police Department Internal Affairs Bureau, along with

3    Det. G. H. Honeywell, is conducting an interview with Ofc. Mary Gilmore, Uniform District

4    III. This interview is part of an investigation concerning the extra-duty job at Dillard's at 347

5    Westshore Plaza. Ofc. Gilmore you have signed the department's policy on untruthfulness

6    and the perjury form, you know the difference between right and wrong, and you know that

7    this is an official proceeding. Please raise your right hand for me (Oath administered)

8    **OFC. GILMORE:**          I do.

9    **DET. NEWMAN:**          Have you ever worked in an extra-duty capacity at Dillard's in

10   Westshore Plaza?

11   **OFC. GILMORE:**          Yes I have.

12   **DET. NEWMAN:**          What was the time period, do you recall?

13   **OFC. GILMORE:**          I believe it was, umm, late 1994, early 1995, somewhere

14   around there.

15   **DET. NEWMAN:**          What was the length of time that you worked there?

16   **OFC. GILMORE:**          Oh, about, approximately a year, on and off.

17   **DET. NEWMAN:**          A year. Do you remember what manager or store supervisor that

18   you reported to on a regular basis?

19   **OFC. GILMORE:**          I don't remember the name, no.

20   **DET. NEWMAN:**          Was it someone different all the time or was it usually the same

1

EXHIBIT D
Page 1 of 6

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: **CHIEF OF POLICE**                    I.A.B. CASE 99A-107
INTERVIEWED: **GILMORE, M. A. OFC.**          TRANSCRIBED: 03/17/99

1    manager?

2    **OFC.GILMORE:**          It was usually the same manager.

3    **DET.NEWMAN:**          Would the name Nancy Hyde ring a bell?

4    **OFC.GILMORE:**          That's it.  Nancy.

5    **DET.NEWMAN:**          It was Nancy Hyde?

6    **OFC.GILMORE:**          Yes.

7    **DET.NEWMAN:**          Was there ever a directive given to you by a store supervisor or

8    a store policy relayed to you by either a store employee or a representative, that dictated

9    that you watch any Afro-American customer in the store for possible illegal activity?

10    **OFC.GILMORE:**          There was never actually a policy given but they would always

11    call when an African-American would walk into the store.

12    **DET.NEWMAN:**          How would they notify you and what would they tell you?  Walk

13    me through that, please.

14    **OFC.GILMORE:**          Uhh, they have a code at Dillard's, in order to call security, in

15    order to answer a telephone at a particular location.  You would go to the nearest phone

16    wherever you were, call that extension and talk to whoever was on the phone.  They would

17    either be the person in that department or they would be--have been called by the person

18    in the department where the African-Americans were telling you that we just had these

19    people walk into the store.  We need you to come monitor them.  And when you would ask,

20    well, what are they doing?  "Well nothing.  But they just came into the department."  They

2

EXHIBIT D
Page 2 of 6

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:  CHIEF OF POLICE                    I.A.B. CASE 99A-107
INTERVIEWED:  GILMORE, M. A. OFC.        TRANSCRIBED:  03/17/99

1    would never, actually, have a reason why they would call you there, only thing I could

2    assume was because they were black.

3    **DET. NEWMAN:**          Did you ever discuss your concern with this store policy, and I'll

4    use that word, policy?  Did you ever discuss that concern you had with any other TPD law

5    enforcement officers?

6    **OFC. GILMORE:**          Yes.

7    **DET. NEWMAN:**          Who?

8    **OFC. GILMORE:**          Ofc. Hopper, Ofc. Jones, Ofc. Carey, Bob Carey.

9    **DET. NEWMAN:**          What was their response to your concerns?

10   **OFC. GILMORE:**          Uhh, Ofc. Hopper agreed with me the fact that it's wrong,

11   absolutely wrong.  Umm, and eventually it's going to come back to bite the department

12   because we're basically harassing these people when they're shopping.  So, umm, Ofc. Jones

13   and Ofc. Carey, on the other hand, worked there very closely with the management and

14   they, I don't want to say they believe in that theory but they didn't have as much grief about

15   doing it as myself and Ofc. Hopper.

16   **DET. NEWMAN:**          Was this policy directed at, specifically, Afro-Americans or was

17   there any other minority group?

18   **OFC. GILMORE:**          It never happened to any other minority group when I was there.

19   It was always groups of black juveniles or, umm, black females, for the most part.

20   **DET. NEWMAN:**          Did they ever say, well, "They're doing something suspicious in

3

EXHIBIT D
Page 3 of 6

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| COMPLAINANT: | CHIEF OF POLICE | I.A.B. CASE 99A-107 |
| INTERVIEWED: | GILMORE, M. A. OFC. | TRANSCRIBED: 03/17/99 |

1   the department" or were they just that open about it that "They just walked into the

2   department"?

3   **OFC.GILMORE:**    They would, actually, say well, "They're being suspicious." And

4   then, when I would question them further, because I had a problem with it myself, well,

5   "What are they doing to be suspicious?" "Well, you just need to come down here." That

6   would be their response.

7   **DET.NEWMAN:**    And when you went down there, normally, what did you see?

8   **OFC.GILMORE:**    Nothing. They were shopping, looking at clothes on the rack,

9   nothing suspicious at all.

10   **DET.NEWMAN:**    Have you personally ever taken any type of police action while

11   working extra-duty against an Afro-American based solely on their race?

12   **OFC.GILMORE:**    Absolutely not.

13   **DET.NEWMAN:**    Did you ever witness any Dillard employee doing that?

14   **OFC.GILMORE:**    Based on the fact that--

15   **DET.NEWMAN:**    Not police action, maybe, like surveillance or investigation.

16   **OFC.GILMORE:**    Oh yeah. They absolutely did. The minute a black, African-

17   American, colored, whatever you want to call them, would walk into the department they,

18   almost, would drop what they were doing and follow these people, you know, through their

19   department, either saying, "Can I help you?" "Are you looking for something specific?" or,

20   they wouldn't let them just browse. It wasn't a matter of them being able to freely shop.

4

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: **CHIEF OF POLICE**         **I.A.B. CASE 99A-107**
INTERVIEWED: **GILMORE, M. A. OFC.**      **TRANSCRIBED: 03/17/99**

---

1     **DET.NEWMAN:**        Det. Honeywell?

2     **DET.HONEYWELL:**     Nothing.

3     **DET.NEWMAN:**        Ofc. Gilmore is there anything else you think I need to be aware

4     of?

5     **OFC.GILMORE:**       Uhh, no, only, I quit working there, basically, because I didn't

6     want to be the one to get in trouble for, you know, doing police activity when really we

7     didn't have any basis to do it, other than them asking us, "Well, we're paying you as an off-

8     duty officer. We want you to do this in our store." I didn't feel right about that so I quit

9     working there.

10    **DET.NEWMAN:**        And that's exactly why you quit working there?

11    **OFC.GILMORE:**       That's exactly why I quit working there.

12    **DET.NEWMAN:**        OK. I have nothing further. Please state your full name and title

13    for me.

14    **OFC.GILMORE:**       Mary A. Gilmore, Tampa Police Officer.

15    **DET.NEWMAN:**        We're going to terminate this interview. The time is 1138 hours.

16    This interview was recorded on Tape #99A-107, Tape #1, Side A.

5

**TAMPA POLICE DEPARTMENT**
Internal Affairs Bureau

COMPLAINANT: **CHIEF OF POLICE**              **I.A.B. CASE 99A-107**
INTERVIEWED: **GILMORE, M. A. OFC.**          **TRANSCRIBED: 03/17/99**

1
2    J. R. NEWMAN, Detective
3    Internal Affairs Bureau

4    mag

6

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| | |
|---|---|
| **COMPLAINANT:** CHIEF OF POLICE | **I.A.B. CASE 99A-107** |
| **INTERVIEWED:** SEILER, GEORGE | **TRANSCRIBED: 03/17/99** |

1   This interview is being placed on tape on March 16, 1999 and the time is 1350 hours.

2   Det. John Newman, with the Tampa Police Department Internal Affairs Bureau, is conducting

3   an interview with Reserve Sergeant George Seiler, from the Tampa Police. This interview is

4   part of an investigation concerning the extra-duty assignment at Dillard's, located at 347

5   Westshore Plaza. George Seiler you have read the department's policy on truthfulness in

6   departmental matters and signed it. You have signed the perjury form. You know the

7   difference between right and wrong and you understand that this is an official proceeding.

8   Is that correct?

9   **SEILER:**            Yes sir.

10  **DET.NEWMAN:**        Please raise your right hand for me (Oath administered)

11  **SEILER:**            I do.

12  **DET.NEWMAN:**        How long have you been working out at Dillard's in an extra-duty

13  capacity?

14  **SEILER:**            Uhh, about, uhh, three years.

15  **DET.NEWMAN:**        About three years. I'm going to ask you some questions and I

16  understand you know some information about an incident, but we will deal with the questions

17  first, OK?

18  **SEILER:**            Sure.

19  **DET.NEWMAN:**        Are you presently working or on the rotation schedule for

20  Dillard's?

1

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| | | |
|---|---|---|
| **COMPLAINANT:** | **CHIEF OF POLICE** | **I.A.B. CASE 99A-107** |
| **INTERVIEWED:** | **SEILER, GEORGE** | **TRANSCRIBED: 03/17/99** |

1  **SEILER:** Yes I am.

2  **DET. NEWMAN:** Do you remember what management or supervisor that you
3  report to or who you report to when you get there?

4  **SEILER:** It varies. That's the one thing. I mean, the, uhh, I know most
5  of them by first name but it does vary.

6  **DET. NEWMAN:** Is there one you deal with more than the others?

7  **SEILER:** Jason.

8  **DET. NEWMAN:** Has there ever been a directive given to you by a store supervisor
9  or a store policy relayed to you by either an employee or representative that dictated you
10  watched African-American customers in the store for possible illegal activity? Has there ever
11  been a specific store policy?

12  **SEILER:** No.

13  **DET. NEWMAN:** Have you ever, after working there in your three years,
14  determined on your own that there is an understood policy that they want law enforcement
15  to pay close attention to any Afro-American that enter the store?

16  **SEILER:** Yes.

17  **DET. NEWMAN:** Explain that to me.

18  **SEILER:** Uhh, well, what normally happened is when we're working off-
19  duty there at the store they'll (loud noise like something falling)--

20  **DET. NEWMAN:** I'm sorry. Hang on. Go ahead.

2

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| | | |
|---|---|---|
| **COMPLAINANT:** | **CHIEF OF POLICE** | **I.A.B. CASE 99A-107** |
| **INTERVIEWED:** | **SEILER, GEORGE** | **TRANSCRIBED: 03/17/99** |

1　**SEILER:**　　　　　　They'll assign us--we actually have a separate radio along with our

2　police radio that they will page us for any type of calls they'll give us.  And, normally, if they

3　have, like, a suspicious type person or something like that, they will tell us what department

4　its in or to call that department and we'll go there.  They'll point them out.  I'd say, at least,

5　a good 95% of the time they're going to be African-American.

6　**DET.NEWMAN:**　　　　What do you do when you go there and you see that the people

7　they are talking about, what action do you take, if any?

8　**SEILER:**　　　　　　Unless they're actually putting things in the bag not any action,

9　just to be there, just stand there.

10　**DET.NEWMAN:**　　　　How long working there did you understand that that was their

11　policy?

12　**SEILER:**　　　　　　It took about six months to finally get it, 'cause I'm not real

13　consistent working there but in the first six months after I was there I got the general idea

14　that's what they were doing.

15　**DET.NEWMAN:**　　　　Was there a disproportionate amount of calls for Afro-American

16　customers compared to any other customers that came in that they deemed suspicious?

17　**SEILER:**　　　　　　Yes.

18　**DET.NEWMAN:**　　　　Was there a code that they used over the PA or did they just

19　notify you over the radio?

20　**SEILER:**　　　　　　No.  They would just call over the radio.

3

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| COMPLAINANT: | CHIEF OF POLICE | I.A.B. CASE 99A-107 |
|---|---|---|
| INTERVIEWED: | SEILER, GEORGE | TRANSCRIBED: 03/17/99 |

1   **DET.NEWMAN:**          Did you share this information with other Tampa Police

2   Department employees that have worked there extra-duty?

3   **SEILER:**          No. Well, no. 'Cause I'm actually still, pretty much, the newest

4   guy on that, the newest guy on that list, so I just assumed everybody else knew it already.

5   **DET.NEWMAN:**          So, but they've never come right out and told you that that's

6   what they do.

7   **SEILER:**          No.

8   **DET.NEWMAN:**          But it was obvious to you.

9   **SEILER:**          Right.

10   **DET.NEWMAN:**          Have you taken any police action based just solely on their

11   suspicions or, like you said before, you don't do anything unless they break the law.

12   **SEILER:**          No. Unless there's a direct violation of law that I see--

13   **DET.NEWMAN:**          Right.

14   **SEILER:**          I don't take any action at all.

15   **DET.NEWMAN:**          Have you ever seen any Dillard employee take any type of action

16   based solely on race?

17   **SEILER:**          No. Not, uhh, no. I would say no.

18   **DET.NEWMAN:**          I understand you became aware of an incident that involved some

19   racial literature that wound up in the mailbox of five black female employees that work there,

20   back in December of 1998. For the benefit of the reader, it's report #98-94460 and it's

4

EXHIBIT E
Page 4 of 7

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:  CHIEF OF POLICE                I.A.B. CASE 99A-107
INTERVIEWED:  SEILER, GEORGE                 TRANSCRIBED: 03/17/99

1    written as an information report.  Tell me about that, what you know about it.

2    **SEILER:**              Uhh, well the only thing about that actual report that I know,

3    and it was given to me by one of the ladies that work in Dillard's.  I believe her name might

4    have been, I think it was Vicki.  Uhh, that apparently some type of letter had been circulated

5    just to the African-American employees only in that store that parti--apparently it happened

6    earlier in the week.  I think that week I worked that Saturday and I guess they were still

7    pretty hot about it and they just happened to ask me about if I had heard anything about it.

8    That was actually the first time I had heard about it.

9    **DET.NEWMAN:**       And Vicki, could she be Victoria Morris?

10   **SEILER:**              I think that was her last name, Morris, yeah.

11   **DET.NEWMAN:**       Did there come a time where--what did you do with that

12   information?

13   **SEILER:**              Well, actually, I happened to bring it the person that ran the job

14   attention.

15   **DET.NEWMAN:**       Who was that?  Ronda Jones.

16   **SEILER:**              And, she had told me--well that's when I found out about that

17   that a report was being written about it.  So, I just left it at that since she was--

18   **DET.NEWMAN:**       Who is presently running the job now?

19   **SEILER:**              Well, I believe, Ronda still is, as far as scheduling and everything.

20   **DET.NEWMAN:**       Did you ever take a break in service from working out there?

5

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| | |
|---|---|
| **COMPLAINANT:  CHIEF OF POLICE** | **I.A.B. CASE 99A-107** |
| **INTERVIEWED:  SEILER, GEORGE** | **TRANSCRIBED:  03/17/99** |

1  **SEILER:**              I mean, not for any really long given time. I, normally, I'll work,

2  maybe, two, two or three days, maybe, a month at the most out there. So, I mean, if I take

3  a break it would be maybe 30 days or something like that. But that's just two or three days

4  of work I wouldn't get out there.

5  **DET.NEWMAN:**     You didn't take a break from there because of what you found

6  out?

7  **SEILER:**              No. I, let's just say I was thinking about it, but I never did. The

8  only time I ended up taking a break, which, I tried to, but I ended up turning out that way

9  was February because of Gasparilla with the Reserve force and everything. I had to give

10  those days up.

11  **DET.NEWMAN:**     Is there anything else you think I need to be aware of with regard

12  to this inquiry?

13  **SEILER:**              No.

14  **DET.NEWMAN:**     I'm going to ask you not to discuss this case with anyone. Do

15  you understand that?

16  **SEILER:**              Uh, huh.  (Affirmative)

17  **DET.NEWMAN:**     Please state your full name and title for me.

18  **SEILER:**              Sure. George Seiler. Reserve Force Sergeant, Tampa Police

19  Department.

20  **DET.NEWMAN:**     We're going to terminate this interview and the time is 1355

# TAMPA POLICE DEPARTMENT
## Internal Affairs Bureau

| | | |
|---|---|---|
| **COMPLAINANT:** | **CHIEF OF POLICE** | **I.A.B. CASE 99A-107** |
| **INTERVIEWED:** | **SEILER, GEORGE** | **TRANSCRIBED: 03/17/99** |

---

1    hours.


2    This interview was recorded on Tape #99A-107, Tape #1, Side A.


3

4    J. R. NEWMAN, Detective

5    Internal Affairs Bureau


6    mag

EXHIBIT E
Page 7 of 7

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: **CHIEF OF POLICE**            **I.A.B. CASE 99A-107**
INTERVIEWED: **GOODMAN, DAVID OFC.**    **TRANSCRIBED: 03/17/99**

1   This interview is being placed on tape on March 16, 1999 and the time is 1415 hours.

2   Det. John Newman and Det. Gerald Honeywell, with the Tampa Police Department Internal

3   Affairs Bureau, are conducting an interview with Ofc. David Goodman, District II.   This

4   interview is part of an investigation concerning the extra-duty assignment at Dillard's.   Ofc.

5   Goodman you signed and read the perjury form and the departments policy on truthfulness

6   in departmental matters.  You know the difference between right and wrong and that this is

7   an official proceeding.   Is that correct?

8   **OFC.GOODMAN:**          Yes sir.

9   **DET.NEWMAN:**          Please raise your right hand for me (Oath administered)

10  **OFC.GOODMAN:**          I do.

11  **DET.NEWMAN:**          Are you currently working an extra-duty assignment at Dillard's

12  at Westshore Plaza?

13  **OFC.GOODMAN:**          Yes.

14  **DET.NEWMAN:**          How long have you been working there?

15  **OFC.GOODMAN:**          About eight years.

16  **DET.NEWMAN:**          About eight years.  Has there ever been a directive issued to you

17  as an extra-duty police officer by either a store supervisor or store policy that's been relayed

18  to you by any employee for you to watch any Afro-Americans to come into the store during

19  your tour there?

20  **OFC.GOODMAN:**          No.

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:  CHIEF OF POLICE                    I.A.B. CASE 99A-107
INTERVIEWED:  GOODMAN, DAVID OFC.        TRANSCRIBED: 03/17/99

---

1   **DET.NEWMAN:**          Have you ever, based on your eight years of experience out

2   there, realized that they call you to a certain department to keep an eye on suspicious people

3   and those people are usually, disproportionately, Afro-Americans as compared to another

4   group?

5   **OFC.GOODMAN:**        Yes.

6   **DET.NEWMAN:**          How long had you been working there when you realized that?

7   **OFC.GOODMAN:**        Umm, I think almost immediately.

8   **DET.NEWMAN:**          Describe to me how they would notify you and what they would

9   expect you to do.

10  **OFC.GOODMAN:**        OK. Well, in the old days, I call it, when I first started working

11  Dillard's they had a paging system. They would page us, "8" was the code for police officer.

12  If you heard your page over the loud speaker you would proceed to that area, talk to the

13  sales associate, and, uhh, see what was going on. Nowadays, they have a walkie-talkie. They

14  call us by walkie-talkie. Hey, could you go over to this particular, could you go to that

15  particular area.

16  **DET.NEWMAN:**          Did they give you much details on the individuals?

17  **OFC.GOODMAN:**        They would just point them out. Hey, keep an eye on them.

18  We suspect suspicious behavior for whatever reason.

19  **DET.NEWMAN:**          When you got there how many times did you realize that their

20  complaints were, pretty much, unfounded?

2

**EXHIBIT F**
**Page 2 of 7**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| | | |
|---|---|---|
| **COMPLAINANT:** | **CHIEF OF POLICE** | **I.A.B. CASE 99A-107** |
| **INTERVIEWED:** | **GOODMAN, DAVID OFC.** | **TRANSCRIBED: 03/17/99** |

1    **OFC.GOODMAN:**       Umm, pretty much, what I do, and there is a store directive that

2    we've signed and read.  Pretty much what I do, if they don't have anything that substantiates

3    any suspicious activity, I leave.  Umm, Dillard's--I have signed at Dillard's and it's right on

4    the security officers desk, we don't want the officers following people around.  Their rules

5    about detention are much more strict than state law, as far as suspicion of theft, and, umm,

6    basically what, what, they want the police there as a deterrent and the way--according to this

7    directive, the one I read, the way they expect to deter retail that it by providing customer

8    service, which, I guess, would mean a sales associate, you know, staying close with whoever

9    is shopping in the area.

10    **DET.NEWMAN:**       But there was one group that they normally called you on more

11    than another?

12    **OFC.GOODMAN:**       Umm, I would say, several years ago, yes.  I find that, I find

13    lately, that I get called specific--more often than not the three general areas I get called to,

14    childrens, I get called to the Juniors area, which is womens area, and I get called to dresses

15    area, moderate dresses.  Umm, I would say, in years past, certainly it was much more

16    disproportionate that they were calling about African-Americans in the store.  Lately, for the

17    most part when they call, they genuinely do have something that they can tell me,

18    specifically, that makes them think that something else is going on more than just a particular

19    race or, you know, particular ethnic background might be in the area.

20    **DET.NEWMAN:**       When did that change?

3

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| | | |
|---|---|---|
| COMPLAINANT: | CHIEF OF POLICE | I.A.B. CASE 99A-107 |
| INTERVIEWED: | GOODMAN, DAVID OFC. | TRANSCRIBED: 03/17/99 |

1   **OFC. GOODMAN:**     Umm, I'd say in the last couple of years. Uhh, and I base that

2   merely on the fact that, generally when they call me to an area, recently I've been able to

3   make arrests from what they've reported to me. And that's, and that's even, and that's even

4   following stricter guidelines, as far as detention, than, you know, probable cause to make

5   stops and arrests and this and that. But I would also tell you, too, that in these areas now

6   they do have African-American sales associates working, I would say, probably more so than

7   they did in the past. And, umm, and I can't say it's any more disproportionate lately than,

8   you know, than the past. I mean, African-American associates have called on African-

9   American customers. The Hispanic associates have called on His--you know. Every--they're

10  calling on everybody now. But, generally I would say that there is, you know, there is a

11  higher, umm, concentration of my response usually involves African-Americans.

12  **DET. NEWMAN:**     Were you aware of an information report that was originated

13  back there in December about some black female associates getting some hate literature in

14  their Dillard's mailbox?

15  **OFC. GOODMAN:**     I heard about that.

16  **DET. NEWMAN:**     What did you hear about it?

17  **OFC. GOODMAN:**     I heard that, umm, one of the--I wasn't working that day, but,

18  I had heard from one of the associates--and actually what I heard about it, I work out at

19  Wilson's Gym on Hillsborough and I saw a Dillard's associate in there and I said hey, you

20  know, making small talk with her. She said, "Did you hear that somebody put some hate

4

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:  **CHIEF OF POLICE**              I.A.B. CASE 99A-107
INTERVIEWED:  **GOODMAN, DAVID OFC.**    TRANSCRIBED: 03/17/99

---

1   mail in one of the African-American's mailbox?"  I said, "No.  I didn't hear about that."

2   So she related to me what, I don't even remember what it said on it.  Some sort of threat

3   or, I'm going to get you, or some--I don't even remember specifically or exactly what it said.

4   And, last I heard about it was that, umm, that evidently they had taken, as evidence, the

5   paper that it was printed on.  They were going to process it.  Several of the sales associates

6   there suspected that the person who received the letter sent it to herself.  That's as much as

7   I know about it.

8   **DET.NEWMAN:**          Have you ever voiced your concerns over some of the treatment

9   to some of the customers to any other officer that's worked extra-duty there?  Have you ever

10  had, you know, just in general conversation, talked to any of the officers that work out there?

11  **OFC.GOODMAN:**          I talked to all the officers that work--well, not all of them.  The

12  ones I see I talk to.

13  **DET.NEWMAN:**          Has anyone ever said to you before that, you know, they don't

14  agree with some of the procedures with Dillard's?  Has that conversation ever come up with

15  any of the officers that you have spoke with?

16  **OFC.GOODMAN:**          Uhh, really the only procedure that I spoke with, that's

17  frustrating, or that we talk about, we say it's frustrating, is that their policy is more stringent,

18  as far as detention of suspected, uhh, shoplifters.  Many times I've had to let people leave

19  the store, which based on state department policy, I could have made contact with them, but

20  as far as Dillard's was concerned, they just wanted to let them go out the door, based on

5

**EXHIBIT F**
**Page 5 of 7**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

**COMPLAINANT:** CHIEF OF POLICE       **I.A.B. CASE 99A-107**
**INTERVIEWED:** GOODMAN, DAVID OFC.     **TRANSCRIBED: 03/17/99**

1    information that I received.

2    **DET.NEWMAN:**       But they do want you present, though, when they call you to an

3    area?

4    **OFC.GOODMAN:**       If they call us to an area they want us present. They want us to

5    come to that area.

6    **DET.NEWMAN:**       OK.

7    **OFC.GOODMAN:**       And, generally, what I do, uhh, I'll talk to the sales associate.

8    If they can articulate to me some definite activity that they observed, which would make me

9    be suspicious of theft, I'll stay. But, my purpose of staying is not to watch. My purpose for

10    staying is trying to develop more information so that I can make a stop. Umm, if they said,

11    hey, these people are here. I think they're suspicious. I don't stay. I leave. And that's

12    Dillard's policy. And I pretty--follow it, you know, to the letter, their policy.

13    **DET.NEWMAN:**       Det. Honeywell?

14    **DET.HONEYWELL:**       How many arrests have you made there in the last year?

15    **OFC.GOODMAN:**       In the last year?

16    **DET.HONEYWELL:**       Estimate?

17    **OFC.GOODMAN:**       Uhh, umm, maybe ten.

18    **DET.HONEYWELL:**       Ten. As far as ethnic background, is it more black, more white,

19    more Hispanic, or pretty even, would you say, across the board?

20    **OFC.GOODMAN:**       For myself I would say Hispanic and African-American equal.

**EXHIBIT F**
**Page 6 of 7**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| | | |
|---|---|---|
| **COMPLAINANT:** | **CHIEF OF POLICE** | **I.A.B. CASE 99A-107** |
| **INTERVIEWED:** | **GOODMAN, DAVID OFC.** | **TRANSCRIBED: 03/17/99** |

1   Caucasian a little less.  Last week alone I made three grand theft arrests.  Two were African-

2   American women.  One was a Hispanic male.

3   **DET.NEWMAN:**          OK.  I'm going to ask that you don't discuss this case with

4   anyone.  Please state your full name and title for me.

5   **OFC.GOODMAN:**      David B. Goodman, Police Officer, City of Tampa.

6   **DET.NEWMAN:**      We're going to terminate this interview and the time is 1427

7   hours.


8   This interview was recorded on Tape #99A-107, Tape #1, Side A.



9
10   J. R. NEWMAN, Detective
11   Internal Affairs Bureau

12   mag

7

**EXHIBIT F**
**Page 7 of 7**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:  CHIEF OF POLICE       I.A.B. CASE 99A-107
INTERVIEWED:  LASTRA, ENRIQUE OFC.    TRANSCRIBED: 03/17/99

1    This interview is being placed on tape on March 16, 1999 and the time is 1430 hours.

2    Det. John Newman, along with Det. Gerald Honeywell, with the Tampa Police Department

3    Internal Affairs Bureau, is conducting an interview with Ofc. Enrique Lastra, District I. This

4    interview is part of the investigation concerning the extra-duty assignment at Dillard's, located

5    at 347 Westshore Plaza. Ofc. Lastra you reviewed and signed the departments general order

6    on truthfulness in departmental matters and the perjury form.  Is that correct?

7    **OFC.LASTRA:**       Yes.

8    **DET.NEWMAN:**       You know the difference between right and wrong and that this

9    is an official proceeding.  Is that correct?

10    **OFC.LASTRA:**       That's right.

11    **DET.NEWMAN:**       Please raise your right hand for me (Oath administered)

12    **OFC.LASTRA:**       Yes.

13    **DET.NEWMAN:**       You are being interviewed as a witness and not as a subject

14    officer.  Do you understand that?

15    **OFC.LASTRA:**       Yes I do.

16    **DET.NEWMAN:**       Have you worked or are you presently working any extra-duty

17    work at Dillard's in Westshore Plaza?

18    **OFC.LASTRA:**       Yes.

19    **DET.NEWMAN:**       Yes to what?  You've worked there or you are presently?

20    **OFC.LASTRA:**       I still work there.

1

EXHIBIT G
Page 1 of 11

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| | | |
|---|---|---|
| **COMPLAINANT:** | **CHIEF OF POLICE** | **I.A.B. CASE 99A-107** |
| **INTERVIEWED:** | **LASTRA, ENRIQUE OFC.** | **TRANSCRIBED: 03/17/99** |

1   **DET.NEWMAN:**        You still work there.  Is there a directive whether it's one that

2   they've told you straight out or are you aware of a policy, a store policy, where if an

3   African-American enters the store they call you down there to observe them or surveil them?

4   **OFC.LASTRA:**        No sir.  I don't know anything about no store policy.

5   **DET.NEWMAN:**        How long have you been working out there?

6   **OFC.LASTRA:**        Four years.

7   **DET.NEWMAN:**        Four years.  Have you ever, after working there for a few

8   months, come to your own conclusions that they focus a lot of attention on African-

9   American customers compared to any other customers in the store?

10  **OFC.LASTRA:**        Sometimes.  It depends on the employees that are working.  But,

11  the management has nothing to do with it.  With policies or anything, not that I can tell, no.

12  **DET.NEWMAN:**        So it would be up to the individual associates?

13  **OFC.LASTRA:**        Individual, yeah.  Individual associates working _____

14  **DET.NEWMAN:**        And the associates would call you down more for black people?

15  **OFC.LASTRA:**        That's correct.

16  **DET.NEWMAN:**        That's correct.  How often did that happen?

17  **OFC.LASTRA:**        Umm, maybe four out of five.

18  **DET.NEWMAN:**        Four out of five times they called you?

19  **OFC.LASTRA:**        Uh, huh.  (Affirmative)

20  **DET.NEWMAN:**        So, it was pretty frequently--depending on what associate was

**EXHIBIT G**
**Page 2 of 11**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:  **CHIEF OF POLICE**    **I.A.B. CASE 99A-107**
INTERVIEWED:  **LASTRA, ENRIQUE OFC.**  **TRANSCRIBED: 03/17/99**

1 working, it was pretty frequent when they called you down?

2 **OFC.LASTRA:**    Yeah. Depending on the associate that was working

3 _____

4 **DET.NEWMAN:**   When was the last time, recently though, that you felt like that

5 happened?

6 **OFC.LASTRA:**    Umm, let me think.  Last weekend before.  Its probably been a

7 couple months, I guess.  Because we--Dillard's has gave us extra duties now to do change runs

8 for them, basically, so we kind of like gone away, so much, from chasing shoplifters around.

9 And they've got us running around getting change for all the different things and we don't

10 get so many calls anymore.

11 **DET.NEWMAN:**   When they did call you what made you, once you got down

12 there, made you realize that their complaint or their request for security was unfounded?

13 How did you know if the call was legitimate or not?

14 **OFC.LASTRA:**    Uhh, I would follow the person around for a few minutes.  They

15 didn't seem to do anything suspicious so I left them alone.

16 **DET.NEWMAN:**   You said that's four out of five times it was more blacks?

17 **OFC.LASTRA:**    Yeah.  Depending on a few associates there.

18 **DET.NEWMAN:**   Did you consider that a concern or what did you chalk that up

19 to?

20 **OFC.LASTRA:**    Uhh, not really.  I mean, I never--'cause what I do is I take it,

3

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:   CHIEF OF POLICE                    I.A.B. CASE 99A-107
INTERVIEWED:   LASTRA, ENRIQUE OFC.         TRANSCRIBED: 03/17/99

---

1    like, if they call me, I go, I look around, if the person isn't doing nothing wrong, I walk off.

2    **DET.NEWMAN:**        Did you ever express these concerns or talk about this with other

3    officers that worked that assignment?

4    **OFC.LASTRA:**        Sure.

5    **DET.NEWMAN:**        What was the general consensus?

6    **OFC.LASTRA:**        Just, basically, that, you know, I've said such and such.  A couple

7    people, _____ associates, I've asked them "Do you get a lot of calls and every time

8    you go down it's a black person?"  And they say, "Sure."

9    **DET.NEWMAN:**        These associates, young associates, older associates?

10   **OFC.LASTRA:**        Right now there's really, like, only one or two left.  The rest of

11   them all left there, the store, and they're middle age.

12   **DET.NEWMAN:**        Were you aware of some of the employees receiving some hate

13   mail or some racial mail in their mailboxes back in December?

14   **OFC.LASTRA:**        No.

15   **DET.NEWMAN:**        You weren't aware of any black females receiving any literature?

16   **OFC.LASTRA:**        No.

17   **DET.NEWMAN:**        Were you ever aware that we even went out there an investigated

18   that?

19   **OFC.LASTRA:**        No.

20   **DET.NEWMAN:**        Who runs the job out there?

4

EXHIBIT G
Page 4 of 11

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| COMPLAINANT: | CHIEF OF POLICE | I.A.B. CASE 99A-107 |
|---|---|---|
| INTERVIEWED: | LASTRA, ENRIQUE OFC. | TRANSCRIBED: 03/17/99 |

1 **OFC.LASTRA:**    Ronda Jones.

2 **DET.NEWMAN:**    Ronda Jones. Is she still working out there?

3 **OFC.LASTRA:**    Yes.

4 **DET.NEWMAN:**    Det. Honeywell, anything?

5 **DET.HONEYWELL:**    Yes. You say you noticed that usually when they call you guys
6 it's mostly for African-American. Would it just be African-American or minorities, would
7 you say?

8 **OFC.LASTRA:**    Actually this, there's a, usually it's African-Americans or Latins.
9 But it's only, like, right now, it's only really, that I know of, there's only, like, maybe two
10 females working there that do that. Most everybody else are pretty cool about it. It just
11 happens to be the same person that calls all the time, when they do call, you know.

12 **DET.NEWMAN:**    Have they ever called before and you get there and it's obvious
13 that--or these people--

14 **OFC.LASTRA:**    Oh sure.

15 **DET.NEWMAN:**    These people are just there to shop and you're like, hey, these
16 people are just here to shop.

17 **OFC.LASTRA:**    Yes. It's happened a few times, yes. I mean, there's a few times
18 that they have been stealing and I've arrested them or trespassed them or something.

19 **DET.NEWMAN:**    When was the last time you arrested somebody out there, do you
20 know? In the last three months?

5

**TAMPA POLICE DEPARTMENT**
**Internal Affairs Bureau**

COMPLAINANT: **CHIEF OF POLICE**                    **I.A.B. CASE 99A-107**
INTERVIEWED: **LASTRA, ENRIQUE OFC.**     **TRANSCRIBED: 03/17/99**

---

1   **OFC. LASTRA:**          I don't think I've arrested anybody in the last three months,

2   there.

3   **DET. HONEYWELL:**     So, these two females, they're the ones that usually call.  These

4   two associates?

5   **OFC. LASTRA:**          Right. One of them is _____ yourself. She's Latin. The

6   other one is a white American.

7   **DET. HONEYWELL:**     Have they ever voiced any dislike for minorities, to you?

8   **OFC. LASTRA:**          No.  They just call me.  But they don't--they never give me a

9   dislike for, you know, they just tell me, this is what we're _____ .  "I've got

10   someone down here who is suspicious."  OK.  I walk down there to check and I say, "Why

11   are they suspicious?"  "Well, they just look like they're looking around and they ain't buying

12   nothing."  And usually it's either a black person or if it's the white female who is calling it's

13   either a black person or a Latin person.  The Latin female _____ but, you know,

14   they don't ever go out and tell me, I think she's suspicious because she's black or I think she's

15   suspicious because--they just tell me they look suspicious and my answer is why do they look

16   suspicious?  "Well they just do."

17   **DET. NEWMAN:**          And once you realize they aren't doing anything--

18   **OFC. LASTRA:**          And then once I--what I'll do is I'll watch them for a little while,

19   'cause, you know, it's my job.  I got to do that.  Watching them and if they don't look

20   suspicious I'll tell them, hey, they're shopping.  They're walking around.  I tell them, "If you

6

**TAMPA POLICE DEPARTMENT**
**Internal Affairs Bureau**

COMPLAINANT: **CHIEF OF POLICE**                I.A.B. CASE 99A-107
INTERVIEWED: **LASTRA, ENRIQUE OFC.**        TRANSCRIBED: 03/17/99

1    have a problem call me back." And I will go do whatever I got to do, because I don't like

2    tailing people _____ for that reason.

3    **DET.NEWMAN:**            Exactly.

4    **OFC.LASTRA:**            "Why you tailing me?" you know. So, I just watch--and plus,

5    that's not the policy. It says, as a matter of fact, it's in writing, it's upstairs in our security

6    desk. It says we will not follow anyone around the store. We will not stop anyone without

7    absolutely proof that they have stolen something. _____

8    **DET.NEWMAN:**            So you wait just a couple minutes and then if not founded you

9    leave?

10   **OFC.LASTRA:**            Yeah. Oh yeah. Dillard's has, more than once, has given us, in

11   writing from their home office, that we are not to follow people around. We are not to look

12   behind clothes racks. Use communication between each other unless we see someone steal

13   something for sure we are not to arrest them. And they do have that in writing. And it is

14   upstairs in our security office. And that's their policy.

15   **DET.NEWMAN:**            OK.

16   **OFC.LASTRA:**            It's just, basically, an individual thing.

17   **DET.NEWMAN:**            With the associates?

18   **OFC.LASTRA:**            Yeah.

19   **DET.HONEYWELL:**        You think the associates just don't know what to look for?

20   **OFC.LASTRA:**            I don't know. I don't know. I just know they call me down for

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:   CHIEF OF POLICE            I.A.B. CASE 99A-107
INTERVIEWED:   LASTRA, ENRIQUE OFC.      TRANSCRIBED: 03/17/99

1   stuff like that and I don't find nothing and I leave.  And Dillard's actually makes us write a

2   paper that we keep up every day because they were keeping track of which associate was

3   calling us and for what reason.  And _____ she was making us--everyday we have

4   to fill out that and if we get a call we have to put the name of the associate that called us and

5   if we found it suspicious or not.

6   **DET.NEWMAN:**          Hang on one second.  (Side B) Back on tape with Ofc. Lastra.

7   The time is 1440 hours.  Where is that log kept?  Upstairs in the security office.

8   **OFC.LASTRA:**          Upstairs in the security office.

9   **DET.NEWMAN:**          Do you still keep a log?

10  **OFC.LASTRA:**          Yeah.  We keep the log everyday.  Some days, and I'm guilty of

11  it, some of us forget to fill it out.

12  **DET.NEWMAN:**          Right.

13  **OFC.LASTRA:**          We don't fill it out, but, we're supposed to do one everyday.

14  And that was brung up to us by Jason, who is the second store manager there.  He made it

15  up and, I think, he was saying that was, basically, to keep track of who was calling and why

16  and if we are actually seeing suspicious thing happening or not.

17  **DET.NEWMAN:**          And, if an associate called you on a black male and female couple

18  that came in and they called you and you went down there and there was nothing to the

19  complaint, what would you write on that log?

20  **OFC.LASTRA:**          The only thing we would write on the log is the name of the

8

╰ TAMPA POLICE DEPARTMENT ╯
Internal Affairs Bureau

| COMPLAINANT: | CHIEF OF POLICE | I.A.B. CASE 99A-107 |
|---|---|---|
| INTERVIEWED: | LASTRA, ENRIQUE OFC. | TRANSCRIBED: 03/17/99 |

1     person that called us and then, they got codes as far as, did the officer see something?  Did

2     they take action?  Did they arrest someone?  Or no action taken, no suspicious activity.  And

3     usually that's the one that winds up going up there, no suspicious activity.  We would just

4     write that and that was it.  We don't write whether it was a black female that we saw,

5     whether it was a black male, Latin, or white.  We don't write it on there.  Basically, who the

6     associate is that called because they wanted to find out which associate was doing all the

7     calling, most of the time.  To keep track of it.  And_____ look through it to see--

8     you might find the same name, same associate every time.

9     **DET.HONEYWELL:**     In your opinion, looking from the outside being an off-duty

10    officer, do you feel like the associates are pressured to try to catch--

11    **OFC.LASTRA:**     No.  No.  No.  I know they--that they--I hear rumors that they

12    get a 24 hours bonus if they catch--

13    **DET.NEWMAN:**     A shoplifter.  We don't know that for a fact, though?

14    **OFC.LASTRA:**     I don't know that for a fact.  It's just the rumors that I hear.

15    Uhh, actually, like I said, Dillard's has a pretty strict policy now.  That only came out about

16    a year ago when they say--they telling us not to follow people around.  Because I think

17    they've been sued a couple of times.  And they're very worried about us making a bad case.

18    So, basically, like I said, they give us that--to do change runs and I think they did it to keep

19    us from catching people.

20    **DET.NEWMAN:**     Following people around?

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: CHIEF OF POLICE        I.A.B. CASE 99A-107
INTERVIEWED:   LASTRA, ENRIQUE OFC.   TRANSCRIBED: 03/17/99

---

1    **OFC.LASTRA:**        Yeah. Following people around. So they got us, basically, doing

2    change runs almost all day we're there. So I get very little time of doing any security work,

3    actually. Which it didn't bother us because I'm still getting $21.00 an hour.

4    **DET.NEWMAN:**       Sure.

5    **OFC.LASTRA:**        So, yeah, we do the change runs.

6    **DET.NEWMAN:**       Anything else Det. Honeywell?

7    **DET.HONEYWELL:**    No.

8    **DET.NEWMAN:**       Ofc. Lastra is there anything else you think I need to be aware

9    of?

10    **OFC.LASTRA:**        Not at all. As far as the management there goes, they are all

11    pretty good people. I've never had a problem with them.

12    **DET.NEWMAN:**       And they've never given you an absolute policy, obviously, to

13    target anyone based on race?

14    **OFC.LASTRA:**        They've never given me one.

15    **DET.NEWMAN:**       You are advised not to discuss this case with anyone. Please state

16    your full name and title for me.

17    **OFC.LASTRA:**        Enrique Lastra, Police Officer in District I.

18    **DET.NEWMAN:**       We're going to terminate this interview and the time is 1455

19    hours.

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:  CHIEF OF POLICE                 I.A.B. CASE 99A-107
INTERVIEWED:  LASTRA, ENRIQUE OFC.      TRANSCRIBED: 03/17/99

1   This interview was recorded on Tape #99A-107, Tape #1, Side A & B.


2
3   J. R. NEWMAN, Detective
4   Internal Affairs Bureau

5   mag

11

EXHIBIT G
Page 11 of 11

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| | | |
|---|---|---|
| **COMPLAINANT:** | **CHIEF OF POLICE** | **I.A.B. CASE 99A-107** |
| **INTERVIEWED:** | **HOLDER, B. SGT.** | **TRANSCRIBED: 03/24/99** |

---

1   This interview is being placed on tape on March 17, 1999 and the time is 1410 hours.

2   Det. John Newman, along with Det. Gerald Honeywell, with the Tampa Police Department

3   Internal Affairs Bureau, is conducting an interview with Sgt. Bobby Holder, from CID,

4   QUAD.  This interview is part of an investigation concerning the extra-duty assignment at

5   Dillard's, located at 347 Westshore Plaza.  Sgt. Holder you signed the perjury form and the

6   department's General Order on truthfulness in departmental matters and you know the

7   difference between right and wrong and you know that this is an official proceeding.  Is that

8   correct?

9   **SGT. HOLDER:** Yes I do.

10   **DET. NEWMAN:** Please raise your right hand for me (Oath administered)

11   **SGT. HOLDER:** I do.

12   **DET. NEWMAN:** Are you currently or have you ever worked the extra-duty

13   assignment at Dillard's, located at Westshore Plaza?

14   **SGT. HOLDER:** Uhh, last time I've worked there was five years ago in 1995.

15   **DET. NEWMAN:** How long did you work there when you were working at

16   Dillard's?

17   **SGT. HOLDER:** I worked there for, uhh, probably, close to a year or more.

18   **DET. NEWMAN:** The same management team or the same personnel with the

19   exception of the associates, were they still in place or do you know who they were?

20   **SGT. HOLDER:** I don't remember the names but I knew who they were at the

1

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| COMPLAINANT: | CHIEF OF POLICE | I.A.B. CASE 99A-107 |
|---|---|---|
| INTERVIEWED: | HOLDER, B. SGT. | TRANSCRIBED: 03/24/99 |

1   time. I don't know if they're there now.

2   **DET.NEWMAN:**          Let me ask you. Was there ever a directive given to you by a

3   store supervisor or a policy relayed to you by a store representative that had you watch Afro-

4   American customers when they came into the store?

5   **SGT.HOLDER:**          Well, it was, there was nothing that was ever told directly to me

6   or anything said directly to me, but, umm, when I was working there they had certain code

7   when they called the police, I think the code was when they said "8" or "88", and that was

8   to watch someone and every time I got the code it was always an African-American I was

9   called to watch, or a clerk or another manager would come and get me to take me to watch

10  someone that was always an African-American. So, I started to get a little upset and I said

11  one day to one of the people there, I said, "Why are you having the police watch all African-

12  Americans come in? The white kids are coming in robbing you blind." You know, but, no

13  comment was made back to me. And, you know, after seeing that go on for a while and I

14  felt like they were targeting African-Americans, I just, I just ceased working the job. You

15  know talking to, you know, other officers that used to work it on and off, no one would

16  openly admit it to me, but you know, I would hear it from other people.

17  **DET.NEWMAN:**          That they worked the job before and they had the same

18  experiences?

19  **SGT.HOLDER:**          Yes.

20  **DET.NEWMAN:**          When you got called when it was a code 8 or a code 88 to go

2

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:  CHIEF OF POLICE                I.A.B. CASE 99A-107
INTERVIEWED:  HOLDER, B. SGT.                TRANSCRIBED:  03/24/99

---

1   to a certain department to watch a customer, and you got there and you realized that they're

2   having you watch African-Americans, what did you do to corroborate or un-sustain whatever

3   they were complaining about?  What actions did you take?

4   **SGT.HOLDER:**          Well, I would, I would watch them to show them that, you know,

5   they weren't up to anything because, most of the time, when they would call, you know,

6   it would be, you know, one time they called me a guy, the guy was a preacher.  Had on a

7   nice suit, tie, and he was just walking around the store looking.

8   **DET.NEWMAN:**          Being a customer?

9   **SGT.HOLDER:**          Just being a customer.

10  **DET.NEWMAN:**          Do you remember who was running the job on TPD's side when

11  you were working there?

12  **SGT.HOLDER:**          I don't, I don't remember.  At one time I thought it might have

13  been Lt. Guidara's job.  Uhh, but I can't remember who was doing the scheduling.  It might

14  have been Ronda Smalley.  I really can't remember.

15  **DET.NEWMAN:**          Do you remember who worked the job regularly?

16  **SGT.HOLDER:**          Uhh, OK, uhh, Ronda Smalley did.

17  **DET.NEWMAN:**          Is that Ronda Jones, Ronda Smalley?

18  **SGT.HOLDER:**          Jones.

19  **DET.NEWMAN:**          OK.

20  **SGT.HOLDER:**          (beeper going off)  It's been so long ago I can't even tell you

EXHIBIT H
Page 3 of 5

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: CHIEF OF POLICE                I.A.B. CASE 99A-107
INTERVIEWED:  HOLDER, B. SGT.               TRANSCRIBED: 03/24/99

---

1    who--I know Guidara worked it on and off.  Umm, I can't remember.

2    **DET.NEWMAN:**          Have you ever seen any Dillard's employees initiate any type of

3    action, whether it be surveillance or a shoplifting investigation, on somebody based on just

4    someone's race?

5    **SGT.HOLDER:**          Well, just given my opinion, that's what I felt because, uhh, like

6    I said, sometimes some of the clerks would come get me after they followed African-

7    Americans through the store and they would, just, they would leave there register just to

8    watch them and follow them through the store.

9    **DET.NEWMAN:**          Did you make many arrests out there?

10   **SGT.HOLDER:**          Uhh, I think I made a couple.  Two or three.

11   **DET.NEWMAN:**          Do you remember what, specifically, what race?

12   **SGT.HOLDER:**          They were white.

13   **DET.NEWMAN:**          They were white.

14   **SGT.HOLDER:**          Yeah.

15   **DET.NEWMAN:**          Do you remember, was there any type of log or activity sheet

16   that you had to fill out for Dillard's?

17   **SGT.HOLDER:**          Uhh, we, we, we logged the, uhh, we logged the arrests in the

18   office.  I don't remember on what.  And, uhh, they kept Polaroids on the wall of all the

19   shoplifters because they, you know, they issued trespass warnings on everybody.

20   **DET.NEWMAN:**          Det. Honeywell would you like to say anything?

4

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:   **CHIEF OF POLICE**                    **I.A.B. CASE 99A-107**
INTERVIEWED:   **HOLDER, B. SGT.**                    **TRANSCRIBED:  03/24/99**

1    **DET. HONEYWELL:**     No.

2    **DET. NEWMAN:**     Sgt. Holder is there anything else that I need to be made aware

3    of in regards to this inquiry?

4    **SGT. HOLDER:**     Uhh, no.

5    **DET. NEWMAN:**     I need for you to state your full name and your title for me.

6    **SGT. HOLDER:**     Uhh, Bobby Lee Holder, Sergeant, Tampa Police Department,

7    CID, QUAD.

8    **DET. NEWMAN:**     We're going to terminate this interview and the time is 1415

9    hours.


10    This interview was recorded on Tape #99A-107, Tape #2, Side A.



11    _____
12    J. R. NEWMAN, Detective
13    Internal Affairs Bureau

14    mag


5

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

**COMPLAINANT:** CHIEF OF POLICE                          **I.A.B. CASE 99A-107**
**INTERVIEWED:** TORRES, D. OFC.                    **TRANSCRIBED: 03/24/99**

---

1    This interview is being placed on tape on March 17, 1999 and the time is 1340 hours.

2    Det. John Newman, along with Det. Gerald Honeywell, with the Tampa Police Department

3    Internal Affairs Bureau, is conducting an interview with Ofc. Dave Torres, District 1. This

4    interview is part of an investigation concerning the extra-duty assignment at Dillard's, located

5    at 347 Westshore Plaza. Ofc. Torres you signed the perjury form, the department's General

6    Order on truthfulness in departmental matters, you know the difference between right and

7    wrong and this is an official proceeding. Is that correct?

8    **OFC.TORRES:**          Yes.

9    **DET.NEWMAN:**          Raise your right hand (Oath administered)

10   **OFC.TORRES:**          Yes.

11   **DET.NEWMAN:**          Are you working or have you ever worked an extra-duty

12   assignment at Dillard's, located at Westshore Plaza?

13   **OFC.TORRES:**          Yes. I currently work Dillard's.

14   **DET.NEWMAN:**          How long have you been working there?

15   **OFC.TORRES:**          Uhh, approximately four years.

16   **DET.NEWMAN:**          Four years. Is there a discriminatory store policy where as an

17   associate or some associates there continuously target Afro-American customers when they

18   come in the store?

19   **OFC.TORRES:**          Uhh, no. Not that I know of, no.

20   **DET.NEWMAN:**          Working there in the last four years, have you ever noticed where

1

EXHIBIT I
Page 1 of 7

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: **CHIEF OF POLICE**                     **I.A.B. CASE 99A-107**
INTERVIEWED: **TORRES, D. OFC.**                **TRANSCRIBED: 03/24/99**

1    they call you in a disproportionate amount on Afro-Americans compared to other customers

2    in the store?

3    **OFC.TORRES:**      I would say yeah.  Most of the time they are, they are Afro-

4    American.  Black females.

5    **DET.NEWMAN:**      Black females?

6    **OFC.TORRES:**      Yeah.  Younger, the younger ones.

7    **DET.NEWMAN:**      What's the age, when you say younger?

8    **OFC.TORRES:**      Uhh, late teens, early 20's.

9    **DET.NEWMAN:**      Is there a directive, an actual store policy, that says when an

10    Afro-American walks in the store they want you to keep an eye on them?

11    **OFC.TORRES:**      No.

12    **DET.NEWMAN:**      There's no written policy at all?

13    **OFC.TORRES:**      No.

14    **DET.NEWMAN:**      No one has ever given you instructions on what their policy is?

15    **OFC.TORRES:**      Correct.

16    **DET.NEWMAN:**      Let me ask you something.  The people that call you on these

17    black females or any other person that comes into the store is it usually the same associate

18    or is it a bunch of different associates?

19    **OFC.TORRES:**      They're different associates.

20    **DET.NEWMAN:**      There's not one that you notice always calling you or it's just

EXHIBIT I
Page 2 of 7

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

**COMPLAINANT: CHIEF OF POLICE**　　　　　I.A.B. CASE 99A-107
**INTERVIEWED:　TORRES, D. OFC.**　　　　　TRANSCRIBED: 03/24/99

1　different ones?

2　**OFC. TORRES:**　　　Correct.　There's a, there used to be, you know, some that

3　would call more than others but they're no longer there.

4　**DET. NEWMAN:**　　　So, a lot of the associates will call?

5　**OFC. TORRES:**　　　Yes.

6　**DET. NEWMAN:**　　　Different ones and mostly it's all on black, Afro-Americans?

7　**OFC. TORRES:**　　　Well, no.　Uhh, well, most of the time, uhh, they don't, I mean,

8　what I'm trying to say is most of the calls, when I get suspicious people, yeah, most of them,

9　the majority is, I'm not saying 75%, I'm saying the majority is black female.

10　**DET. NEWMAN:**　　　OK.　And those complaints come from different associates and

11　not the same associate?

12　**OFC. TORRES:**　　　Correct.

13　**DET. NEWMAN:**　　　When they ask you to come down there what do you do to

14　corroborate their complaint of suspicious activity?

15　**OFC. TORRES:**　　　I, basically, just talk to them and they tell me who they're looking

16　at and then I stay away from that department but I watch from afar, just to see.

17　**DET. NEWMAN:**　　　Just to see if they're doing anything suspicious?

18　**OFC. TORRES:**　　　Correct.

19　**DET. NEWMAN:**　　　Are there certain areas of the store, certain departments, that

20　you get called to more than others?

3

**EXHIBIT I**
**Page 3 of 7**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| COMPLAINANT: | CHIEF OF POLICE | I.A.B. CASE 99A-107 |
|---|---|---|
| INTERVIEWED: | TORRES, D. OFC. | TRANSCRIBED: 03/24/99 |

1   **OFC. TORRES:**          Yes.

2   **DET. NEWMAN:**          What department do you get called to the most?

3   **OFC. TORRES:**          Uhh, the most I'd have to say Tommy, the men's Tommy

4   Hilfiger department.

5   **DET. NEWMAN:**          What's the Juniors section?  What is that?

6   **OFC. TORRES:**          Juniors is, uhh, I think it's for the slender, more petite type

7   women.  It's upstairs.  I do get a lot of calls there also.

8   **DET. NEWMAN:**          OK.  Do you make a lot of arrests out there?

9   **OFC. TORRES:**          No, I do not.  No.  I, I want to make, you know, I want to make

10   a--if they're not positive about somebody doing something, I'm not going to make an arrest

11   on it.

12   **DET. NEWMAN:**          Based on the five years that you've been out there, have you ever

13   gone out to one of those where they called you, as the off-duty officer, they call you out

14   there and you go there and you see that they're only calling you because, you know, there's

15   no suspicious activity, these people are just, you know, minority and they called you on

16   them.  Have you ever felt that way before?

17   **OFC. TORRES:**          No.  I haven't, to be honest with you.  I just, I think that they

18   see something, like a Sears bag and they thought it was empty and now it's full.  That type

19   of thing but they can't, clearly they can't say that they actually put something in the bag.

20   **DET. NEWMAN:**          But you've never gone out there where you said they're just

4

EXHIBIT I
Page 4 of 7

| COMPLAINANT: | CHIEF OF POLICE | I.A.B. CASE 99A-107 |
|---|---|---|
| INTERVIEWED: | TORRES, D. OFC. | TRANSCRIBED: 03/24/99 |

1   calling me because they're black?

2   **OFC.TORRES:**   No.

3   **DET.NEWMAN:**   Have you ever heard any officers complain of that, where they

4   say, "hey I worked at Dillard's before and all they ever do is call me to watch black people

5   as they enter the store"?

6   **OFC.TORRES:**   Well, I mean, I've heard some but I can't remember exactly who

7   said it.  But I've heard it before, yes I have.  Yes I have.

8   **DET.NEWMAN:**   You've heard that before?

9   **OFC.TORRES:**   Yes I have.

10   **DET.NEWMAN:**   But you have no first-hand experience with that?

11   **OFC.TORRES:**   No.  No.  I've never had that problem.  I'm just saying that the

12   majority they do call on black females.

13   **DET.NEWMAN:**   Were you aware of some racist mail being placed in the mailboxes

14   of five black female associates that work at Dillard's, back in December?

15   **OFC.TORRES:**   No.  I was not aware of that.

16   **DET.NEWMAN:**   So you had not idea that that was going on?

17   **OFC.TORRES:**   No.

18   **DET.NEWMAN:**   Did any Dillard's employees ever complain to you about any

19   discriminatory practices that they feel Dillard's participates in?

20   **OFC.TORRES:**   No.  Never.

**EXHIBIT I**
**Page 5 of 7**

# TAMPA POLICE DEPARTMENT
## Internal Affairs Bureau

COMPLAINANT: **CHIEF OF POLICE**        **I.A.B. CASE 99A-107**
INTERVIEWED: **TORRES, D. OFC.**      **TRANSCRIBED: 03/24/99**

---

1    **DET.NEWMAN:**      How often do you work out there?

2    **OFC.TORRES:**      I work, uhh, at least once a week, sometimes twice a week.

3    **DET.NEWMAN:**      Do they have any policies in effect to the contrary to this

4    complaint, where they don't want you to do certain things, or they do want you to do

5    certain things as the extra-duty officer?

6    **OFC.TORRES:**      Yeah. They don't want us to, uhh, you have to be absolutely

7    positive, and you can't be suspicious about stopping somebody. You can't approach

8    somebody that you're suspicious of unless you actually know that they're doing, or

9    committing an offense.

10    **DET.NEWMAN:**      OK.

11    **OFC.TORRES:**      And you're not supposed to tail people. They actually use the

12    word "tail" in their policy for the security officers.

13    **DET.NEWMAN:**      Det. Honeywell, is there anything else you would like to add?

14    **DET.HONEYWELL:**      You ever do any Field Interrogation while you're there?

15    **OFC.TORRES:**      Umm, no. No. To be honest with you, no. I don't want to

16    come in contact with anybody unless I'm positively sure because they don't want us to do

17    that, to scare away the customers.

18    **DET.HONEYWELL:**      OK.

19    **DET.NEWMAN:**      Is there anything else you think I need to be made aware of?

20    **OFC.TORRES:**      No.

6

**EXHIBIT I**
**Page 6 of 7**

# TAMPA POLICE DEPARTMENT
## Internal Affairs Bureau

**COMPLAINANT:** CHIEF OF POLICE       **I.A.B. CASE 99A-107**
**INTERVIEWED:** TORRES, D. OFC.       **TRANSCRIBED:  03/24/99**

1    **DET.NEWMAN:**      I need for you to state your full name and title for me.

2    **OFC.TORRES:**      Ofc. David Torres, Police Officer.

3    **DET.NEWMAN:**      We're going to terminate this interview and the time is 1346

4    hours.

5    This interview was recorded on Tape #99A-107, Tape #2, Side A.

6
7    J. R. NEWMAN, Detective
8    Internal Affairs Bureau

9    mag

7

EXHIBIT I
Page 7 of 7

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

**COMPLAINANT: CHIEF OF POLICE**         **I.A.B. CASE 99A-107**
**INTERVIEWED: JONES, R. A. OFC.**         **TRANSCRIBED: 03/23/99**

1    This interview is being placed on tape on March 17, 1999 and the time is 1350 hours.

2    Det. John Newman, along with Det. Gerald Honeywell, with the Tampa Police Department

3    Internal Affairs Bureau, is conducting an interview with Ofc. Ronda Jones, from the

4    Firehouse Squad.   This interview is part of the investigation concerning the extra-duty

5    assignment at Dillard's, located at 347 Westshore Plaza.  Ofc. Jones you have signed the

6    General Order on truthfulness in departmental matters.  You've signed the perjury form.

7    You know this is an official proceeding and you know the difference between right and

8    wrong.  Is that correct?

9    **OFC.JONES:**            Yes I do.

10    **DET.NEWMAN:**       Please raise your right hand for me (Oath administered)

11    **OFC.JONES:**            I do.

12    **DET.NEWMAN:**       Do you work at Dillard's at Westshore Plaza?

13    **OFC.JONES:**            Yes I do.

14    **DET.NEWMAN:**       How long have you been working out there?

15    **OFC.JONES:**            You know, I don't know for sure.

16    **DET.NEWMAN:**       Just give me a round-about estimate.

17    **OFC.JONES:**            Probably over five years.

18    **DET.NEWMAN:**       Presently, I understand you are scheduling the actual job.

19    **OFC.JONES:**            Yes I am.

20    **DET.NEWMAN:**       So you're familiar with a lot of the store policies that Dillard's

1

EXHIBIT J
Page 1 of 9

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| | | |
|---|---|---|
| COMPLAINANT: | CHIEF OF POLICE | I.A.B. CASE 99A-107 |
| INTERVIEWED: | JONES, R. A. OFC. | TRANSCRIBED: 03/23/99 |

1 have and how it applies to Tampa Police Officers.

2 **OFC.JONES:**    Correct.

3 **DET.NEWMAN:**   Has there or is there, right now, a directive given to the law

4 enforcement officers that work out there by a store supervisor or a store policy relayed to

5 you by either an employee or a store representative which dictates that you watch all Afro-

6 American customers as they enter the store for illegal activity?

7 **OFC.JONES:**    No.  Not at all.

8 **DET.NEWMAN:**   You've worked out there, you said, about five years.  Have you

9 ever seen any discriminatory practices or what you felt were discriminatory practices against

10 Afro-Americans?

11 **OFC.JONES:**    There is maybe two employees that might call on just black

12 people, mostly just black females.  But for the most part, the whole store, will call us,

13 generally, whenever they see suspicious activity.

14 **DET.NEWMAN:**   Do they explain to you what suspicious activity is once you get

15 down to whatever department they call you to?

16 **OFC.JONES:**    A lot of them are real scared.  It's kind of hard to describe,

17 umm, or get them to say too much, once I get there.  Umm, but the other ones that aren't

18 scared, they will tell us when we get there as soon as the person really isn't in ear-shot

19 distance.

20 **DET.NEWMAN:**   Is there a disproportionate amount of times that you've been

EXHIBIT J
Page 2 of 9

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| COMPLAINANT: | CHIEF OF POLICE | I.A.B. CASE 99A-107 |
|---|---|---|
| INTERVIEWED: | JONES, R. A. OFC. | TRANSCRIBED: 03/23/99 |

1   called, when you're working out there in an extra-duty capacity, for Afro-Americans

2   compared to any other ethnic or racial group?

3   **OFC.JONES:**        No. There is, probably, a majority of black females that I watch

4   over everybody else, but they don't call me more so. It's just the way they're acting and the

5   way they will run their mouth and stuff when they get to the department.

6   **DET.NEWMAN:**      Is there a log that you have to fill out at the security office that

7   tells you what associate might have called you on somebody and who they might have called

8   you on?

9   **OFC.JONES:**        Yeah. There is. And lately I haven't been too good about filling

10   it out myself. So, but, yes. There is a log and, uhh, some people aren't real religious about

11   filling it out.

12   **DET.NEWMAN:**      If you get called to a department and they say it's suspicious

13   activity, what do you do next to corroborate what the associate has told you or to take any

14   action? What do you do?

15   **OFC.JONES:**        I--we usually just hang out in the department until the people that

16   they think are suspicious--or even when I get to the department, sometimes I just have to

17   look around and see who looks suspicious myself and if I don't think anybody looks suspicious

18   I leave. But if somebody is acting suspicious when I get there, umm, I kind of assess it

19   myself. Umm, if they do have a bag, first of all, isn't from this mall or if it looks like they

20   came in with a pair of sunglasses just in the bottom of the bag to look like they came in with

3

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

**COMPLAINANT:** CHIEF OF POLICE       **I.A.B. CASE 99A-107**
**INTERVIEWED:** JONES, R. A. OFC.       **TRANSCRIBED:** 03/23/99

---

1    something to fill it up the rest of the way then I'll stay.

2    **DET.NEWMAN:**      Det. Honeywell?

3    **DET.HONEYWELL:**      What areas do you get called to the most in the store?

4    **OFC.JONES:**      Umm, lately, 'cause it kind of takes turns which departments we

5    get called in the most. Recently, it's been the Juniors department again. But, prior to that,

6    it was mostly like the men's Tommy Hilfiger area. Tommy Girl has been most popular lately.

7    **DET.NEWMAN:**      And that's in the Juniors section?

8    **OFC.JONES:**      Right. But--actually, to be honest with you on that, most of the

9    employees that work in the, umm, Juniors department right now that have been calling us

10    are black and they're calling on black people too.

11    **DET.NEWMAN:**      There was a report that you originated back in December of

12    1998 where five employees received some racial literature in their Dillard's mailboxes. Do

13    you know what precipitated that and why we wrote that report or how it came to your

14    attention?

15    **OFC.JONES:**      Umm, manager got with me--

16    **DET.NEWMAN:**      Which manager?

17    **OFC.JONES:**      Miss Nicholson. She's the newest manager. She hasn't been

18    there a whole long time. She got with me, told me that, umm, it's a real big concern of

19    theirs that some of the employees received this letter and she wanted to try to get it taken

20    care of as soon as possible. In fact, uhh, I need--I'm glad you showed me this because I

4

### TAMPA POLICE DEPARTMENT
#### Internal Affairs Bureau

COMPLAINANT:  CHIEF OF POLICE                    I.A.B. CASE 99A-107
INTERVIEWED:  JONES, R. A. OFC.                  TRANSCRIBED: 03/23/99

---

1  needed the report number to pull the prints.

2  **DET.NEWMAN:**          Do you know if print comparisons have been done?

3  **OFC.JONES:**          They told me some was going to get done but they told me it

4  might be a while and that's what I needed to follow up on, to see if it's been done yet.

5  'Cause she just asked me about it.

6  **DET.NEWMAN:**          Did you get an opportunity to talk to any of the people that were

7  listed as victims in the report?

8  **OFC.JONES:**          They, umm, Miss Nicholson asked me not to.  Umm, she said

9  that, umm, she wanted to try to keep it as low profile as possible but their actual department,

10  I don't know exactly what it's called, something to do with them, they were going to

11  investigate it themselves.  They were going to put people on lie-detectors and--

12  **DET.NEWMAN:**          They meaning Dillard's?

13  **OFC.JONES:**          A lot of the Dillard's employees, especially the ones that they

14  suspected.

15  **DET.NEWMAN:**          Do you know if anything has come out of that?

16  **OFC.JONES:**          No.

17  **DET.NEWMAN:**          Did we request for them to dust prints, already, on the--for the

18  benefit of the reader it's the same report, it's #98-94460.  Did we request that they be

19  printed?  Did we do all the requests and everything?

20  **OFC.JONES:**          Yes I did.

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: **CHIEF OF POLICE**      **I.A.B. CASE 99A-107**
INTERVIEWED: **JONES, R. A. OFC.**     **TRANSCRIBED: 03/23/99**

---

1   **DET.NEWMAN:**     We just haven't submitted a comparison yet.  If there were

2   latents that were obtained from this letter who are we going to compare them to?  Do you

3   have any idea?

4   **OFC.JONES:**     Umm, they have a couple different people that they think did

5   it.  In fact, one of the suspects that they thought was an actual black female.  She worked

6   in the Juniors department and she had been having problems with the manager and they

7   thought she was trying to make it look like that manager did it.  So they were going to have

8   that manager, I think, do print comparison prints and I think they were going to have, umm,

9   I can't remember her last name, Sharon Gainer.  They were going to have her do the prints.

10   So it was Tammy, Sharon, and a couple other people, I think.  I don't know who the names

11   are.

12   **DET.NEWMAN:**     Do you know an associate there by the name of Victoria Morris?

13   **OFC.JONES:**     There is a Vickie that I--umm, I don't know--I know faces better

14   than I put them with names.  To be honest with you.  I don't remember.  The only one I

15   know is this Sharon Gainer because they've had several problems with her.

16   **DET.NEWMAN:**     Have many of the store associates complained to you about any

17   type of discriminatory policies that Dillard's might have?

18   **OFC.JONES:**     (long pause) I think, maybe, when I first came on other officers

19   said something.  But no employees.

20   **DET.NEWMAN:**     What did the other officers say to you?

6

### TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| | |
|---|---|
| COMPLAINANT: **CHIEF OF POLICE** | **I.A.B. CASE 99A-107** |
| INTERVIEWED: **JONES, R. A. OFC.** | **TRANSCRIBED: 03/23/99** |

1  **OFC. JONES:**        They said, uhh, it seemed like, it seemed like the day that I

2  covered for somebody and I worked there they only called me on black people and it got

3  old. That's what, and I don't even remember who it was.

4  **DET. NEWMAN:**        How long ago was that, do you remember?

5  **OFC. JONES:**        It was when I first started working there.

6  **DET. NEWMAN:**        There's something I just forgot. Hang on. We're going off tape

7  for a minute. OK. We're back on tape. Det. Honeywell is there anything you would like

8  to say or add?

9  **DET. HONEYWELL:**        You said they already suspect this one female, right? This black

10  female involved in this letter.

11  **OFC. JONES:**        Possibly doing the letter, yes.

12  **DET. HONEYWELL:**        Is she the only suspect?

13  **OFC. JONES:**        No. They--well see. This is all hush-hush. They just confided

14  in me because I, kind of, run the job. I'm like the liaison person. But, like I said, they

15  wouldn't put it possibly past because of what a couple of employees said, past the--one of

16  the managers that's no longer there, even, and her name is Tammy. Umm, but she's a white

17  female and they suspected her, too. So, those are the only two names that I know of, off

18  hand, that I can think of and one was white and one was black. And they were having a

19  problem with each other at the time, so, that's the reason I think they were suspecting each

20  of them.

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| | | |
|---|---|---|
| **COMPLAINANT:** | **CHIEF OF POLICE** | **I.A.B. CASE 99A-107** |
| **INTERVIEWED:** | **JONES, R. A. OFC.** | **TRANSCRIBED: 03/23/99** |

1    **DET. NEWMAN:**      I remembered what I wanted to ask you.  Have you taken any

2    action against any African-American customer just based on solely someone saying they're

3    suspicious or do you always wait until you corroborate what they tell you when they call you

4    down to the department?  Do you just go down there and take what an associate might say,

5    at face value, without at least corroborating it by your own surveillance or your own

6    observations?

7    **OFC. JONES:**      Well, that's--it's kind of a messed up question 'cause the answer

8    is kind of messed up that goes along with that.  Umm, the best way I can describe it is well

9    I go there and I do follow somebody 'cause there are certain people that I know are good

10    at watching people.

11    **DET. NEWMAN:**      OK.

12    **OFC. JONES:**      And, umm, again, actually, it's funny that you say that because

13    the people that I trust the most are the black females that work there.  They call me and 9

14    times out of 10 they're right on.  So sometimes if they're the ones that call me **(speakover)**

15    **DET. NEWMAN:**      They're more credible.

16    **OFC. JONES:**      They're more credible and I'll watch them more so even if they

17    don't do anything once I get there.  I've learned that over the years because I've already

18    caught people for them but they've already told me about.  So I usually, certain ones.

19    **DET. NEWMAN:**      Is there anything else you think I need to be aware of?

20    **OFC. JONES:**      Well, I mean, I could probably find out several peoples names

**EXHIBIT J**
**Page 8 of 9**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:  **CHIEF OF POLICE**          I.A.B. CASE 99A-107
INTERVIEWED:  **JONES, R. A. OFC.**        TRANSCRIBED:  03/23/99

---

1  if you'd want, that employees, if you needed to know, that would probably come in here and

2  talk to you, too, if you needed them.

3  **DET.NEWMAN:**          OK.  At this time, probably not.  We're just going to look at the

4  officers, make sure that we're doing everything that we're supposed to be doing.  Gerald?

5  **DET.HONEYWELL:**       No.

6  **DET.NEWMAN:**          I need for you to state your full name and your title for me.

7  **OFC.JONES:**           Ofc. Ronda Jones with the Tampa Police Department.

8  **DET.NEWMAN:**          We're going to terminate this interview and the time is 1326

9  hours.

10  This interview was recorded on Tape #99A-107, Tape #2, Side A.

11
12  J. R. NEWMAN, Detective
13  Internal Affairs Bureau

14  mag

9

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: **CHIEF OF POLICE**                    I.A.B. CASE 99A-107
INTERVIEWED: **CAREY, R. OFC.**                    TRANSCRIBED: 04/14/99

1    This interview is being placed on tape on April 13, 1999 and the time is 1440 hours. Det.

2    John Newman, with the Tampa Police Department Internal Affairs Bureau, is conducting an

3    interview with Master Patrol Officer Robert Carey, Badge #62. This interview is part of the

4    investigation concerning the extra-duty assignment at Dillard's, located at 347 Westshore

5    Plaza, permit 92-0093. Ofc. Carey you are being interviewed as a witness and not as a

6    subject officer. Do you understand that?

7    **OFC.CAREY:**           Yes sir.

8    **DET.NEWMAN:**          You understand this is an administrative investigation?

9    **OFC.CAREY:**           Yes sir.

10   **DET.NEWMAN:**          Please raise your right hand for me (Oath administered)

11   **OFC.CAREY:**           I do.

12   **DET.NEWMAN:**          How long have you been working at the extra-duty assignment

13   out at Dillard's? Give or take. I'm not looking for exact dates. Years or months.

14   **OFC.CAREY:**           It's been a while. I think since the beginning of the job and then

15   there was a short period of time when I didn't work out there and then I went back to work

16   out there again and I've been there for--

17   **DET.NEWMAN:**          So pretty regular since '92 except for that one break.

18   **OFC.CAREY:**           Correct.

19   **DET.NEWMAN:**          There has been some concern that was brought to this office's

20   attention that perhaps there were some discriminatory practices being implemented out at

1

**EXHIBIT K**
**Page 1 of 9**

### TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:  **CHIEF OF POLICE**       **I.A.B. CASE 99A-107**
INTERVIEWED:  **CAREY, R. OFC.**       **TRANSCRIBED: 04/14/99**

---

1    Dillard's. Have you ever heard or directed by any of the managers out at the store to focus

2    your attention on Afro-American customers when they came in the store, for no other

3    reason but the fact that they were African-American?

4    **OFC.CAREY:**       No.

5    **DET.NEWMAN:**       Have you ever been involved where a sales associate is some

6    section of the store has called for police attention, whether it's over the intercom or the

7    radio, or however they use the code system there, to come to a certain section because they

8    had an African-American in their section and they deemed them suspicious?  Have you ever

9    been called to situations like that?

10    **OFC.CAREY:**       Say that again for me.

11    **DET.NEWMAN:**       Sure.  Have you ever gone to a department, at the request of an

12    associate, because they said they have some patrons that were acting suspicious and when you

13    got there they were African-Americans?

14    **OFC.CAREY:**       I've gone, I've gone to situations before, yeah, where, you know,

15    they've had suspicious individuals and they're black.

16    **DET.NEWMAN:**       What did you do when you got there?  What was your, you

17    know, your method of operation to determine whether or not they were actually doing

18    anything illegal?

19    **OFC.CAREY:**       Most of the time when I respond, uhh, it's, it's to provide a

20    presence.  Obviously to listen to, you know, the specific nature of the complaint, uhh, from,

2

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| | | |
|---|---|---|
| COMPLAINANT: | CHIEF OF POLICE | I.A.B. CASE 99A-107 |
| INTERVIEWED: | CAREY, R. OFC. | TRANSCRIBED: 04/14/99 |

1   you know, whatever sales associate is there and then, you know, I base whatever decision,

2   you know, you know my presence there is going to be, you know, in regards to, you know,

3   whatever the specific nature of the complaint is and, you know, the observations that I make.

4   If it doesn't appear as though there's, you know, any suspicious activity going on then I, you

5   know, carry out my normal business and, you know, just go about, you know, you know, the

6   normal patrol of the store or whatever.

7   **DET.NEWMAN:**          Are there some associates there that target or focus their

8   concentration on African-Americans more than any other group that you're aware of?

9   **OFC.CAREY:**          Not that I'm aware of, no.

10   **DET.NEWMAN:**          Have you ever gone to an area, where they did call you down

11   there for some African-Americans that were in a certain section, you got there and they

12   weren't doing anything wrong but shopping, even though the associate had called you down

13   there?

14   **OFC.CAREY:**          I've, I've gone to situations where I've been called down there,

15   you know, it would appear as though, you know, people are just shopping.

16   **DET.NEWMAN:**          You talked a little bit off tape that sometimes you're challenged

17   by some of the patrons there.  Why don't you describe some of the instances where someone

18   might challenge you and why?

19   **OFC.CAREY:**          Just, you know, there are certain situations sometimes when

20   you're called to the scene of whatever and then, you know, the particular individual would

3

### TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

**COMPLAINANT:** **CHIEF OF POLICE**          **I.A.B. CASE 99A-107**
**INTERVIEWED:** **CAREY, R. OFC.**           **TRANSCRIBED: 04/14/99**

1   show exception that, you know, an officer might show up and, you know, just, you know,

2   kind of the verbal challenge.  You know, like, you know, you know, we're following just

3   because we're black.  Or, uhh, "Don't you think we have enough money to buy something

4   in Dillard's?"  And, uhh, you know, it kind of puts us on the spot a little bit.

5   **DET.NEWMAN:**          Does that happen frequently?

6   **OFC.CAREY:**           Not all the time, no.

7   **DET.NEWMAN:**          Do the associates call more on African-Americans that come into

8   the store, in terms of suspicious activity, than any other group?

9   **OFC.CAREY:**           I think that they call when they just notice something suspicious

10  in their area.  Sometimes they're understaffed in certain areas and when, you know a lot of

11  people come into their area uhh, we'll receive a call to go up there, you know, just to

12  provide, you know, maybe an extra pair of eyes, uhh, you know, the actual, you know,

13  uniform presence.  Uhh, it just, whatever the particular set of circumstances are.  I mean

14  we're called on whomever.

15  **DET.NEWMAN:**          So, you've never really experienced any type of discriminatory

16  practice the Dillard's might have or some of it's associates might have?

17  **OFC.CAREY:**           No.  No.  Not that I can recall.

18  **DET.NEWMAN:**          You were aware of an incident that was investigated in December

19  involving some hate mail that wound up in the mailboxes of some of the black females

20  associates in Juniors.  How were you made aware of that?

4

**EXHIBIT K**
**Page 4 of 9**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| | | |
|---|---|---|
| **COMPLAINANT:** | **CHIEF OF POLICE** | **I.A.B. CASE 99A-107** |
| **INTERVIEWED:** | **CAREY, R. OFC.** | **TRANSCRIBED: 04/14/99** |

---

1    **OFC. CAREY:**    It was brought to my attention by management.

2    **DET. NEWMAN:**    What did management tell you?

3    **OFC. CAREY:**    Well, they showed me a letter that had been placed in, uhh,

4    several black employees that worked up in the, uhh, I guess it would be, like, the Juniors

5    department or the woman's department that handles Juniors type things and, uhh, you know,

6    this, I believe you have a copy of it there--

7    **DET. NEWMAN:**    Right.

8    **OFC. CAREY:**    --was placed in several, uhh, black employees mail folders.

9    **DET. NEWMAN:**    And, did they have a suspect at that time or were they focusing

10    their attention on one employee or anybody about who might have done that?

11    **OFC. CAREY:**    Well, they had their suspicions and they believed that it was a

12    black female employee that may have, you know, actually put that in there, so--

13    **DET. NEWMAN:**    Were they upset that this type of offense happened at Dillard's

14    or have they experienced stuff like this before?  What was their response?

15    **OFC. CAREY:**    Yeah.  They were very upset.  They, they, they, uhh, you know,

16    wanted the matter investigated.  They provided the note.  Uhh, uhh, Ofc. Jones originated

17    a report and I'm not specifically aware of, you know, that I can recall right now of anything

18    similar to this that had occurred in the store before.  You know, not that I'm specifically

19    aware of.

20    **DET. NEWMAN:**    OK.  I can't think of anything else.  Ofc. Carey is there anything

5

**EXHIBIT K**
**Page 5 of 9**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:  CHIEF OF POLICE              I.A.B. CASE 99A-107
INTERVIEWED:  CAREY, R. OFC.               TRANSCRIBED:  04/14/99

1  about that extra-duty assignment or about this service-related inquiry that I need to be made

2  aware of?

3  **OFC.CAREY:**            No.  Not that I can specifically think of.

4  **DET.NEWMAN:**           You provided me with two letters from Dillard's or policies and

5  they're about what the police duties are and what they expect out of the police officers at

6  the store.  Are these presently hanging up some where in the security office?

7  **OFC.CAREY:**            This letter, the copy that I have is the original.

8  **DET.NEWMAN:**           From Ted Gassman.

9  **OFC.CAREY:**            Yeah it's from Ted Gassman and he's, like, uhh, want to say, like,

10  a, like, I don't want to get his title wrong--

11  **DET.NEWMAN:**           Right.

12  **OFC.CAREY:**            --but he's like a Regional Manager of the Southeast Region or

13  whatever.  He has, you know, he's a very important person.

14  **DET.NEWMAN:**           In charge of a few stores.

15  **OFC.CAREY:**            In this whole area, yeah.  He's very high up on the corporate

16  ladder.

17  **DET.NEWMAN:**           OK.

18  **OFC.CAREY:**            And, uhh, you know, when the Dillard's respond to the store to

19  carry out business he's, you know, there to escort them.  He'll pick them up from the airport

20  and, uhh, you know, this deals with policeman and shortage--if you want me to read, you

6

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:  CHIEF OF POLICE                    I.A.B. CASE 99A-107
INTERVIEWED:  CAREY, R. OFC.                     TRANSCRIBED:  04/14/99

---

1    know, what's on--

2    **DET.NEWMAN:**    No. I'm going to make it part of the investigation. Does this

3    memorandum from Ted Gassman, is it visible somewhere in the security office?

4    **OFC.CAREY:**    Yes. It's, it's in our security office. There's a desk that's in the

5    middle of the floor. This is underneath the glass, uhh, desktop that's on top and it's

6    positioned right under there so that, so that this page, the page that's marked confidential,

7    dated April 17, 1990, Store Manager Ted Gassman, Police/shortage and then, you know,

8    you know the policemen in your store are there as a deterrent only. All policemen, at all

9    times, should be in uniform.

10    **DET.NEWMAN:**    And then it details what he expects out of the police officers

11    duties would be.

12    **OFC.CAREY:**    Correct. You know, and then, that's what's on there. And

13    there's a cover letter that, you know, is usually positioned underneath this one.

14    **DET.NEWMAN:**    So, this is there for, not just you to see, but also the associates

15    as well. Is that correct?

16    **OFC.CAREY:**    Well, the--

17    **DET.NEWMAN:**    Do they come into the security office?

18    **OFC.CAREY:**    If they were to come into the security office and look at the glass

19    top, they would be able to read that. I don't know what they're provided in their particular

20    employee package, or whatever else, but this was provided to us.

7

### TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

| COMPLAINANT: | CHIEF OF POLICE | I.A.B. CASE 99A-107 |
|---|---|---|
| INTERVIEWED: | CAREY, R. OFC. | TRANSCRIBED: 04/14/99 |

---

1  **DET.NEWMAN:**        You have never personally been given or heard of any directive

2  from anyone at Dillard's that might involve any practices that were discriminatory in

3  conduct?

4  **OFC.CAREY:**         Oh, absolutely not.  Absolutely not.

5  **DET.NEWMAN:**        And you've been working that job for a long time?

6  **OFC.CAREY:**         Yes sir.  I mean, we respond based upon complaints, suspicious

7  activity that, you know, would be observed by sales associates, uhh, you know, sometimes,

8  you know, they will request us just to do a walk through, you know, through an area.  Uhh,

9  any observations that we may make, on our own, and then, you know, anytime, you know,

10  a certain situation arises, you know, we would take enforcement action, uhh, and, you know,

11  carry out whatever, you know, duties as, you know, required by that, you know, i.e. you

12  know, an arrest, you know, filling out the appropriate paperwork, photographing the

13  individual and then, you know, you know, issuing a trespass warning.  You know, and, you

14  know, I mean, whoever it is, or whatever type of activity is brought to our attention, that's,

15  you know, the action that we take.

16  **DET.NEWMAN:**        OK.  I need for you to state your full name and your title for

17  me, please.

18  **OFC.CAREY:**         Uhh, Robert B. Carey, or Robert Brian Carey and I'm a Master

19  Patrol Officer.

20  **DET.NEWMAN:**        We're going to terminate this interview and the time is 1554

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT:   CHIEF OF POLICE          I.A.B. CASE 99A-107
INTERVIEWED:   CAREY, R. OFC.          TRANSCRIBED:  04/14/99

1    hours.


2    This interview was recorded on Tape #99A-107, Tape # , Side A.


3    _____
4    J. R. NEWMAN, Detective
5    Internal Affairs Bureau

6    mag

9

# CITY OF TAMPA, FLORIDA     DATE: April 28, 1999

TO:        Chief B.R. Holder

ATTN:      Assistant Chief W.A. Sawyer

FROM:      Kirby C. Rainsberger

SUBJECT:   Service Related Inquiry 99A-107
           Dillards Extra Duty Practices



Sir:

I have reviewed the above referenced file concerning the practices of extra duty officers employed at Dillards, particularly as regards the possibility that officers may be unjustifiably targeting minorities for surveillance. Although the witness statements vary considerably, as a whole it appears from the file that Dillards does not have an official policy of targeting minorities for shoplifting surveillance. At most, some, but not all, Dillards clerks (both white and black) disproportionately report minorities as suspicious. Extra duty officers, without exception, do not act on these reports in any manner impacting the citizen without personal observations of illegal activity. Most officers report that they are aware of the disproportionate reporting and that the reports are discounted accordingly. There is not one instance of an officer stopping or confronting a citizen solely on the basis of a clerk's report. Therefore, while the Dillards clerks may be engaging in questionable targeting practices, TPD officers are clearly **not** participating in any race based targeting.

This inquiry should be closed as **no violation**.

**EXHIBIT L**
**Page 1 of 1**

# TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN      I.A.B. CASE: 99-67
INTERVIEWED: CAREY, R. B. OFC.      TRANSCRIBED: 09/28/99

---

This interview is being placed on tape on September 20, 1999 and the time is 1725 hours. Det. Harriet Watkins, with the Tampa Police Department Internal Affairs Bureau, is conducting an interview with Ofc. R. B. Carey, District 1, Badge #62, Squad 10. This interview is part of an investigation concerning an arrest made at Dillard's of Mrs. Melveen Malone. Ofc. Carey you are being interviewed as a witness and you are not the subject officer of this investigation. Do you understand what perjury is?

**OFC. CAREY:**      Yes ma'am.

**DET. WATKINS:**      Could you raise your right hand please (Oath Administered)

**OFC. CAREY:**      I do.

**DET. WATKINS:**      Ofc. Carey on September 9, 1999 you were at Dillard's Department Store. I understand that you work there off-duty. Is that correct?

**OFC. CAREY:**      Yes ma'am. I had worked off duty during the day and I was subsequently relieved by Ofc. Jones. Uhh, she took over the afternoon shift and I think if we look at the time here it says 1645. I don't know exactly what time she came in to relieve me. I don't know whether it was 3:30 or 4:00. It would be on a schedule. So she relieved me and then I sat up in the office and, you know, we were up there kind of talking for a little bit.

**DET. WATKINS:**      Then what happened? How did you get involved with Mrs. Malone?

# TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN            I.A.B. CASE: 99-67
INTERVIEWED:  CAREY, R. B. OFC.         TRANSCRIBED: 09/28/99

---

**OFC. CAREY:** We got a call to go to the bridge area. Uhh, reference something. They needed us in bridge.

**DET. WATKINS:** What is "bridge"?

**OFC. CAREY:** Well, that's kind of a good question because, you know, for as long as I've been there, you know, they've always referred to that as the bridge area but it's, it's kind of like designer clothing. You know, like designer names and I really don't know where the term bridge, where the term bridge comes from. Uhh, but there's DKNY, Peter Nigod.

**DET. WATKINS:** Peter who?

**OFC. CAREY:** Nigod. Uhh, Ellen Tracy. You know, there's kind of like top, top—

**DET. WATKINS:** Top of the line type clothes?

**OFC. CAREY:** Yeah. Adrian Venidetti, you know, clothes of that nature. You know. More expensive clothing in this area.

**DET. WATKINS:** OK. So you got a call to go to that bridge area?

**OFC. CAREY:** Yes.

**DET. WATKINS:** Did you, at that time, go alone to that area?

**OFC. CAREY:** Myself and Ofc. Jones responded to there. I was just getting ready to leave. I had my, uhh, my extra-duty pay voucher that I was, kind of like, filling out and we walked down to where bridge was, came down the down escalator, walked to the bridge area and, uhh, that's located in the, I guess it would be, in

**EXHIBIT M**
**Page 2 of 31**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN        I.A.B. CASE: 99-67
INTERVIEWED:  CAREY, R. B. OFC.        TRANSCRIBED: 09/28/99

---

the west side of the store in between where the mall entrance is and their elevator, uhh, entrance would be. Just, uhh, just a little bit north of where the north B entrance doors to the store is. And close to the, to the center, main center aisle of the store that runs east and west. So I walked down there with Ofc. Jones (telephone ringing) uhh, kind of scanned the area to see if I could notice any type of a problem, immediately, and the only thing that I noticed was in the area, uhh, closest to the west wall I noticed the Assistant ASM, Jane Fannin, standing over there, uhh, near one of the clothes racks with a white female whom I have never seen before. So I kind of assumed that that was probably where the problem was. And, uhh, Ofc. Jones responded to that location then I walked over to where the, the telephone and cash register stand is and, at that time, I began to prepare my time voucher. So I was kind of busy writing while Ofc. Jones was over, kind of meeting, with the Assistant ASM.

**DET. WATKINS:**        How far of a distance would you say it was from where you were standing in comparison to where they were standing?

**OFC. CAREY:**        Maybe twenty feet, an approximate of twenty feet or whatever else. Uhh, maybe a little bit more, maybe, give or take, you know, a little bit.

**DET. WATKINS:**        Did you have them in eyesight, Ofc. Jones and the ASM?

**OFC. CAREY:**        Not, not at that time, no. I was, you know, she walked that way and I put, I put the time sheet down and I was going to, you know, fill

3

**EXHIBIT M**
**Page 3 of 31**

# TAMPA POLICE DEPARTMENT
## Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN      I.A.B. CASE: 99-67
INTERVIEWED: CAREY, R. B. OFC.      TRANSCRIBED: 09/28/99

---

out the time sheet and leave, you know, that's, that's what I was going to do. And, uhh, while I was preparing the time sheet Ofc. Jones came back and made contact with me and, uhh, apparently they had explained to her what was going on and then she came over and made contact with me and then she headed over to where this, uhh, Melveen Malone was.

**DET. WATKINS:**      Now, where they were standing, the store clerk apparently and the ASM, could they see Mrs. Malone and Ronda from where they were standing?

**OFC. CAREY:**      Yeah. I would (clears throat) I would assume that they would be able to see her. (Sigh) Where I was, where I was standing by this, uhh, cash register the witness employee, uhh, and you'd have to—Lucia—

**DET. WATKINS:**      That's close enough.

**OFC. CAREY:**      And I don't know how—and I don't know what her last name is. If you told me I might recognize it, because that's the first time I have ever seen her before. Where she and Ms. Fannin were standing were off to my right, uhh, to, to my right a little bit and across from me. And where Mrs. Malone was contacted she was off to my left, towards the corner of, it's kind of difficult to explain but the, the department kind of, it's kind of angled slightly. There's an aisle that kind of goes through the middle of the department and then it, this, uhh, kind of a, not a right angle but, you know, an angle where it kind of goes in a, like a, like a, like a hex shape or something like that way where, you know, you would continue to walk through the main

**EXHIBIT M**
**Page 4 of 31**

# TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN        I.A.B. CASE: 99-67
INTERVIEWED:  CAREY, R. B. OFC.        TRANSCRIBED: 09/28/99

---

aisle of the store.  I'm on one side of the aisle and Fannin and this other woman were on the other side of this aisle.  So they were not in the same immediate area.  Uhh, it's all kind of like the bridge area but they were across the hallway, you know, from where the, you know, Mrs. Malone was.

**DET. WATKINS:**        Now, how far distance, at this time, would you have been from Mrs. Malone?

**OFC. CAREY:**        Maybe, again, maybe about fifteen feet.  Maybe give or take a little bit.  She would have been to my left but up until that point I hadn't even noticed her.  Uhh, you know, I didn't, you know, even when I came into the department I didn't make any special, special notice of, like anything unusual, you know, I mean to me.  There was nothing unusual.  Uhh, the only thing I saw was Fannin and this other girl and that's where I assumed the problem had been, you know, because I pointed that out to Ofc. Jones.

**DET. WATKINS:**        So what happened when you saw Ofc. Jones go towards Mrs. Malone?

**OFC. CAREY:**        Well, she came by and you know, told me that, you know, she might be going 10-15.  She walked over to that area.  I finished writing whatever I was writing and then I walked over to assist her.  She had already made contact with her.

**DET. WATKINS:**        With Mrs. Malone?

**EXHIBIT M**
**Page 5 of 31**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN        I.A.B. CASE: 99-67
INTERVIEWED: CAREY, R. B. OFC.        TRANSCRIBED: 09/28/99

---

**OFC. CAREY:**        Yeah. When I approached. And she was already engaged in conversation with her. And, uhh, she requested her to go up to the, the office with you know, uhh with Ronda. Ronda requested Mrs. Malone to, you know, accompany her up to the office.

**DET. WATKINS:**        Did she explain to her why?

**OFC. CAREY:**        When I was there she, she eventually explained that somebody had witnessed her put something in her bag. And when she asked her to go to the office Mrs. Malone became nervous, what I would consider to be nervous, and excited, and she was kind of questioning why. And, uhh, Ronda explained, "If you come up to the office I'll explain to you why." And, uhh, Mrs. Malone kind of, uhh, backed away from her and kind of stepped backwards a little bit and, at that point, uhh Ronda reached out and took a hold of her arm, took the packages that were in her hand, because she had two bags in her hand, two Dillard's bags and then she had, uhh, a purse that was on a strap over her shoulder and, uhh, she kind of took control of the bags and pulled the bags away from her and handed me the bags, and then she reached down and got her handcuffs and told her that she was under arrest. And she handcuffed her and then, uhh, began to escort her to the security office, which is upstairs.

**DET. WATKINS:**        Now at this point Ofc. Jones has not told you what she was told by the ASM or the clerk?

**OFC. CAREY:**        No. I had—no. I have no idea. I have no, I have no earthly idea, you know, what's going on. And, uhh, she told me, Ronda told me,

**EXHIBIT M**
**Page 6 of 31**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN          I.A.B. CASE: 99-67
INTERVIEWED: CAREY, R. B. OFC.        TRANSCRIBED: 09/28/99

---

"Check around the rounders" that are on the floor, the clothes racks, you know, for maybe something that had been dropped. We were there for several moments. I can't tell you exactly how many minutes but it was long enough for me to, you know, start filling out the sheet and I was kind of concentrating on filling out the sheet while I'm standing there at the register. She goes over and talks to whomever, so I'm, I'm standing in plain sight in the department, in uniform, just like this, in plain sight for, you know, several moments. We both walked up together. Ronda crossed, you know, the, the, the main aisle of the store to go over to talk to Fannin and this other woman and then, uhh, she came back, you know, made contact with me and then walked over to where, you know, Mrs. Malone was.

**DET. WATKINS:**          You said you were filling out the "sheet." What sheet are you referring to?

**OFC. CAREY:**          My, my extra—off-duty sheet. My extra-duty worksheet. The pay voucher is what I'm filling out and then, uhh, of course, Ronda leaves to go upstairs. I go over to where the rounders are. And, of course, I have her bags now. I have—Ronda went to try to take her purse off but she was handcuffed and the strap was, kind of like, you know, over her shoulder. We couldn't get that off so she went upstairs.

**DET. WATKINS:**          Did Ronda handcuff her in the front or the rear?

**OFC. CAREY:**          Pretty sure it was the rear. OK. Uhh, so, you know, they, they leave and go upstairs and, uhh, then of course I checked inside the bags. She

7

**EXHIBIT M**
**Page 7 of 31**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN      I.A.B. CASE: 99-67
INTERVIEWED:  CAREY, R. B. OFC.      TRANSCRIBED: 09/28/99

---

had a dress that was in a dress bag.  Usually when, and you're a woman so you probably know this, a lot of times when women purchase, and it's probably more so than, than, more frequent than not, when women buy dresses, rather than taking a dress and folding it, and folding it, and folding it, and folding it and then sticking it inside a regular, you know, brown Dillard's bag, they'll, they'll leave it on the hanger and I guess, normally they will ask you, "Do you want it left on the hanger?"  They leave it on the hanger and then they put like a clear plastic garment bag that's got the Dillard's insignia on it over the thing and then a lot of times they'll tie the bottom so that the dress doesn't come out of the bag, so that it doesn't get wrinkled, so that if a woman puts it down a little bit the thing isn't dragging on the floor, I guess, you know, where the material could be damaged or where it could get, you know, dirty or soiled or whatever else.  So she had that in the brown Dillard's bag.  Then she had—

**DET. WATKINS:**      Just the plastic or the dress in the plastic?

**OFC. CAREY:**      Dress in the plastic.  Then there was a separate dress bag, the same type of bag that was unused, that had no merchandise in it whatsoever in there.  And then in that bag there was a second bag that had some type of a small purse in.  And I can remember the purse had, like a, sales, sales ticket on it.  And then the other bag contained, I believe it was, a pair of shoes.  So there was, uhh, a bag inside the bag with merchandise in it and then there was the dress inside the garment bag and then there was an empty, unused garment bag that was in there as well.  And then she had a separate bag that I believe had one pair of shoes in it.

**EXHIBIT M**
**Page 8 of 31**

# TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN        I.A.B. CASE: 99-67
INTERVIEWED:  CAREY, R. B. OFC.        TRANSCRIBED: 09/28/99

---

**DET. WATKINS:** OK. Now, when you were checking this bag out was there anyone present to witness that?

**OFC. CAREY:** I'm not sure. I'm not sure if Jane Fannin was there or not. She, Jane, may have been there, uhh, when I was there. Uhh, but when I looked at that stuff I said, you know, that, that this doesn't look good. You know, it doesn't look like, it looks like everything that was in there, kind of like, belongs there. You know, when I looked at it. So, uhh, I went upstairs and I spoke to Ronda. I showed Ronda the thing, this woman had receipts for everything that she had purchased. And even though it, there was, like, there was like one receipt that had several purchases on it, but she didn't have the products for that and I think it was stuff that was being shipped maybe back to Kentucky or whatever else.

**DET. WATKINS:** Now, were the receipts that the woman had, were they in the bag or were they in her possession?

**OFC. CAREY:** I think they were in her possession, in her purse maybe. I'm not exactly sure where the receipts came from. But we were able to match receipts to merchandise or whatever else, you know, and then it was determined that everything that she had had been paid for. Uhh, I spoke to Lucia, what's her last name? Do we have her last name?

**DET. WATKINS:** If we do, Ranier.

**OFC. CAREY:** OK. Ranier. I spoke to her. Ronda, Ronda sent me back down to get her information and I spoke to her.

9

**EXHIBIT M**
**Page 9 of 31**

# TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN       I.A.B. CASE: 99-67
INTERVIEWED: CAREY, R. B. OFC.       TRANSCRIBED: 09/28/99

---

**DET. WATKINS:**       Now she would be the clerk there in that bridge area?

**OFC. CAREY:**       Yeah. She's—there's a couple of clerks. Because this—usually this one sales associate assigned to every register area and then sometimes—I know over in the men's area especially, there's usually somebody that's extra. You know, there's usually maybe two people assigned somewhere. Like sometimes there's two people assigned to POLO or there's two people that are assigned to, uhh, uhh, maybe Men's Tommy or to Slacks or to Denim or wherever. You know, so sometimes there's more than one employee assigned to a specific area. But, in her area, her area was on the DKNY side, which is the side that's closest to the west wall. And this woman was over on the opposite side and, uhh, you know, I talked to her and she showed me, she walked, she walked me through whatever she, she saw because me and Jane Fannin, the Assistant Manager, went back and we checked, kind of like, the sales racks again, and we looked around on the floor and, uhh, you know, in the racks, amongst the racks and everything else. And it almost appeared as though everything that was there belonged there, but of course, if you were to shoplift something from there, more than likely, you know, it would be there anyways. Do you know what I mean?

**DET. WATKINS:**       Uh, huh. (Affirmative)

**OFC. CAREY:**       You know, there was, you know, there appeared to be nothing out of place, let's put it that way, you know. And I didn't see anything that was lying on the floor but I checked that area and this Lucia, she, she walked me through

**EXHIBIT M**
**Page 10 of 31**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN                 I.A.B. CASE: 99-67
INTERVIEWED: CAREY, R. B. OFC.               TRANSCRIBED: 09/28/99

---

because I asked her.  I got her information for Ronda and I asked her, I said, "A lot of times people when they buy something sometimes try to match colors."  You know, they'll go and they'll take something out of the bag and they'll try to, you know, like hold it up against something else.  Like shoes, belts need to match shoes and, you know, maybe a skirt needs to match a blouse or, or whatever else you know.  But you know matching colors.  And I specifically asked her if that's what she thought this woman may have been doing.  And she said, "No."  She said, "She put something in the bag."  But she told me she wasn't sure what it was.  That's what she told me.  And when I asked her, uhh, (pause) this, in the diagram I draw here is probably not going to be like real—

**DET. WATKINS:**                 Let me get you a piece of paper so you can have a better view here.

**OFC. CAREY:**                 Wish I had something that was like a, just like a little, so I can draw something, like a straight line.  These angles are probably not going to be accurate.

**DET. WATKINS:**                 Uh, huh.  (Affirmative)

**OFC. CAREY:**                 Right here there's like a display on the corner of the department.  Over here, over here is another display and they're directly across from one another.  There, there used to be, like, a little glass enclosure case and now they're kind of open, but there's a little, there's like a  little foot area, you know, that comes out like this and then there's a display and normally they'll put some sort of a mannequin or something on the display.  Here is the elevator opening, where you go and get on the

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN                 I.A.B. CASE: 99-67
INTERVIEWED: CAREY, R. B. OFC.               TRANSCRIBED: 09/28/99

---

elevator or go out into the dark area where they receive their merchandise. And then, of course, this is, this is all kind of open. But this Lucia told me that she was looking for the sales associate, Joan, and that's who I saw over here coming out of like the, like the back room of the fitting room that's over here. But she said that she was walking down here and she was kind of walking fast and then she made a sharp right turn right here and walked into this area, right over here, and that's where Mrs. Malone was. And that's where she saw her put something in the bag. And, of course, you know, I asked her about the—I was, I was specific about asking her about her, about matching the clothing because I see people in there do that all the time. You know, and people are constantly doing it. You know, and this is a tough business sometimes because people, (laughs) people are funny, you know, and it makes you think a lot of times. But some people, some people carry merchandise into the store without having a bag or anything on it and it's stuff that they have that they're trying to return or whatever else.

**DET. WATKINS:**                 Now where Lucia, where she came to where you said Mrs. Malone was standing in this area, was there any racks in her or anything in between the two of them?

**OFC. CAREY:**                 Yes. This whole area is full of—this, there's clothes on the wall and then there's, there's rounders and racks that are in here. So that's where she's standing, in amongst the racks over here.

**DET. WATKINS:**                 OK.

**EXHIBIT M**
**Page 12 of 31**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN        I.A.B. CASE: 99-67
INTERVIEWED:  CAREY, R. B. OFC.        TRANSCRIBED: 09/28/99

---

**OFC. CAREY:** And that's where she turned into. You know, when she came and turned she showed me right where she walked and turned into so, it—to me, I would almost have the opinion that if you were to be watching her you would think that she was going to walk by and at the last second she just happened to turn left and she turned in, into there, you know, and of course, that's when she says she sees her stick something in the bag. She's not—she told me, you know, "I'm not sure what it was, but she stuck something in the bag." And, you know, I asked her about the matching the color thing and she said—is the new machine broken already.

**DET. WATKINS:** No. We're doing good. We're going to run out of tape here in a minute but go ahead.

**OFC. CAREY:** And she said that. You know.

**DET. WATKINS:** So, at that point, after she showed you where she went or what happened, what did you do?

**OFC. CAREY:** Well, that's where, that's where Ofc. Jones made initial contact with her, in that same area.

**DET. WATKINS:** In that same area.

**OFC. CAREY:** So, you know, it's, you know, we had already looked, we had already looked on the floor to see if anything was laying on the floor, uhh, and—

**DET. WATKINS:** Ofc. Carey if I can just pause for a minute. We're about to run off tape on Side B. So we're going to go ahead and go to another tape.

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN       I.A.B. CASE: 99-67
INTERVIEWED:  CAREY, R. B. OFC.       TRANSCRIBED: 09/28/99

---

**OFC. CAREY:**        I didn't know I was that big winded.

**DET. WATKINS:**        This is, again, Det. Watkins and I'm continuing my interview with Ofc. Carey.  Go ahead.

**OFC. CAREY:**        I just wanted to reiterate about the, you know, that I, that I had asked her about matching the clothing and she said that that wasn't what she was doing.

**DET. WATKINS:**        So after you talked with Lucia did you go back to where Ofc. Jones was?

**OFC. CAREY:**        Yeah.  I went back up and talked to Ofc. Jones, uhh, (sighs and pauses) I had also spoke to Jane Fannin.  And Fannin told me, uhh, I can't exactly remember, but—let me go back just a little bit.  Lucia tells me, you know, as I'm getting ready to depart the department, she tells me, well she states to me, "Let me know what happens because if I bag one I get twenty-five bucks."  And she makes that statement to me as, as I'm walking away but, (sighs) I don't know what their exact policy is, but if an employee is involved with the apprehension of a shoplifter they usually give them some sort of, I don't know whether you would call it bonus money or what, in their paycheck.  You know, there's some type of a, maybe an incentive or a reward and I'm not exactly sure how they refer to that.  So, of course, that's what she tells me as I'm walking away.  "Let me know what happens because if I bag one I get twenty-five bucks."  And Fannin told me—when I told her it didn't look good, because I told her, "This doesn't look good."  Because I looked in the bag.  I looked at the merchandise.

**EXHIBIT M**
**Page 14 of 31**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN       I.A.B. CASE: 99-67
INTERVIEWED: CAREY, R. B. OFC.       TRANSCRIBED: 09/28/99

---

And I believe I showed her afterwards. I says, "This doesn't look good." She made some sort of statement to me, and I'm not, the other one is almost a direct quote, or as an exact quote, but, uhh, Fannin says something like, you know, "Mrs. Malone was kind of like looking around like a thief." And I guess my interpretation of that would be, they, they watch you instead of looking at the clothing and that's, that's a common thing when people come in and sometimes they're in there shopping, uhh, when they're in there shopping and they're not shopping, you know. Sometimes when they're, I guess maybe, coming in to, you know, commit the criminal act. And a lot of times an employee will tell me that, you know, when—if I get a call to go down to an area where somebody suspicious, they'll tell me, "They're watching me. They're not looking at the clothes." They're not doing whatever. "They're watching me." And a lot of times when we get called to an area because of suspicious activity, the people that are the subject of the suspicion will, within moments of our arrival, leave.

**DET. WATKINS:**       So after you had that conversation with Fannin, you went back up to Ofc. Jones location?

**OFC. CAREY:**       Right. And Fannin—

**DET. WATKINS:**       What happened?

**OFC. CAREY:**       And Fannin said to me, also, she said, "Maybe, maybe we should have just watched her." But she said something to the effect of she was, you know, "looking around like she was a thief."

**DET. WATKINS:**       How was Mrs. Malone dressed? Do you recall?

**EXHIBIT M**
**Page 15 of 31**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN          I.A.B. CASE: 99-67
INTERVIEWED:  CAREY, R. B. OFC.          TRANSCRIBED: 09/28/99

---

**OFC. CAREY:**          There would be a picture of her at Dillard's, unless they've taken it.

**DET. WATKINS:**          Is it a full body picture?

**OFC. CAREY:**          No.  It's, it's going to be more of a head shot, uhh, she had on some sort of a, a, and it says in here a lime green outfit.

**DET. WATKINS:**          You're referring to the custody memo?

**OFC. CAREY:**          Yeah.  And I don't know whether it's a custody memo.

**DET. WATKINS:**          Or the TPD Crime Analysis report.

**OFC. CAREY:**          Right.  Short sleeve shirt, lime green, Capri pants.  Like, I guess, that must be like the bicycle style.

**DET. WATKINS:**          Yes.  Just below the knee.

**OFC. CAREY:**          Yes.  The bicycle style pant and then some sort of a green top.  And I forget what she had on for shoes.

**DET. WATKINS:**          As far as her overall appearance, would you characterize it as average, neat, not average?  Was it anything striking about her appearance that uhh—

**OFC. CAREY:**          I don't know.  She wasn't—

**DET. WATKINS:**          You know how you can say some people are well dressed when they go shopping.  Some people are just average when they go shopping.

**EXHIBIT M**
**Page 16 of 31**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN      I.A.B. CASE: 99-67
INTERVIEWED: CAREY, R. B. OFC.      TRANSCRIBED: 09/28/99

---

**OFC. CAREY:**      Right. I was going to say if, if I had to characterize this, I wouldn't say that she looked out of place in there shopping. You know, sometimes you're in the POLO area and you'll see somebody come in wearing kind of like tattered pants or an old dirty T-shirt or whatever else and you know that kind of raises the red flag a little bit because if they're in shopping POLO you would almost expect them to kind of be dressed similar to like, to that when they walk through the door. Unless maybe they're in there shopping for a gift for a, you know a brother or a father or an uncle or an aunt.

**DET. WATKINS:**      Uh, huh. (Affirmative)

**OFC. CAREY:**      Or somebody else, you know, you would almost expect them, but I wouldn't say that she appeared, uhh, out of place or anything.

**DET. WATKINS:**      OK. So when you get back where Ofc. Jones is, do you relate to Ofc. Jones your conversation with Lucia?

**OFC. CAREY:**      Eventually I do, but we, you know, this, there's conversation in there that transpires uhh—I'd gone up to where she was. We had done whatever and then eventually she takes the handcuffs off of her, off of Mrs. Malone. But she decides to go ahead and have the trespass warning issued as well.

**DET. WATKINS:**      Now is that policy to give them a trespass warning in a situation like that? What is the policy, if you're supposed to give them a trespass warning, that you're aware of at Dillard's?

**OFC. CAREY:**      I, I, you know, I don't believe there's a specific written policy. I know some people—because if you look at the book, sometimes when

**EXHIBIT M**
**Page 17 of 31**

# TAMPA POLICE DEPARTMENT
## Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN          I.A.B. CASE: 99-67
INTERVIEWED:  CAREY, R. B. OFC.          TRANSCRIBED: 09/28/99

---

you come in, you'll see trespass only, below somebody's photo, if you flip through the, the book.  Now sometimes people will come in and they, they'll be an associate of somebody that is arrested for shoplifting and they'll be issued the trespass warning along with the person that's been arrested.  So, you know, there may be something but I'm not specifically aware of, of anything.  I know that, uhh, you know, in Mrs. Malone's case, you have an employee that's stating, "She stuck something in the bag."  And that would be an indication that if you conceal something, maybe with the intent to deprive the merchant, than you've committed the theft.  But in this particular case no merchandise was ever recovered.  (Telephone ringing) And the only, the only basis for our contact is, is based upon what, you know, the employee, you know, in part related to us.  You know, she, she made, you know, she's the one that, you know, establishes the probable cause.

DET. WATKINS:          The employee?

OFC. CAREY:          Yeah.  The employee, the probable cause that this woman has committed a theft, at least from my interpretation of the whole situation.  And I'm quite certain if Mrs. Malone would have just accompanied Ofc. Jones upstairs to the security office, even though a situation like that might be you know, still, you know, somewhat embarrassing, you know everything would have been done behind closed doors.  It would have been a matter of her, you know, showing, you know, showing us that, you know wait.  I have this, this, this, and this and here are, you know, here are my receipts to show that I purchased everything and then it would have been, you know, a— who knows what course of action would have—

**EXHIBIT M**
**Page 18 of 31**

# TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN       I.A.B. CASE: 99-67
INTERVIEWED:  CAREY, R. B. OFC.       TRANSCRIBED: 09/28/99

---

**DET. WATKINS:** How long have you worked off-duty at Dillard's?

**OFC. CAREY:** A long time.  (laughs)  I'm not sure how long they've been there.

**DET. WATKINS:** Just a guesstimate of years.

**OFC. CAREY:** They took, they took over—I guess it used to be Robinson's, then it became Maison Blanche, then Dillard's took over there.  Maybe '90 or '91.  And I worked there for a little bit and then I didn't work there for a short period of time and then I went back there and I worked there, again, from that point till present.

**DET. WATKINS:** After you talked to Lucia and then you went back and made contact with Ofc. Jones, what was Mrs. Malone's demeanor or behavior then?

**OFC. CAREY:** Well, I spoke to her real brief in the, in the office. Uhh, she appeared to be upset, uhh, probably still nervous, uhh.  She was cooperative, you know, I mean she, she provided, you know, all the information to fill this out.  Uhh—

**DET. WATKINS:** Which is the Crime Analysis report.

**OFC. CAREY:** The Crime Analysis report.  Uhh, I asked her, I asked her if she was in town for the convention and she said, "Yes."  I believe I asked her if she had ever been arrested before and she told me no.  Uhh, I don't know whether I asked her anything else.  Uhh, something about if—see this is—She's from Shively.  I believe I asked her if she was near somewhere.  Somewhere near there or whatever else and she said, "No."  It wasn't near there.  You know, I might have said Memphis, you know, but I got the wrong state, like a knucklehead, you know.

**EXHIBIT M**
**Page 19 of 31**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN      I.A.B. CASE: 99-67
INTERVIEWED:  CAREY, R. B. OFC.      TRANSCRIBED: 09/28/99

---

**DET. WATKINS:** So now, while you're having conversation with her, at any point did Ofc. Jones tell you to "Shut up" as you were talking to her?

**OFC. CAREY:** Oh no. No. No. No I don't think—

**DET. WATKINS:** So by the time you're back in the office and you're making this talk with Mrs. Malone, it appears that she's calmed down at this point or was her behavior different now than what it was downstairs in the bridge area?

**OFC. CAREY:** Yeah. Yeah. She's, she's not, I mean, before (pauses) I think we're all trained to recognize certain signs, you know. And when you, when you talk to somebody or whatever else, you know, if there's some sort of, you know, distancing or, uhh, whatever else you know, it kind of concerns me that there's always going to be "fight or flight" you know, you know, you know, and you don't know. I mean, you just don't know all the time. And she had, she had backed up and Ronda had to, kind of like, take the bags from her, you know.

**DET. WATKINS:** And that's in the bridge area?

**OFC. CAREY:** That's in the bridge area. You know and she was, she was excited down there. She, you know, I mean—

**DET. WATKINS:** Would it not be unusual though, you've worked in the store for quite a period of time, for a person that is totally innocent to react if you really had no clue of what you were being detained for or being accused of stealing something; would it also be normal to act excited? Have you ever experienced that?

**EXHIBIT M**
**Page 20 of 31**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN                I.A.B. CASE: 99-67
INTERVIEWED: CAREY, R. B. OFC.               TRANSCRIBED: 09/28/99

---

**OFC. CAREY:**                    (Long pause)  I imagine anybody could get excited.

I mean, I don't know Mrs. Malone's—I don't know what's she's like.  I don't know her

personal, her personal behavior traits, uhh, you know, other than the contact that I had

with her, you know, that, that particular day.  So it would be, it would be difficult for me

to even, you know, venture to, uhh, to try to answer, you know, a question of her

demeanor or whatever else.  If I saw her today, here today, I—I mean, obviously I would

assume that if you were accused of committing some sort of crime and you hadn't

committed a crime then yeah, maybe, maybe your adrenaline would be raised a little bit.

You may develop some fear, nervousness, you know, because obviously there would be

apprehension involved in not knowing what, what course of action or, or, or what course

an investigation was going to take, you know, you know, just, you know, moments into

the future, you know.  So, you know I'm quite certain, yeah somebody could be excited

or scared or whatever else.

**DET. WATKINS:**                    So after you were in the office with Ofc. Jones and

the conversation you mentioned that you had with Mrs. Malone, how long did you stay in

there after that?  What happened after that?  Did you hang around?

**OFC. CAREY:**                    I stayed there—Ronda called for an ASM to do the

trespass.  And I think we called for Jane Fannin because Jane Fannin had been downstairs

initially.  Jane Fannin was aware of what had transpired.  It was even there, during a

portion of whatever happened, you know, whatever transpired.  How long they had

watched this woman before, before, uhh, we were called I don't know.  You know, I

21

**EXHIBIT M**
**Page 21 of 31**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN      I.A.B. CASE: 99-67
INTERVIEWED: CAREY, R. B. OFC.      TRANSCRIBED: 09/28/99

---

don't know whether it was a minute, ten minutes, twenty minutes. I, I just don't know, you know. I don't know what timespan transpired between the time this Lucia saw her do whatever and you know, then we arrived in the bridge area. But I was upstairs. They called for an ASM. I believe her name is Nancy McDonald responded. She gave her the verbal trespass warning. And what they tell them is that they're no longer welcome in this Dillard's or any other Dillard's and when, uhh, Mrs. McDonald told her this Dillard's it didn't seem to really strike a cord with Mrs. Malone but when they mentioned any other Dillard's I believe she even asked about, "Even back in Kentucky?" And that seemed to upset her, knowing that she would be trespassed from the stores back in, in Kentucky as well. I don't believe, I don't believe Dillard's has any way of really knowing, you know, if somebody's been trespassed from, you know, from, from one store or another other than maybe having some sort of contact. And they, you know, I told you before that they, that they keep some contact because they'll receive e-mails sometimes when—

**DET. WATKINS:**      At all the different stores?

**OFC. CAREY:**      Right. When somebody comes in and they'll do like a hit and run and run in and grab a bunch of POLO or Tommy or whatever else. They may get like a description of somebody, you know, and send and we've even sent them from our stores before when, you know, something like that has happened. Then, and then it alerts them to look for—

**DET. WATKINS:**      But not necessarily to Kentucky?

**EXHIBIT M**
**Page 22 of 31**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN   I.A.B. CASE: 99-67
INTERVIEWED: CAREY, R. B. OFC.   TRANSCRIBED: 09/28/99

---

**OFC. CAREY:**     No. I don't think it goes to Kentucky. (laughing) You know, I really don't think it goes to Kentucky. But she gave her the trespass warning, Ronda photographed her, and then Mrs. Malone left. And I believe I even asked her if she, if she wanted me to walk down with her, you know, while she left the store or whatever else and, you know, she declined and you know she left on her own. You know, she wasn't to the best of, at least to the best of my knowledge right now, she wasn't escorted from the store or anything.

**DET. WATKINS:**    As far as you know, does Dillard's have a policy as it relates to the police officers, that you all are actually supposed to see the crime occur prior to making the arrest on a shoplifting or attempting to make an arrest on a shoplifter?

**OFC. CAREY:**     There is, (clears throat)—They have, and if I'd been a little bit more prepared for this, and I can get you a copy of this, uhh, there's a policy that's under—there's like a policy sheet that's in, in the office at Dillard's. Technically, we're there as only a deterrent, but in the event that something happens, you know, we're there to take action as well. It's not specifically us but I believe it, it—and I don't, I can't quote you what the sheet says but to the best of my knowledge, if we don't see it or another employee doesn't see it, than it kind of didn't happen. And there's been times where you know people believe that the bags may have gotten a little bit fatter or whatever else and you've shopped in Dillard's and, you know, Dillard's is not unlike any other department store. But a lot of times you have high racks or high rounders, you know, somebody could walk behind a rack. Sometimes people hear the noise of bags

**EXHIBIT M**
**Page 23 of 31**

# TAMPA POLICE DEPARTMENT
## Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN          I.A.B. CASE: 99-67
INTERVIEWED: CAREY, R. B. OFC.          TRANSCRIBED: 09/28/99

---

rustling, uhh, you know, there's, there's a lot of things that happen in these stores that, you know, are suspicious but aren't actually acted upon because somebody didn't actually witness somebody stuff something directly inside. And then there's other times that, you know, that you know sometimes you know I mean, I mean, I saw a kid go out of there one day with a Bentley, Bentley luggage bag full of clothing. Bentley luggage. But it's kind of a semi-translucent bag and it was packed full of clothing. And Ofc. Torres approached the kid to, you know, to kind of raise question as far as you know the contents of the bag and this kid took off and ran. And he ran from the third level down to the second level, ran across the garage, and then leaped off the second floor of the parking garage with that bag, and then eventually bolted to a, a rental car that was parked underneath the parking garage and took flight, you know, with a female. So you know there's sometimes the things have the appearance of whatever, but as far as a specific policy, if I see something, uhh, I'm, I'm not to act, the last, the last three arrests that I made, I arrested three black females, uhh, an employee Ruth LaBorder, I think her last name is, and then another girl uhh, Martha, and she's got one of them Spanish last names like, it's not Martinez but it's like that.

DET. WATKINS:          Don't worry about it.

OFC. CAREY:          They saw three girls stuffing POLO purses into bags. They called me. I responded. As I'm coming down the escalator I can see Ruth, like this, you know.

DET. WATKINS:          Like beckoning you to come over?

24

**EXHIBIT M**
**Page 24 of 31**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN                I.A.B. CASE: 99-67
INTERVIEWED:  CAREY, R. B. OFC.             TRANSCRIBED: 09/28/99

---

**OFC. CAREY:**                    Yeah.  Like come on.  You know, like right now.

She tells me, you know, that, that, you know, the girls are over here in her department

stuffing the purses, which are from another department in bags, but when I get there, you

know, of course, I want somebody to be able to at least point the finger at somebody and

say, "That's the suspect right there."  And, of course, I saw a black female holding a bag

and she saw me and I said, "Ruth, is that one of them?"  And when I looked back, after

looking at her, she was already gone out the door running.

**DET. WATKINS:**                  So if a clerk points out a person specifically and

says that person just stoled something, you would at least look into the matter?

**OFC. CAREY:**                    Oh, absolutely.  Oh I most certainly would.  I

would, first I would try to determine what they saw, you know.  It's not going to be the—

it would be something where I would, I would investigate.  Uhh, sometimes you get a call

and they're, like, they're regulars.  You know, they come here all the time.  I talked to

you about that before, you know, where they see people that come and you know

sometimes they come in and they never they purchase anything but they go out with bags

that are full.  Uhh, we would have to see something, you know.  I mean, not us

specifically, but an employee—

**DET. WATKINS:**                  Or yourself?

**OFC. CAREY:**                    Would have to see them conceal merchandise.  If an

employee told me that this person concealed something in a bag that would give me

**EXHIBIT M**
**Page 25 of 31**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN        I.A.B. CASE: 99-67
INTERVIEWED:  CAREY, R. B. OFC.        TRANSCRIBED: 09/28/99

---

probable cause to believe that they were in fact committing a crime and you know, I would, I would stop that person and investigate.

**DET. WATKINS:**        Now initially when Ronda and yourself came to the bridge area, way back to the beginning that started this whole thing, were you privy to any of Ronda's conversation with Lucia or the ASM?

**OFC. CAREY:**        No.

**DET. WATKINS:**        You weren't privy to any of that conversation?

**OFC. CAREY:**        No.  Not at all.

**DET. WATKINS:**        Did you hear anything mentioned that perhaps Mrs. Malone had taken a T-shirt or had a T-shirt in that area?  Does that sound familiar at all?

**OFC. CAREY:**        No.  Not, not anything about a shirt.  Uhh, the only thing that, and I explained before, that this Lucia told me, you know, that she put something in the bag and she, she told me that she wasn't sure what it was.  She put something in the bag.  And then I asked, again, I specifically asked her about if it was something you know where she was trying to match colors and she said, "No.  It definitely wasn't."

**DET. WATKINS:**        Now I'm going to test your memory on this one.  As you left for that day do you recall the weather conditions?  Was it raining?

**OFC. CAREY:**        Yeah.  It, it, as a matter of fact, I'm glad you mentioned that because, uhh, it had—I don't know whether—it, it was kind of a day similar to this outside.

**EXHIBIT M**
**Page 26 of 31**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN         I.A.B. CASE: 99-67
INTERVIEWED: CAREY, R. B. OFC.         TRANSCRIBED: 09/28/99

---

**DET. WATKINS:**         Which is dark and dreary and rainy.

**OFC. CAREY:**         Right, you know. And, uhh, we asked about the bag she had, the dress bag, and she, Mrs. Malone, and she told us that an employee had gave, had given her that bag so that she could put it over her head to get to her car to, uhh, so she didn't get, you know, rained on.

**DET. WATKINS:**         You've been working at Dillard's for quite a while, since you've been working there, do you have any personal knowledge of any, persay, profiling going on at Dillard's where perhaps certain groups of people or certain races are targeted more than others at Dillard's?

**OFC. CAREY:**         I'm not aware of profiling. Uhh, I can't, you know, I mean—there, there are people that come in sometimes that appear to be suspicious and, uhh, when somebody suspicious comes in, you know, all I know is that, you know, that the employees will call. Uhh, and you know we'll respond to wherever it is, address whatever type of issue that has been brought to our attention, uhh, sometimes, sometimes, and I explained, sometimes there's more than one employee in a specific area. But then other times maybe because of illness or whatever else, maybe there's not enough coverage and sometimes we'll even get called to an area if a lot of people are shopping in an area and you got one employee that's kind of really, really busy. You know, sometimes they just want an extra pair of eyes up in an area, you know, maybe an extra body up there just to maybe to prevent or deter. But I'm not aware of profiling. Nobody's ever mentioned profiling to me, you know, like, specifically watch out for

**EXHIBIT M**
**Page 27 of 31**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN                    I.A.B. CASE: 99-67
INTERVIEWED:  CAREY, R. B. OFC.                 TRANSCRIBED: 09/28/99

---

black males or black females or Hispanics or, you know, whatever. I mean, I think even when we go through the academy, you know, they told us that, you know, that the, that the common shoplifter, and that's back in the 19—early 1980's.

**DET. WATKINS:**          1980's?

**OFC. CAREY:**          (Laughing)  You know, like, was like the white female that, maybe fourteen years of age, uhh, I think sometimes the shoplifting stuff could be very big business for people. You know, they, I mean, you know, they talk, you know, billions of merchandise that's shoplifted from maybe retail agents you know throughout, maybe it's the world, I don't know, you know. But it's a lot of money that's stolen so it's big business for some, you know, to come in a steal. And, you know, sometimes it's the, you know, load up the bags and sometimes it's the, you know, run through the door and grab whatever and run back out. But you know they—I think each case we have is, you know, and I can't speak from what an employee's personal bias is or prejudices might be or whatever else but, you know, they—I mean, it seems to be our (deep sigh) our run of almost any situation that could arise, you know, if it's we're running out of tape again?

**DET. WATKINS:**          Uhh, yes we are.  We got a little bit.  Go ahead. We're about to wrap it up.

**OFC. CAREY:**          But you know, if, you know, if it's a suspicious, you know, lady, if it's a suspicious man, you know, whatever they believe the case may be,

**EXHIBIT M**
**Page 28 of 31**

## TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN                    I.A.B. CASE: 99-67
INTERVIEWED:  CAREY, R. B. OFC.                 TRANSCRIBED: 09/28/99

---

you know, I mean, they may call and have us come down and we'll address the issue and if it turns out to be nothing than it's nothing. You know.

**DET. WATKINS:**                 And I believe we are going to run out of tape on this question so let me go ahead and stop and we'll go to the other side.

**OFC. CAREY:**                   OK.

**DET. WATKINS:**                 This is again Det. Watkins and I'm continuing my interview with Ofc. Carey.

**OFC. CAREY:**                   (Makes a sound of whoosh, laughing)

**DET. WATKINS:**                 When you came, initially when Ofc. Jones came in contact with Mrs. Malone, what was her demeanor in her dealing with—

**OFC. CAREY:**                   Who?

**DET. WATKINS:**                 Ofc. Jones' demeanor?

**OFC. CAREY:**                   Her initial, her initial, her initial contact with her—I wasn't standing right there with her so I, you know, I don't know what her, uhh, initial contact was.

**DET. WATKINS:**                 But when you went over to her and subsequently you were given the bags by her, what was going on at that time?

**OFC. CAREY:**                   Uhh, I mean, she, she didn't appear to be doing anything wrong to me. You know, I mean, she seemed to be, you know, kind of professional. Obviously, obviously she was the officer that was in control. She had knowledge of what was going on, uhh, and she was in control of the situation and I was

**EXHIBIT M**
**Page 29 of 31**

# TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN         I.A.B. CASE: 99-67
INTERVIEWED:  CAREY, R. B. OFC.         TRANSCRIBED: 09/28/99

---

there just to assist her.  But you know, I mean, she wasn't yelling at her.  I didn't, I didn't perceive that she was being rude.  No profanity.  You know, nothing like that.  Nothing at all., I mean, she wasn't yelling at her.  I didn't, I didn't perceive that she was being rude. No profanity.  You know, nothing like that.  Nothing at all.

**DET. WATKINS:**         What about in the office upstairs?

**OFC. CAREY:**         Nothing like that either.

**DET. WATKINS:**         In her dealings with her?

**OFC. CAREY:**         You know, I mean, I was up and down, you know, because I went back down and got uhh Lucia's information.  You know, her date of birth and, and her name, but, uhh I didn't notice anything like that either.

**DET. WATKINS:**         Alright Ofc. Carey I think we have covered, at least I think just about everything.  Before we conclude this interview is there anything else that you care to state at this time?  I don't think we left very much out.

**OFC. CAREY:**         No I don't think so.

**DET. WATKINS:**         We're going to conclude this interview at this time. You are instructed not to discuss this investigation because it's still being investigated. It's an open IA complaint.  And this interview is concluded and the time is 1824 hours.

This interview was recorded on Tape #99-67, Tape #1, Side A & B, and Tape #2, Side A & B.

**EXHIBIT M**
**Page 30 of 31**

# TAMPA POLICE DEPARTMENT
### Internal Affairs Bureau

COMPLAINANT: MALONE, MELVEEN        I.A.B. CASE: 99-67
INTERVIEWED:  CAREY, R. B. OFC.        TRANSCRIBED: 09/28/99

*Det H/C. Watkins*
_____
H. C. WATKINS, Detective
Internal Affairs Bureau

mag

**EXHIBIT M**
**Page 31 of 31**

| TRESPASS WARNING<br>City of Tampa Police Department | Date Issued<br>09/07/99 | Time Issued<br>1723 | Expires<br>INDEF. |
|---|---|---|---|

**Issued To:**

Name:    Last  *MALONE,*   First  *MELVEEN*   Middle  *FUKUA*    AKA  *Pumpkin*

Address  *3915 ELGIN RD   SHIVELY, KY*

| Race<br>B | Sex<br>F | DOB<br>05/05/48 | Height<br>5'4" | Weight<br>150 | Eyes<br>BRN | Hair<br>BLK |
|---|---|---|---|---|---|---|

**Location When Warned:**

*347 WESTSHORE PLAZA*

**Restricted From:**

Address  *SAME*

Business Name  *DILLARDS DEPT STORE*

**Authority:**

Complainant's Name  *NANCY MACDONALD*

☐ Owner    ☑ Manager    ☐ Security    ☐ Agent

☐ Other (Explain):

**Officer Issuing Warning:**

| Name<br>*R.A. JONES* | Badge Number<br>215 | Division<br>FH/32 |
|---|---|---|

TPD 709 (2/97)



09/07/99

B/F MALONE, MELVEEN FUKUA
D.O.B. 05/05/48
TRESPASSED ONLY

**EXHIBIT N**
**Page 1 of 1**

# de la PARTE & GILBERT
### PROFESSIONAL ASSOCIATION
## ATTORNEYS AT LAW

DAVID M. CALDEVILLA*
ALICIA M. CARIDI
RONALD A. CHRISTALDI
CHARLES W. CRABTREE, JR.
EDWARD P. de la PARTE, JR.
L. DAVID de la PARTE
DAVID D. DICKEY
MICHAEL S. DORRIS
CHARLES R. FLETCHER
RICHARD A. GILBERT†*
PATRICK J. McNAMARA
\* BOARD CERTIFIED APPELLATE LAWYER
\* BOARD CERTIFIED IN BUSINESS LITIGATION LAW
† BOARD CERTIFIED CIVIL TRIAL LAWYER

101 E. KENNEDY BLVD.
SUITE 3400
POST OFFICE BOX 2350
TAMPA, FLORIDA 33601-2350
(813) 229-2775
FACSIMILE (813) 229-2712

FOUNDER
LOUIS A. de la PARTE

October 16, 2000

**By U.S. Certified Mail**
**Return Receipt Requested**

Mr. James Palermo
Tampa City Attorney
315 E. Kennedy Blvd.
Tampa, Florida 33602

Tampa Police Department
411 N. Franklin St.
Tampa, Florida 33602

> RE:   Notice of Claim
>          Robert Malone  SS# 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
>          Melveen Malone  SS# 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
>          3915 Elgin Rd.
>          Shively, Kentucky 40216

To Whom It May Concern:

This law firm represents Reverend Robert Malone and his wife, Melveen Malone. Please direct all future correspondence concerning this matter to me. Pursuant to Section 768.28(6), Florida Statutes, this letter is provided as written notice of the following claim against the City of Tampa (the "City") and/or the Tampa Police Department ("TPD") for the incident described below.

The Malones have claims for damages arising from the wrongful arrest, false imprisonment, outrageous conduct and infliction of emotional distress upon Mrs. Melveen Malone. The Malones are unaware of any unpaid prior adjudicated claim in excess of $200 owed to the State of Florida or any of its agencies, officers, or subdivisions by them. A summary of the facts upon which the Malones' claims are based is provided below.

The Malones are residents of Kentucky (at the above-referenced address), where Reverend Malone is a minister. On or about September 7, 1999, the Malones visited Tampa to participate in the activities of the National Baptist Convention being held here.

**EXHIBIT O**
**Page 1 of 2**

de la PARTE & GILBERT
PROFESSIONAL ASSOCIATION
October 16, 2000
Page 2 of 2

Dillard's maintains a retail store in the Westshore Mall of Tampa. On or about September 7, 1999, Dillard's employed extra-duty TPD officers in the Westshore Mall store. Sometime between 5:00 p.m. and 5:30 p.m. on September 7, 1999, Mrs. Malone was at Dillard's shopping. After having made several purchases, and without any unlawful activity on her part, Mrs. Malone was approached by TPD Officer Rhonda Jones. Officer Jones stopped Mrs. Malone, accused her of shoplifting, handcuffed her, and walked her through the store to an upstairs room, where Officer Jones frisked Mrs. Malone, searched her personal belongings, and questioned her.

All the while, Mrs. Malone maintained that she had not engaged in any illegal activity, and her requests to call to her husband were denied. Eventually, TPD Officer Robert Carey and Officer Jones confirmed that all merchandise in Ms. Malone's possession matched her receipts. However, even after they confirmed that Mrs. Malone had no stolen merchandise, the TPD officers nonetheless continued to keep Ms. Malone detained and handcuffed, and then they photographed her.

When Mrs. Malone was eventually released, instead of apologizing to her and offering her a ride back to her hotel, the TPD officers added insult to injury by telling Mrs. Malone that she was to immediately leave the store and that she was prohibited from ever again returning to this or any other Dillard's store. Even though it was a rainy day and Mrs. Malone had to walk a few blocks to get back to her hotel, the TPD officers also took from Mrs. Malone a clear plastic dress bag that a Dillard's sales clerk had previously given her to use as a rain poncho.

As a result of the foregoing, Mrs. Malone has suffered severe emotional distress, the expense of medical and nursing care and treatment, loss of earnings and the ability to earn money, bodily injury, aggravation of a pre-existing condition, and pain and suffering. Because of the outrageous conduct inflicted upon his wife, Reverend Malone has been deprived of his wife's society, companionship and consortium, as well as her assistance in and about their home and in her earnings at her employment.

The Malones hereby demand compensation for the damages they have sustained as a result of the foregoing events. If the City and TPD deny liability or otherwise do not desire to resolve this matter short of litigation, the Malones request that this claim be promptly denied rather than waiting the entire six (6) month period allotted under Section 768.28(6).

If you would like to meet with me to discuss this matter further, I would welcome the opportunity. I look forward to your prompt response.

Sincerely,

de la PARTE & GILBERT, P.A.

David M. Caldevilla

cc:   Honorable Bill Nelson, Florida Insurance Commissioner (By U.S. Certified Mail)
       Kirby Rainsberger, Esquire

EXHIBIT O
Page 2 of 2