FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Date 7-25-02   Time
CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

MELVEEN MALONE, and )
ROBERT L. MALONE, )
                              )
      Plaintiffs, )
                              )
vs. )   Case No. 8:01-CIV-2313-T-24EAJ
                              )
CITY OF TAMPA, )
                              )
      Defendant. )
_____)

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Melveen Malone ("Mrs. Malone") and Robert L. Malone ("Rev. Malone") sue Defendant City of Tampa (the "City"), and state:

### Allegations Common to All Counts

1.    This is an action seeking money damages for violations of the plaintiffs' constitutional and common law rights. Although this action was originally filed in the Circuit Court in and for Hillsborough County, Florida, the City subsequently removed the case to the U.S. District Court for the Middle District of Florida. This Court has jurisdiction pursuant to 42 USC §§ 1331, 1343, and/or 1367.

2.    Rev. and Mrs. Malone are African Americans.

3.    At all material times, Rev. Malone and Mrs. Malone have been husband and wife.

4.    At all material times, Rev. Malone and Mrs. Malone have been residents of Louisville, Kentucky, and citizens of the United States of America.

5.    The City is a municipal corporation of the State of Florida, and is located in Hillsborough County, Florida.

6.    At all material times, the City has operated the City of Tampa Police Department (the "TPD") as its agency and instrumentality.

Exhibit "4"
Page 1 of 20

7. Dillard's, Inc. is a foreign corporation engaged in the retail merchandise business, and at all material times, operated a department store located at Westshore Plaza, Tampa, Hillsborough County, Florida ("Dillard's Westshore") and utilized "extra-duty" TPD officers to assist in handling security issues.

8. At all material times, the TPD officers on extra-duty assignments at Dillard's Westshore wore full TPD police uniforms.

9. In December 1998, the TPD received an incident report alleging that several black female employees at Dillard's Westshore had received an anonymous letter, which stated, "Niggers need to know their place. 1 was fine 6 is too many." A copy of the incident report is attached to the original complaint as **"Exhibit A."** According to the incident report, the complaint was initially received and investigated by TPD Officers Robert Carey and Ronda Jones.

10. Victoria Morris was one of the Dillard's Westshore African American female employees who received said anonymous letter, and was also employed as an agent with the Florida Department of Law Enforcement ("FDLE").

11. In January 1999, FDLE Agent Morris communicated with TPD Officer Robert Tungate about the anonymous letters.

12. TPD Officer Tungate subsequently reported the matter to TPD Deputy Chief J. Siling, and this gave rise to a TPD Internal Affairs Bureau investigation, referred to as "IAB Case No. 99A-107."

13. On or about March 16, 1999, members of the TPD Internal Affairs Bureau took a sworn statement from TPD Officer Tungate. Among other things, TPD Officer Tungate's testimony included the following:

> DET. NEWMAN: Have you ever worked extra-duty at Dillard's?
>
> OFC. TUNGATE: No.

2

Exhibit "A"
Page 2 of 20

> DET. NEWMAN: Why not?
>
> OFC. TUNGATE: Uhh, several years **ago I had heard that if you worked at Dillard's that the management would tell you to follow blacks around**.
>
> DET. NEWMAN: For no reason, just to follow them.
>
> OFC. TUNGATE: **Just because they were black.**
>
> DET. NEWMAN: But you never, you **have no** personal knowledge of that. That's just what other officers have told you.
>
> OFC. TUNGATE: That's just, yeah, that **was just** rumor and that's why I never chose to work that job.
>
> DET. NEWMAN: So, when Agent Morris **said** something to you you put two and two together that there could be a concern?
>
> OFC. TUNGATE: Yes.

(Emphasis added). A copy of the complete transcript of TPD **Officer** Tungate's sworn statement is attached to the original complaint as **"Exhibit B."**

14. On or about March 16, 1999, members of the TPD Internal Affairs Bureau took a sworn statement from TPD Officer M.B. Hopper. Among other things, TPD Officer Hopper's sworn testimony included the following:

> DET. NEWMAN: Have you ever worked in an extra-duty capacity at Dillard's in Westshore Plaza?
>
> OFC. HOPPER: Yes.
> . . . . .
>
> DET. NEWMAN: ... While you were working there, extra-duty as a Tampa Police Officer, was there ever a directive given to you by a store supervisor or a store policy relayed to you by either a store employee or representative that dictated you watch any Afro-American customers in the store for possible illegal activity?
>
> OFC. HOPPER: There was never anything directly told to me, nor was I ever informed of any official policy, **but there was a policy, unofficially.**
>
> DET. NEWMAN: How do you know that?

OFC. HOPPER: Because **every time a black** would hit the store they would call me. On some occasions they would call me **for minorities** and it would turn out to be off-duty police officers or something, you know.

. . . . .

DET. NEWMAN: What did they say to you? How did that work? Describe the procedure.

OFC. HOPPER: Basically, they would **say**—they would give you limited information. They would say to you, "**We need** you down in Juniors." And, I said, "Well, who is it that you need me in **Juniors** for? What does the person look like?" "Oh, it's a black male" you know, **and that** was after dragging it out, "wearing blue jeans" or whatever it might be. **But**, honestly, John, a lot of times they wouldn't even give you that. It was just **through** experience. **Every time you went down there is was a black. Every time. Every time.**

DET. NEWMAN: Did you ever voice **your concerns** with [Dillard's manager] or any other store people?

OFC. HOPPER: I never said anything. I **talked** to other officers. I remember me and Bobby Holder talked about it **one time**, saying it's bullshit that **they call for every minority** that hits the damn **door**. Uhh, I can remember talking it over to, with Bob—

DET. NEWMAN: Bob Carey?

OFC. HOPPER: **Bob Carey and, uhh, his girlfriend, the female?**

DET. NEWMAN: Ronda?

OFC. HOPPER: Jones. **Ronda Jones. And,** uhh, uhh, **they, I guess understood that there was a problem there**, uhh, **although**, and I like Bob and Ronda and I don't think they did anything criminal **or illegal** or against department policy, I really don't, but **they were very much pro Dillard's because that was their main job. You know. They were**—so, **they seemed to defend that a little bit better than, than a lot of other officers. In fact, they** were the only two that—

DET. NEWMAN: Do you remember any **other** officers that you spoke with about the concerns you had?

OFC. HOPPER: Oh gosh. You know I can't think of any. I remember Bobby Holder. I remember that I talked to **Ronda** [Jones]. I think Bob [Carey], about it. I'm trying to think of some of **the other** officers that worked there. But, God, all you would have to do is go **back and** pull the list of officers working off-duty. **I mean, it would surprise me if you came in and somebody said, "I never saw anything like that in my life." I mean it really would. That would be the, that would be the shocker, because-**

. . . . .

> DET. NEWMAN: OK. But no one actually gave you a specific directive, but it was pretty obvious to you, based on your experience, that this was going on?
>
> OFC. HOPPER: **It was very obvious and, I want to be clear on this, so that there's no mistake. It was very obvious to me that they were, they were targeting out minorities, or any African-American that walked in there.** ...   .....
>
> OFC. HOPPER: ... So, was I ever **told of a** specific policy? No. **Was I aware of one? Absolutely.** There's **no doubt in my mind** that they did, 'cause it's just, statistically, it was just, just too unbelievable. It just doesn't happen that way.

(Emphasis added). A copy of the complete transcript of TPD Officer Hopper's sworn statement is attached to the original complaint as **"Exhibit C."**

15. On or about March 16, 1999, members of the TPD Internal Affairs Bureau took a sworn statement from TPD Officer Mary Gilmore, who had also worked extra-duty at Dillard's Westshore. Among other things, TPD Officer Gilmore's sworn testimony included the following:

> DET. NEWMAN: Was there ever a directive given to you by a store supervisor or a store policy relayed to you be either a store employee or a representative, that dictated that you watch any African-American customer in the store for possible illegal activity?
>
> OFC. GILMORE: There was never actually a policy given **but they would always call when an African-American would walk into the store.**
>    .....
>
> DET. NEWMAN: Did you ever discuss your concern with this store policy, and I'll use that word, policy? Did you ever discuss that concern you had with any other TPD law enforcement officers?
>
> OFC. GILMORE: Yes.
>
> DET. NEWMAN: Who?
>
> OFC. GILMORE: Ofc. Hopper, Ofc. Jones, Ofc. Carey, Bob Carey.
>
> DET. NEWMAN: What was they response to your concerns?
>
> OFC. GILMORE: Uhh, **Ofc. Hopper agreed** with me the fact **that it's wrong, absolutely wrong.** Umm, and eventually, **it's going to come back to**

5

Exhibit " A
Page 5 of 20

> bite the department because we're basically **harassing** these people while they're shopping. So, umm, <u>Ofc. Jones and Ofc. Carey,</u> **on the** other hand, worked there very closely with the management and they, I **don't want** to say they believe in that theory but <u>they didn't have as much grief about doing it</u> as myself and Ofc. Hopper.
>
> . . . . .
>
> DET. NEWMAN: Ofc. Gilmore, is there **anything** else you think I need to be aware of?
>
> OFC. GILMORE: Uhh, no, only, **I quit working there, basically, because I didn't want to be the one to get in trouble** for, you know, doing police activity when really we didn't have any **basis to do** it, other than them asking us, "Well, we're paying you as an off duty **officer.** We want you to do this in our store." **I didn't feel right about that so, I quit working there.**

(Emphasis added). A copy of the complete transcript of TPD Officer Gilmore's sworn statement is attached to the original complaint as **"Exhibit D."**

16. On or about March 16, 1999, members of the TPD Internal Affairs Bureau took a sworn statement from TPD Sergeant George Seiler, who had also worked extra-duty at Dillard's Westshore. Among other things, TPD Sergeant Seiler's sworn testimony confirmed that it was "obvious" to him that Dillard's Westshore engaged in a practice of directing law enforcement officers "to pay close attention to any Afro-Americans that enter the store." A copy of the complete transcript of TPD Sergeant Seiler's sworn statement is attached to the original complaint as **"Exhibit E."**

17. On or about March 16, 1999, members of the TPD Internal Affairs Bureau took a sworn statement from TPD Officer David Goodman, who had also worked extra-duty at Dillard's Westshore. Among other things, TPD Officer Goodman's sworn testimony confirmed that it was "obvious" to him that Dillard's Westshore engaged in a practice of directing law enforcement officers "keep an eye on suspicious people and those people are usually, disproportionately, Afro-Americans as compared to another group". A copy of the complete transcript of TPD Officer Goodman's sworn statement is attached to the original complaint as **"Exhibit F."**



18. On or about March 16, 1999, members of the TPD Internal Affairs Bureau took a sworn statement from TPD Officer Enrique Lastra, who had also worked extra-duty at Dillard's Westshore. Among other things, TPD Officer Lastra's sworn testimony was that about 4 out of 5 calls he received at Dillard's Westshore was to observe African-Americans. A copy of the complete transcript of TPD Officer Lastra's sworn statement is attached to the original complaint as **"Exhibit G."**

19. On or about March 17, 1999, members of the TPD Internal Affairs Bureau took a sworn statement from TPD Sergeant Bobby Holder, who had also worked extra-duty at Dillard's Westshore. Among other things, TPD Sergeant Holder's sworn testimony confirmed that Dillard's Westshore was directing him to watch all African-Americans who entered the store, and as a result, he stopped working there. A copy of the complete transcript of TPD Sergeant Holder's sworn statement is attached to the original complaint as **"Exhibit H."**

20. On or about March 17, 1999, members of the TPD Internal Affairs Bureau took a sworn statement from TPD Officer David Torres, who had also worked extra-duty at Dillard's Westshore. Among other things, TPD Officer Torres's sworn testimony confirmed he noticed that Dillard's Westshore called him "in a disproportionate amount on Afro-Americans compared to other customers in the store" and that "Most of the time, they are ... Afro-American. Black females." A copy of the complete transcript of TPD Officer Torres' sworn statement is attached to the original complaint as **"Exhibit I."**

21. On or about March 17, 1999, members of the TPD Internal Affairs Bureau took a sworn statement from TPD Officer Ronda Jones, who had also worked extra-duty at Dillard's Westshore. Among other things, TPD Officer Jones described herself as the TPD officer that "run[s] the job" at Dillard's Westshore and said that she is "like the liason person." TPD Officer Jones also stated that when she first began working at Dillard's Westshore, other TPD officers may have told her something about discriminatory practices at Dillard's Westshore, such as "...

7

they only called me on black people and it got old." However, TPD Officer Jones denied that Dillard's Westshore had a directive or policy dictating that law enforcement officers watch all African American customers for illegal activity. Rather, TPD Officer Jones stated that "There is maybe two employees that might call on just black people, mostly just black females." When asked whether she had been called a disproportionate amount of times for African American customers, TPD Officer Jones said:

> No. **There is, probably, a majority of black females that I watch over everybody else, but they don't call me more so. It's just the way they're acting and <u>the way they</u> [i.e., African American females] <u>will run their mouth and stuff</u> when they get to the department.**

(Emphasis added). A copy of the complete transcript of TPD Officer Jones's sworn statement is attached to the original complaint as **"Exhibit J."**

22. On or about April 13, 1999, members of the TPD Internal Affairs Bureau took a sworn statement from TPD Master Patrol Officer Robert Carey, who had also worked extra-duty at Dillard's Westshore. Among other things, TPD Officer Carey testified that he began working there in 1992 and worked there pretty regularly "since the beginning of the job". Like TPD Officer Jones, TPD Officer Carey generally denied that there were any discriminatory practices at Dillard's Westshore. A copy of the transcript of TPD Officer Carey's sworn statement is attached to the original complaint as **"Exhibit K."**

23. On or about April 28, 1999, TPD's in-house attorney issued a memorandum to Assistant TPD Chief W.A. Sawyer and TPD Chief B.R. Holder concerning IAB Case No. 99A-107, together with a binder of the sworn statements and other evidence compiled by the internal affairs investigation. A copy of that memorandum is attached to the original complaint as **"Exhibit L."**

24. Among other things, the April 28, 1999 memorandum concluded that "while the Dillards clerks may be engaging in questionable targeting practices, TPD officers are clearly not

participating in any race based targeting." (Emphasis in original). As such, TPD's in-house attorney recommended that "This inquiry should be closed as no violation." (Emphasis in original).

25. In concluding that "TPD officers are clearly **not** participating in any race based targeting", TPD's in-house attorney disregarded evidence generated in IAB Case No. 99A-107, including but not limited to the above-quoted sworn testimony of TPD Officers Hopper and Gilmore, revealing that TPD Officers Jones and/or Carey understood there were discriminatory "racial profiling" practices at Dillard's Westshore and defended and participated in those practices.

26. Pursuant to the April 28, 1999 memorandum and the subsequent approval thereof, the City ratified and/or adopted such discriminatory racial profiling practices, and/or revealed a practice, policy, or custom to condone, or acquiesce in, or act with deliberate indifference to, such discriminatory racial profiling practices.

27 Following the conclusion of TPD Internal Affairs Bureau's investigation in IAB Case No. 99A-107, the City took no remedial or corrective action against Dillard's Westshore, TPD Officer Jones, TPD Officer Carey, or any other TPD officers, nor did the City instruct, train, or supervise them in a manner to discourage or stop them from engaging in such discriminatory racial profiling practices against African American customers of Dillard's Westshore.

28 On or about September 7, 1999, Rev. and Mrs. Malone were visiting Tampa to participate in the activities of the National Baptist Convention being held there.

29. On or about September 7, 1999, TPD Officers Jones and Carey were working an extra-duty assignment at Dillard's Westshore.


Exhibit " A "
Page 9 of 20

30. At all material times, TPD Officers Jones and Carey were employed by the City and acting within the scope of their employment, in their official capacities as police officers, and as agents and instrumentalities of the City.

31. Sometime during the afternoon of September 7, 1999, Mrs. Malone was shopping at Dillard's Westshore and was conducting herself in a lawful manner.

32. At that time and place, a Dillard's Westshore employee, Ms. Lucia Ranieri, claimed that she saw Mrs. Malone place an unidentified item in her bag but could not see what the item was.

33. At that time and place, Ms. Ranieri reported this to the Dillard's Westshore Assistant Store Manager, Jane Fannin, and Ms. Fannin called TPD Officer Jones to the area where Mrs. Malone was browsing.

34. At that time and place, in Ms. Fannin's presence, Ms. Ranieri told TPD Officer Jones that she had seen Mrs. Malone put something in a bag, but she was not sure what it was.

35. At that time and place, Ms. Fannin instructed TPD Officer Jones to watch Mrs. Malone.

36. At that time and place, contrary to Ms. Fannin's instructions to merely watch Mrs. Malone, TPD Officer Jones instead proceeded to stop and detain Mrs. Malone without any unlawful activity by Mrs. Malone and after Mrs. Malone had made several purchases within Dillard's Westshore.

37. At that time and place, TPD Officer Jones also falsely accused Mrs. Malone of shoplifting, handcuffed her, placed her under arrest, seized her belongings, grabbed her, and led her through the store to an upstairs room.

38. TPD Officer Carey observed Mrs. Malone's detention and arrest.

39. On or about September 20, 1999, members of the TPD Internal Affairs Bureau took a sworn statement from Officer Carey. Officer Carey described what he saw as follows:

>OFC CAREY: Yeah. When I approached. And she [Officer Jones] was already engaged in conversation with her [Mrs. Malone]. And, uhh, she requested her to go up to the, the office with you know, uhh with Ronda [TPD Officer Jones]. Ronda requested Mrs. Malone to, you know, accompany her up to the office.
>
>DET WATKINS: Did she explain to her why?
>
>OFC CAREY: When I was there she, she [TPD Officer Jones] eventually explained that somebody had witnessed her [Mrs. Malone] put something in her bag. And when she [TPD Officer Jones] asked her to go to the office Mrs. Malone became nervous, what I would consider to be nervous, and excited, and she was kind of questioning why. And, uhh, Mrs. Malone kind of, uhh, backed away from her and kind of stepped backwards a little bit and, at that point, uhh Ronda [TPD Officer Jones] reached out and took hold of her arm, took the packages that were in her hand, because she had two bags in her hand, two Dillard's bags and then she had, uhh, a purse that was on a strap over her shoulder and, uhh, she kind of took control of the bags and pulled the bags away from her and handed me the bags, and then she reached down and got her handcuffs and told her that was under arrest. And she handcuffed her and then, uhh, began to escort her to the security office, which is upstairs.

A copy of the complete transcript of TPD Officer Carey's sworn statement is attached to the original complaint as **"Exhibit M"**.

40. At that time and place, TPD Officer Carey joined TPD Officer Jones, and they frisked Mrs. Malone, searched her personal belongings, and questioned her.

41. Throughout the entire incident, Mrs. Malone steadfastly maintained that she had done nothing wrong, and her requests to call her husband by telephone were denied by TPD Officers Jones and Carey. In addition, TPD Officer Jones threatened Mrs. Jones with additional criminal charges if she failed to be quiet.

42. Even after TPD Officers Jones and Carey confirmed that all merchandise in Mrs. Malone's possession matched her receipts, they nonetheless continued to keep her handcuffed, and photographed her.

43. TPD Officers Jones and Carey subsequently placed Mrs. Malone's photograph in a book of known shoplifters and trespassers maintained at Dillard's Westshore.

Exhibit " A "
Page 11 of 20

11

44. TPD Officers Jones and/or Carey subsequently issued a written TPD trespass warning to Mrs. Malone and told her that she was prohibited from entering any Dillard's stores in the future. A copy of the trespass warning is attached to the original complaint as **"Exhibit N"**. TPD Officers Jones and Carey then un-handcuffed and "un-arrested" Mrs. Malone, released her, and directed her to immediately leave the store.

45. Even though it was a rainy day and Mrs. Malone had to walk a few blocks to get back to her hotel, TPD Officers Jones and Carey also seized from Mrs. Malone's possession a clear plastic dress bag that a Dillard's sales clerk had previously given her to use as a rain poncho, and they did not return it to her.

46. As a result of the foregoing, Mrs. Malone has suffered bodily injury, pain, suffering, severe emotional distress, disability, mental anguish, loss of capacity for enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and/or aggravation of a pre-existing condition. The losses are either permanent or continuing and Mrs. Malone will suffer the losses in the future.

47. On October 16, 2000, the Malones' undersigned attorneys provided the City with a notice of claim in accordance with Section 768.28, Florida Statutes. A copy of the notice is attached to the original complaint as **"Exhibit O"**.

48. All conditions precedent to maintaining this action have occurred, been performed, been satisfied, or been waived.

### COUNT I: INTENTIONAL VIOLATION OF 42 USC §1983

49. This is an action by Mrs. Malone against the City for intentional violation of 42 USC §1983.

50. Mrs. Malone restates each and every allegation contained in Paragraphs 1 through 48.

Exhibit " A "
Page 12 of 20

51. At all material times, the City was aware that its employees, including TPD Officers Jones and Carey, were engaging in discriminatory "racial profiling" practices, which included targeting, stalking, detaining, expelling, and/or otherwise harassing African American customers while performing extra-duty assignments at Dillard's Westshore.

52. In the course of engaging in such discriminatory racial profiling practices, the City and/or its employees interfered with and violated Mrs. Malone's civil rights by, among other things, stopping, detaining, handcuffing, arresting, frisking and searching her, without probable cause to do so.

53. In the course of engaging in such discriminatory racial profiling practices, the City and/or its employees unlawfully deprived Mrs. Malone of rights, privileges, and immunities secured to her under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitutions, and under the Constitution of the State of Florida, and the laws thereof and of the United States, including but not limited to:

(a) Mrs. Malone's right to privacy;

(b) Mrs. Malone's right to be free from racial discrimination;

(c) Mrs. Malone's right to be free from unreasonable searches and to be secure in her person;

(d) Mrs. Malone's right to not be subjected to excessive force;

(e) Mrs. Malone's right to be free from unlawful arrest and confinement;

(f) Mrs. Malone's right of free speech; and

(g) Mrs. Malone's right to due process of law.

54. The City is liable for the foregoing acts of its employees.

55. At all material times, the City and its employees, TPD Officers Jones and Carey, acted under color of law, including the statutes, ordinances, charter, customs, usages, and laws of the City and of the State of Florida, and under color of their official positions and capabilities.

56. As a direct and proximate consequence of the foregoing, Mrs. Malone has suffered damages.

57. Pursuant to 42 USC §1988, if Mrs. Malone is the prevailing party in this action, she is entitled to recover her reasonable attorney's fees and costs from the City.

**WHEREFORE,** Mrs. Malone demands judgment against the City for damages, interest, attorney's fees and costs, and such other relief as the Court deems appropriate.

### COUNT II: VIOLATION OF 42 USC §1983 WITH DELIBERATE INDIFFERENCE

58. This is an action by Mrs. Malone against the City for violation of 42 USC §1983 with deliberate indifference.

59. Mrs. Malone restates each and every allegation contained in Paragraphs 1 through 48.

60. At all material times, the City acted with deliberate indifference to the fact that its employees, including TPD Officers Jones and Carey, were engaging in discriminatory "racial profiling" practices, which included targeting, stalking, detaining, expelling, and/or otherwise harassing African American customers while performing extra-duty assignments at Dillard's Westshore.

61. In the course of engaging in such discriminatory racial profiling practices, the City and/or its employees interfered with and violated Mrs. Malone's civil rights by, among other things, stopping, detaining, handcuffing, arresting, frisking and searching her, without probable cause to do so.

62. In the course of engaging in such discriminatory racial profiling practices, the City and/or its employees unlawfully deprived Mrs. Malone of rights, privileges, and immunities secured to her under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United

States Constitutions, and under the Constitution of the State of Florida, and the laws thereof and of the United States, including but not limited to:

(a) Mrs. Malone's right to privacy;

(b) Mrs. Malone's right to be free from racial discrimination;

(c) Mrs. Malone's right to be free from unreasonable searches and to be secure in her person;

(d) Mrs. Malone's right to not be subjected to excessive force;

(e) Mrs. Malone's right to be free from unlawful arrest and confinement;

(f) Mrs. Malone's right of free speech; and

(g) Mrs. Malone's right to due process of law.

63. At all material times, the City and its employees, TPD Officers Jones and Carey, acted under color of law, including the statutes, ordinances, charter, customs, usages, and laws of the City and of the State of Florida, and under color of their official positions and capabilities.

64. As a direct and proximate consequence of the foregoing, Mrs. Malone has suffered damages.

65. Pursuant to 42 USC §1988, if Mrs. Malone is the prevailing party in this action, she is entitled to recover her reasonable attorney's fees and costs from the City.

**WHEREFORE,** Mrs. Malone demands judgment against the City for damages, interest, attorney's fees and costs, and such other relief as the Court deems appropriate.

### COUNT III: NEGLIGENT VIOLATION OF 42 USC §1983

66. This is an action by Mrs. Malone against the City for negligent violation of 42 USC §1983.

67. Mrs. Malone restates each and every allegation contained in Paragraphs 1 through 48.

Exhibit "A"
Page 15 of 20

68. At all material times, the City reasonably should have known that its employees, including TPD Officers Jones and Carey, were engaging in discriminatory "racial profiling" practices, which included targeting, stalking, detaining, and/or otherwise harassing African American customers while performing extra-duty assignments at Dillard's Westshore.

69. In the course of participating in such discriminatory racial profiling practices, the City and/or its employees negligently interfered with and violated Mrs. Malone's civil rights by, among other things, stopping, detaining, handcuffing, arresting, frisking and searching her, without probable cause to do so.

70. In the course of participating in such discriminatory racial profiling practices, the City and/or its employees negligently and unlawfully deprived Mrs. Malone of rights, privileges, and immunities secured to her under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitutions, and under the Constitution of the State of Florida, and the laws thereof and of the United States, including but not limited to:

(a) Mrs. Malone's right to privacy;

(b) Mrs. Malone's right to be free from racial discrimination;

(c) Mrs. Malone's right to be free from unreasonable searches and to be secure in her person;

(d) Mrs. Malone's right to not be subjected to excessive force;

(e) Mrs. Malone's right to be free from unlawful arrest and confinement;

(f) Mrs. Malone's right of free speech; and

(g) Mrs. Malone's right to due process of law.

71. At all material times, the City and its employees, TPD Officers Jones and Carey, acted under color of law, including the statutes, ordinances, charter, customs, usages, and laws of the City and of the State of Florida, and under color of their official positions and capabilities.

72. As a direct and proximate consequence of the foregoing, Mrs. Malone has suffered damages.

73. Pursuant to 42 USC §1988, if Mrs. Malone is the prevailing party in this action, she is entitled to recover her reasonable attorney's fees and costs from the City.

**WHEREFORE,** Mrs. Malone demands judgment against the City for damages, interest, attorney's fees and costs, and such other relief as the Court deems appropriate.

### COUNT IV: FALSE IMPRISONMENT

74. This is an action by Mrs. Malone against the City for false imprisonment.

75. Mrs. Malone restates each and every allegation contained in Paragraphs 1 through 48.

76. By their above-described conduct, the City's employees intentionally caused Mrs. Malone to be completely restrained and detained against her will.

77. The detention was without probable cause, and was unreasonable and unwarranted under the circumstances.

78. As a direct and proximate consequence of the foregoing, Mrs. Malone has suffered damages.

**WHEREFORE,** Mrs. Malone demands judgment against the City for damages, interest, costs, and such other relief as the Court may deem appropriate.

### COUNT V: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

79. This is an action by Mrs. Malone against the City for intentional infliction of emotional distress.

80. Mrs. Malone restates each and every allegation contained in paragraphs 1 through 48.

81. The above-described conduct of the City's employees was intentional and outrageous, and includes but is not limited to:

(a) making Mrs. Malone the target of discriminatory racial profiling practices;

(b) stopping, detaining, arresting, handcuffing, frisking and searching Mrs. Malone, without probable cause;

(c) threatening Mrs. Malone with additional criminal charges if she failed to be quiet;

(d) parading Mrs. Malone in handcuffs through the department store in plain view and thereby publicly subjecting her to extreme embarrassment and humiliation;

(e) handcuffing Mrs. Malone with such excessive force and pressure that her wrists were bruised;

(f) speaking to Mrs. Malone in an arrogant, disrespectful, condescending, and harassing manner;

(g) refusing to allow Mrs. Malone to call her husband by telephone; and

(h) after having confirmed that Mrs. Malone was innocent of any crimes, continuing to detain her and keep her handcuffed, photographing her, placing her photograph in a book of known shoplifters and trespassers, banning her from all Dillard's stores, and seizing and not returning her rain protection despite inclement weather.

82. The above-described conduct of the City's employees caused Mrs. Malone severe emotional distress.

83. As a direct and proximate consequence, Mrs. Malone has suffered damages.

**WHEREFORE,** Mrs. Malone demands judgment against the City for damages, interest, costs, and such other relief as the Court may deem appropriate.

## COUNT VI: BATTERY

84. This is an action by Mrs. Malone against the City for battery.

85. Mrs. Malone restates each and every allegation contained in Paragraphs 1 through 48.

86. By the above-described conduct, the City's employees intentionally touched and otherwise contacted Mrs. Malone in a harmful and offensive manner by among other things, grabbing Mrs. Malone, handcuffing her, and frisking her, without probable cause.

87. As a direct and proximate consequence of the foregoing, Mrs. Malone suffered damages.

**WHEREFORE,** Mrs. Malone demands judgment against the City for damages, interest, costs, and such other relief as the Court may deem appropriate.

## COUNT VII: ASSAULT

88. This is an action by Mrs. Malone against the City for assault.

89. Mrs. Malone restates each and every allegation contained in Paragraphs 1 through 48.

90. By the above-described conduct, the City's employees made an intentional, unlawful offer of corporal injury to Mrs. Malone by force, or force unlawfully directed toward Mrs. Malone's person.

91. The above-described conduct of the City's employees placed Mrs. Malone in fear of imminent peril.

92. The City's employees had the apparent present ability to effectuate the threatened or attempted action.

93. As a direct and proximate consequence of the foregoing, Mrs. Malone suffered damages.

**WHEREFORE,** Mrs. Malone demands judgment against the City for damages, interest, costs, and such other relief as the Court may deem appropriate.

## COUNT VIII: LOSS OF CONSORTIUM

94. This is an action by Rev. Malone against the City for loss of consortium.

95. Rev. Malone restates each and every allegation contained in Paragraphs 1 through 48.

96. As a direct and proximate consequence of the foregoing, Rev. Malone has been deprived of his wife's society, services, care, comfort, companionship and consortium, as well as

19

her assistance in and about their home. The losses are either permanent or are continuing in nature, and Rev. Malone will suffer the losses and impairment in the future.

**WHEREFORE,** Rev. Malone demands judgment against the City for damages, interest, costs, and such other relief as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of any and all issues triable of right by a jury.

Respectfully submitted,

de la PARTE & GILBERT, P.A.

*/s/ David M. Caldevilla*

David M. Caldevilla
Florida Bar No. 654248
P. O. Box 2350
Tampa, FL 33601-2350
Telephone: (813) 229-2775
**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served by Facsimile and U.S. Mail to Kirby Rainsberger, Assistant City Attorney, 411 N. Franklin Street, Tampa, Florida 33602; on this 10th day of July, 2002.

*/s/ David M. Caldevilla*

David M. Caldevilla

Exhibit "A"
Page 20 of 20

20